

**MARASHLIAN & DONAHUE**, PLLC
THE *COMMLAW* GROUP

A NEW KIND OF LAW FIRM

March 30, 2023

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR 31 2023

RECEIVED

**VIA HAND DELIVERY**

Mark J. Langer, Clerk
Clerk's Office
United States Court of Appeals
District of Columbia Circuit
333 Constitution Avenue, NW
Room 5205
Washington, DC 20001

  **Re:** *In re Tanana Chiefs Conference, Petitioner*
     *PETITION FOR ISSUANCE OF WRIT OF MANDAMUS*

Dear Mr. Langer,

  On behalf of Tanana Chiefs Conference, please find enclosed for filing an original and three copies of the Petition for Issuance of Writ of Mandamus. Also enclosed is a check for $500, made payable to the Clerk, US Court of Appeals. An additional copy of this cover letter has been submitted for stamp and return.

  Should there be any questions regarding this matter, kindly contact the undersigned.

       Respectfully submitted,

       Allison D. Rule

Enclosures (3)

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **In re Tanana Chiefs Conference,** | : | **PETITION FOR ISSUANCE OF** |
| **Petitioner** | : | **WRIT OF MANDAMUS** |

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## Parties and Amici

The only party before this Court in this case is Tanana Chiefs Conference. This Petition has also been served on the Federal Communications Commission. This matter did not come before the district court. This Court has original jurisdiction over this Petition pursuant to the All Writs Act, 28 U.S.C. § 1651. *See also* Fed. R. App. P. 21.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner, Tanana Chiefs Conference, is a non-profit, intertribal consortium. As such, Petitioner has no parent company, and no publicly-held company has a 10% or greater ownership interest in Tanana Chiefs Conference.

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................................... ii

PETITION FOR WRIT OF MANDAMUS................................................................................. 1

I.    Relief Sought ..................................................................................................................... 1

II.   Issues Presented................................................................................................................. 3

III.  Facts Necessary to Understand the Issues Presented by the Petition................................ 5

IV.   Why the Writ Should Issue ............................................................................................. 11

   A.   The FCC Has a Duty To Provide Prompt Review of Appeals Concerning Universal

   Service Fund Administration............................................................................................. 11

   B.   The FCC's Delay in Acting on Petitioner's Application for Review is Unreasonable,

   and Therefore this Court Has a Duty to Compel the FCC to Act....................................... 13

   C.   The FCC's Unreasonable Delay is so Egregious as to Warrant Mandamus Under the

   All Writs Act. .................................................................................................................... 14

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

All Writs Act, 28 U.S.C. § 1651(a) .................................................................... 1

*Amer. Broadcasting Co., Inc.("ABC") v. FCC*, 191 F.2d 492, 500 (D.C. Cir. 1951) ................. 23

*Cutler v. Hayes,* 818 F.2d 879, 897 (D.C. Cir. 1987) ........................................ 19, 20

*Marinoff v. Dep't of Health, Educ. & Welfare*, 595 F.2d 1208 (2d Cir. 1979) ........................ 14

*FCC v. ITT World Commc'ns*, 466 U.S. 463 (1984) ................................................ 2

*In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) ......... 2, 13, 15

*In re California Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001) ................................ 14

*In re Core Commc'ns, Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008) .................................... 16

*LaBonne v. Heckler*, 574 F.Supp. 1016 (D. Minn. 1983) .............................................. 16

*Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 115 (D.D.C. 2005) .................................. 18, 19

*Marinoff v. Dep't of Health, Ed. & Welfare*, 456 F. Supp. 1120, 1121 (S.D.N.Y. 1978) ............. 14

*MCI Telecomm. Corp. v. FCC*, 627 F.2d 332, 346 (D.C. Cir. 1980) ................................. 2, 13, 21

*Mountain States Legal Foundation v. Andrus*, 499 F. Supp. 383, 397 (D. Wyoming 1980) ....... 23

*Nader v. FCC*, 520 F.2d 182 (D.C. Cir. 1975) ........................................................ 2

*Razaq v. Poulos*, 2007 WL 61884 (N.D. Cal. Jan. 8, 2007) ............................................ 18

*Telecommc'ns Research & Action Ctr. v. FCC ("TRAC")*, 750 F.2d (D.C. Cir. 1984) ......... passim

**Statutes**

28 U.S.C. § 1651(a) .................................................................................. 1

28 U.S.C. § 2342(1) .................................................................................. 2

47 C.F.R. § 54.601 .................................................................................. 7

47 C.F.R. § 54.602 .................................................................................. 7

47 C.F.R. § 54.623 ................................................................................................ 7, 8

47 C.F.R. § 54.702 ........................................................................................... 6, 7, 12

47 C.F.R. § 54.724(b) ............................................................................................. 16

47 U.S.C. § 151 ...................................................................................................... 20

47 U.S.C. § 254 ................................................................................................ passim

47 U.S.C. § 402(a) .................................................................................................... 2

5 U.S.C. § 555(b) ............................................................................................. 3, 5, 12

5 U.S.C. § 706(1) ...................................................................................................... 2

**Other Authorities**

*Changes to the Board of Directors of the National Exchange Carrier Association, Inc., Federal*
    *State Joint Board on Universal Service*, Third Report and Order in CC Docket No. 97-21,
    Fourth Order on Reconsideration in CC Docket No. 97-21, and Eighth Order on
    Reconsideration in CC Docket No. 96-45, FCC 98-306, 13 FCC Rcd. 25058, 25091-96 (1998)
    ............................................................................................................................ passim

*In the Matter of Promoting Telehealth in Rural America*, Report and Order in WC Docket No.
    17-310, FCC 18-82 (June 25, 2018) ................................................................. 22, 23

Letter from FCC Chairman Ajit V. Pai to Senator Steve Daines (Sept. 13, 2017) ....................... 22

*In the Matter of Promoting Telehealth in Rural America, Further Notice of Proposed*
    *Rulemaking*, FCC 22-15, WC Docket No. 17-310 (Feb. 22, 2022)         27

# PETITION FOR WRIT OF MANDAMUS

Tanana Chiefs Conference ("TCC" or "Petitioner") respectfully submits this Petition for Issuance of Writ of Mandamus ("Petition"), requesting that this Court compel the Federal Communications Commission (the "Commission," "FCC," or "Agency") to take action it is unreasonably withholding.

## I.     Relief Sought

After trying for nearly three years to obtain a resolution to its pending request for relief, Petitioner has been unable to effectuate a decision by the Commission. The FCC and its subordinate Wireline Competition Bureau ("WCB" or "Bureau") have responded to Petitioner's requests for expedited action of its administrative appeal with virtual silence, leaving Petitioner without an avenue for relief. This agency inaction has created consequences for TCC tantamount to a denial of relief, *i.e.*, a severe delay in funding for telemedicine services in rural clinics served by TCC. This has increased the risk that TCC may be forced to deny critical health care services for indigent Alaska Natives who are wholly dependent on clinics that are part of Petitioner's consortium.

With no other alternative available, Petitioner respectfully requests that this Court issue a writ of mandamus[1] compelling the FCC to act on Petitioner's pending

---

[1] This Court has authority to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions

request for relief within 90 days. In the alternative, TCC requests that this Court order the FCC to develop a schedule for resolution of the pending matter within a reasonable time,[2] including its rationale for allowing more than 90 days to elapse since Petitioner requested relief, and that it keep the Court informed of its progress. In the meantime, Petitioner submits that the Court need not only protect its *prospective* jurisdiction over appeals of final FCC orders[3] by mandating that the agency issue a judicially reviewable decision,[4] but also that the Court *retain* jurisdiction over this matter until the FCC puts the matter now pending before it to rest.[5]

---

and agreeable to the usages and principles of law."). Congress has instructed courts to "compel agency action unlawfully or unreasonably delayed." 5 U.S.C. § 706(1).

[2] *See, e.g., MCI Telecomm. Corp. v. FCC,* 627 F.2d 332, 346 (D.C. Cir. 1980) (remanding to the FCC to recommend a feasible schedule for resolution of issues before it while retaining jurisdiction "'to ensure compliance'" with the Court's decision) (quoting *Nader v. FCC,* 520 F.2d 182 (D.C. Cir. 1975)).

[3] The Court of Appeals has exclusive jurisdiction to review final FCC orders. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *FCC v. ITT World Commc'ns,* 466 U.S. 463 (1984); *Telecommc'ns Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 75 (D.C. Cir. 1984) ("[T]he statutory commitment of review of FCC action to the Court of Appeals, read in conjunction with the All Writs Act, affords this court jurisdiction over claims of unreasonable Commission delay.") (*internal citation omitted*).

[4] *See TRAC,* 750 F.2d at 76; *In re American Rivers & Idaho Rivers United,* 372 F.3d 413, 419 (D.C. Cir. 2004) ("[T]he primary purposes of the writ in circumstances like these is to ensure that an agency does not thwart [the court's] jurisdiction by withholding a reviewable decision.").

[5] *See MCI,* 627 F.2d at 346.

## II.    Issues Presented

The FCC's lassitude in acting on Petitioner's Application for Review, filed more than three years ago on February 14, 2020,[6] of an Order by the Bureau released on January 15, 2020 ("WCB Order")[7] - wherein it denied Petitioner's request that the WCB Order be reversed - is an example of the Commission's unwillingness to resolve a critical matter before it within a reasonable time period, in violation of Section 555(b) of the Administrative Procedure Act ("APA"), which establishes a clear duty of the Agency to act on the matters Petitioner has brought before it and to do so "within a reasonable time."[8]

The WCB Order of which TCC seeks reversal concerns the Bureau's denial of TCC's Request for Review of a decision by the Universal Service Fund ("USF" or "Fund") administrator, the Universal Service Administrative Company ("USAC"), submitted on April 28, 2017, denying critical funding to which TCC is

---

[6] *See In the Matter or Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Company, Application for Review,* WC Docket 02-60 (Feb. 14, 2020), a copy of which is attached hereto as **Exhibit A.**

[7] *In the Matter of Request for Review and Waiver of a Decision by the Universal Service Administrator by Tanana Chiefs Conference, Fairbanks, AK, Order,* DA 20-64, WC Docket 02-60 (Jan. 15, 2020), a copy of which is attached hereto as **Exhibit B.**

[8] 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.").

entitled in order to fund telehealth services for rural clinics it serves.[9] The Bureau

delayed issuing the WCB Order for nearly three years after Petitioner filed its

Request for Review, and then only after this Court ordered the Bureau to respond to

a previous Petition for Writ of Mandamus ("Mandamus Petition") filed by TCC.[10]

Despite numerous efforts by TCC to obtain a final decision from the Commission,

the FCC's unreasonable delays in responding to both the Request for Review and

pending Application for Review, as well as numerous other communications by

Petitioner,[11] have effectively denied critical telemedicine funding to TCC since it

first filed its Request for Review nearly six years ago, in April 2017.

The Commission's inaction in the instant matter illustrates its failure to

undertake the duty Congress assigned to it in Section 254 of the Telecommunications

Act of 1996 (the "Act").[12] Congress statutorily mandated that the FCC direct the

administration of the universal service mechanisms and make policies to deploy and

enhance access to telecommunications and information services, particularly to low-

---

[9] *See In the Matter or Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Company*, Request for Review and Waiver, WC Docket 02-60 (Apr. 28, 2017), a copy of which is attached hereto as Exhibit A to **Exhibit A.**

[10] *See In re Tanana Chiefs Conference, Petitioner, Order*, No. 19-1232, United States Circuit Court of Appeals for the District of Columbia Circuit (Jan. 8, 2020), a copy of which is attached hereto as Exhibit I to **EXHIBIT A.**

[11] *See e.g.*, Exhibits D-G to Request for Review and **EXHIBITS F-I** attached hereto.

[12] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended) at 47 U.S.C. § 254(a)(1), (b)(3).

income consumers and those in rural, insular, and high cost areas.[13] Thus, two issues raised by this Petition are whether the FCC has abdicated its Congressionally mandated duty by: (a) failing to carry out the most basic oversight function, expeditious *de novo* review of actions of USAC; and (b) hampering the funding for the provision of vital telemedicine services to rural clinics served by TCC.[14] The FCC should timely resolve these *particular* issues.

Once established that the Agency has a clear duty under the Act to act on the matters Petitioner has brought before it, and to do so "within a reasonable time" under the APA,[15] this Petition raises the issue of whether the FCC's delay in resolving the dispute in this case is unreasonable, a finding which sets in motion this Court's responsibility to take action to spur the Agency to respond. Further, this Petition raises the issue whether, in light of the guiding considerations and principles employed by this Court, the Agency's delay is so egregious as to warrant mandamus.

## III.  Facts Necessary to Understand the Issues Presented by the Petition

The factual background which led TCC to seek relief from the Commission is detailed in its Application for Review, which is incorporated herein by reference,[16]

---

[13] 47 U.S.C. § 254(a)(2).
[14] See 5 U.S.C. § 555(b).
[15] *Id.*
[16] *See* **EXHIBIT A** at 2-5 (*citations omitted*).

as well subsequent filings delineated below. For ease of reference, TCC provides a brief summary of those facts.

TCC is a Fairbanks, Alaska-based non-profit intertribal consortium that provides health and social services to forty-two Alaskan communities, including thirty-seven federally recognized tribes in Alaska's vast interior region. TCC, through its health care providers ("HCPs") provides health care services to approximately 15,000 Alaskan Natives.[17]

The urgent underlying matter concerns rural health care funding for three clinics served by TCC, located in the remote villages of Huslia, Hughes, and Chalkyisik ("HHC Clinics"). These are the sole health care facilities in the respective villages.[18]  Because these villages are accessible only by air or water, the HHC Clinics are dependent on telemedicine services that TCC provides. These services include electronic health record access, videoconferencing, computerized physician order entry, and dispensing medicines over long distances.[19]

TCC cannot provide these services without funding from the Rural Health Care ("RHC") program, part of the Universal Service program, administered by USAC.[20]  The RHC program provides support for rural HCPs and consortia like TCC

---

[17] *Id.* at 2.

[18] *Id.*

[19] *Id.*

[20] USAC is responsible for the day-to-day management of the Universal Service Fund but has no authority to interpret FCC rules or make policy. *See* 47 C.F.R. §

by enabling telecommunications carriers to provide services to the HCPs at greatly reduced rates.[21] USAC requires that eligible health care entities, such as TCC, file a Form 466 annually for each HCP it serves so that the RHC funds may be distributed to the designated telecommunications carrier, which in turn provides discounts to the subject HCPs.[22] In TCC's case, RHC subsidies cover nearly 98% of the overall monthly cost of providing telemedicine services.[23]

Every year since the inception of the RHC program, USAC's deadline for filing Forms 466 in order to receive funding has been June 30.[24] For several years, TCC timely submitted its Forms 466. In 2017, however, due to inadvertent ministerial errors, TCC missed the newly-imposed deadline for filing its Forms 466 for the HHC Clinics, and USAC refused to accept TCC's Forms 466 for the HHC

---

54.702(a), (c) (2010); *see also Changes to the Board of Directors of the National Exchange Carrier Association, Inc., Federal-State Joint Board on Universal Service*, Third Report and Order in CC Docket No. 97-21, Fourth Order on Reconsideration in CC Docket No. 97-21, and Eighth Order on Reconsideration in CC Docket No. 96-45, FCC 98-306, 13 FCC Rcd. 25058, 25091-96 (1998) (adopting specific rules for appeal of USAC decisions and delimiting USAC's authority to purely administrative activities) ("*USAC Third Report & Order*").

[21] See 47 C.F.R. §§ 54.601, 54.602.

[22] *See* 47 C.F.R. §§ 54.623 (a), 54.675 (c)-(d).

[23] *See* **Exhibit A** at 3.

[24] *Id* at 4; *see also* Request for Review at 9, *citing* 47 C.F.R. § 54.675(c)(4), Form 466 Instructions and USAC's website; copies of which are attached to the Request for Review as *Exhibits Four* and *Five.*

Clinics, which resulted in a financial shortfall of $633,170.19 for funding year 2016 ("FY16").[25]

One month after USAC's decision, on April 28, 2017, TCC filed the Request for Review, appealing USAC's refusal to accept the subject Forms 466, or in the alternative, seeking waiver of two FCC rules that would require USAC to accept TCC's Forms 466 and provide the necessary funding for the HHC Clinics.[26] TCC representatives subsequently undertook several meetings and exchanged correspondence with WCB officials and other Commission administrators, providing additional information and citing FCC precedents that TCC hoped would help the Bureau expedite a decision in its favor.[27]

Despite TCC's multiple attempts to work with WCB, by October 2019, more than two and a half years had elapsed since TCC submitted the Request for Review with no indication of when WCB would release a decision.[28] In need of the funds to pay its provider, TCC had no choice but to file its Mandamus Petition with this Court. On January 8, 2020, this Court issued its Order, directing the FCC to file a

---

[25] *Id.* at 4-5 (*citations omitted*). The newly-imposed deadline was due to USAC's anticipation of an RHC funding shortfall. But, as delineated in the Request for Review at 9 and *Exhibit Six* thereto, USAC had more than enough funding in reserve - $35,280,855 - to cover the RHC funding shortfall.

[26] *Id.* at 4-5.

[27] *Id.* (*citations omitted*).

[28] *Id.* at 5.

response to TCC's Mandamus Petition within 30 days.[29]  The Bureau released the WCB Order on January 15, 2020.[30]

On February 14, 2020, TCC filed its Application for Review, wherein it explained in detail that the WCB Order should be reversed because:

1.  The WCB Order deviated from the Commission's established rural health care policy, resulting in an abuse of discretion;

2.  The WBC Order conflicted with established precedents by denying TCC's Request for Review, despite having granted such requests to similarly situated applicants, resulting in abuse of discretion;

3.  The WCB Order conflicted with a relevant statute and precedents by ignoring TCC's argument that strict application of the filing deadline would be contrary to the statutory requirements of Section 254 of the Communications Act, as well as TCC's public interest and other arguments, resulting in an abuse of discretion; and

4.  The WBC Order misstated important and material facts raised by TCC in its Request for Review, resulting in an abuse of discretion.[31]

On March 4, 2020, the Bureau releases a Public Notice, seeking comment on TCC's Application for Review ("TCC PN").[32] In response to the TCC PN, a total of 24 comments were filed in support of TCC's Application for Review, mainly from

---

[29] *Id.*
[30] *See* **EXHIBIT B.**
[31] **EXHIBIT A** at 7-24.
[32] *See Wireline Competition Bureau Seeks Comment on Tanana Chiefs Conference Application for Review, Public Notice,* DA 20-224, WC Docket No. 02-60 (Mar. 4, 2020), at copy of which is attached hereto as **EXHIBIT C.**

other tribal entities and/or rural health care providers; no opposition comments were filed.[33]

Nearly a year after the TCC PN comment period closed and with no response from the FCC, on February 2, 2021, TCC filed a Request for Expedited Action, asking to the FCC to expeditiously issue a decision on its Application for Review.[34] On the same day, TCC's counsel sent courtesy copies to FCC officials *via* email; one of whom responded, thanking counsel for the courtesy copy but expressing no indication that expedited action would be taken on the Application for Review.[35]

On March 10, 2023, counsel for TCC sent another email to FCC officials, again requesting expedited action on the Application for Review and stating that TCC would file another Petition for Writ of Mandamus with this Court if a decision is not promptly released.[36] The FCC responded with an email five days later, stating

---

[33] *See In the Matter of Request for Review and Waiver of a Decision by the Universal Service Administration by Tanana Chiefs Conference, Fairbanks Alaska, Tanana Chiefs Conference Reply Comments*, WC Docket No. 02-60 (Apr. 17, 2020) at 2, n.5 (*citations omitted*), a copy of which is attached hereto as **EXHIBIT D.** A sample of the submitted comments is attached hereto as **EXHIBIT E**

[34] *See Tanana Chiefs Conference: Urgent Request for Expedited Action Rural Health Care Support Mechanism: WC Docket No. 02-60 (Feb. 2, 2021)*, a copy of which is attached hereto as **EXHIBIT F.**

[35] *See* email from Ronald E. Quirk to Kris Anne Monteith, Chief, WCB and email from Kris Anne Monteith, both dated February 2, 2021, copies of which are attached hereto as **EXHIBIT G.**

[36] *See* email from Ronald E. Quirk to Alejandro Roark dated March 10, 2023, a copy of which is attached hereto as **EXHIBIT H.**

that they were "looking into this matter" but again expressing no indication that any action would be taken on TCC's pending Application for Review.[37]

TCC owes its telecommunications provider $633,116.81 for services provided during FY16 to the HHC Clinics. While that provider has not, as yet, called on TCC pay up, it could at any time require TCC to pay in full, with late payment penalties. Without the subject funding, TCC will likely have to divert funding needed to provide for provisions of health care services away from its patients and to its telecommunications provider.

In sum, the Agency's delay in acting on Petitioner's Application for Review leaves Petitioner in a state of uncertainty as to whether it will ever receive its FY16 RHC funding and hence whether TCC will be able to make the necessary payments to its telecommunication provider. The delay in deciding this matter in unacceptable.

## IV.    Why the Writ Should Issue

### A. The FCC Has a Duty To Provide Prompt Review of Appeals Concerning Universal Service Fund Administration

With Section 254 of the Act, Congress assigned to the FCC overarching responsibility to establish mechanisms to preserve and advance universal service.[38] The FCC delegated day-to-day ministerial functions to USAC, but strictly prohibited

---

[37] *See* email from Adam Copeland to Ronald E. Quirk dated March 15, 2023, a copy of which is attached hereto as **EXHIBIT I.**
[38] *See* 47 U.S.C. § 254(a).

USAC from engaging in policy-making.[39]  To maintain strict oversight over USAC, the FCC established procedures for review of USAC decisions. The FCC acknowledged that adequate oversight of the Fund administrator would require an *expedited* review process.  It emphasized that FCC "oversight would be strengthened by an appeals process that ensures that matters are brought promptly to the Commission."[40]

And, yet, this Petitioner has been deprived of a reviewable final FCC action on its Application for Review.  This Court must not allow the FCC to maintain a practice of tacit acceptance of a challenged USAC action when doing so tramples on the due process rights of the rightful recipients of RHC funding.[41]

There can be no doubt that in adopting Section 254, Congress assigned the FCC the paramount obligation to oversee universal service, and that the FCC should understand its "clear duty" to act promptly when presented with questions concerning USF administration.  In examining the degree of discretion given to the Agency by Section 254's mandate, this Court must also consider the APA's directive that agencies act within a reasonable time.[42]  As shown below, the FCC should be

---

[39] *See* 47 C.F.R. § 54.702(c).

[40] *See USAC Third Report and Order* at ¶ 66.

[41] *See TRAC*, 750 F.2d at 76 ("Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction.").

[42] *See* 5 U.S.C. § 555(b), cited in *American Rivers*, 372 F.3d at 418.

prepared to handle appeals of USAC decisions, and its failure to address even this one Application for Review violates the statutory "reasonable time" requirements.

### B. The FCC's Delay in Acting on Petitioner's Application for Review is Unreasonable, and Therefore this Court Has a Duty to Compel the FCC to Act

As discussed in a subsequent section, the delay in this instance is egregious enough to warrant a writ of mandamus to the FCC ordering it to act on TCC's Application for Review within 90 days. However, even if the Court finds that mandamus is not warranted, but does find that the delay is unreasonable, the Court has the authority, even the statutory mandate, to take other actions to "catalyze the FCC's proceedings."[43] The APA instructs that courts "shall compel agency action" where action has been "unlawfully withheld or unreasonably delayed."[44] This Court may act to preserve its own jurisdiction over appeals of final FCC orders where the FCC's delay makes appellate review impossible.[45]

Although the merits of this dispute are not before this Court in this Petition, the subject of the dispute is relevant insofar as it demonstrates the straightforward nature of the questions presented to the FCC. The fact that Petitioner's Application

---

[43] *MCI*, 627 F.2d at 343.

[44] 5 U.S.C. §§ 555(b), 706(1); *MCI Telecommc'ns Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980). Section 706(1) provides that "the reviewing court *shall . . .* compel action unlawfully withheld or unreasonably delayed." (emphasis added).

[45] *See American Rivers*, 372 F.3d at 417 (Court has jurisdiction to entertain petition for writ of mandamus to safeguard protective jurisdiction under statute to review agency decisions).

for Review is not complex, not to mention the numerous instances wherein the FCC granted relief to similarly situated applicants,[46] makes the FCC's inaction all the more unreasonable. Delay in this case has had the effect of a denial of Petitioner's Application for Review. With the passage of time, it is exigent that the FCC apply its own rules and conduct prompt review of USAC appeals – including Petitioner's Application for Review.

### C. The FCC's Unreasonable Delay is so Egregious as to Warrant Mandamus Under the All Writs Act.

This Court has "jurisdiction to issue a writ of mandamus compelling an agency of the United States 'to perform a duty owed to the plaintiff.'"[47] Mandamus relief is "warranted where agency action has been delayed to such an extent as to frustrate the court's role of providing a forum for review."[48] This Court has provided six principles for determining whether unreasonable agency recalcitrance to act is so egregious as to warrant mandamus:

1.  The time agencies take to make decisions must be governed by a "rule of reason;"

2.  Where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

---

[46] *See* **Exhibit A** at 11-17 (*citations omitted*) and Request for Review at 14 (*citations omitted*).

[47] *Marinoff v. Dep't of Health, Ed. & Welfare*, 456 F. Supp. 1120, 1121 (S.D.N.Y. 1978) aff'd sub nom. *Marinoff v. Dep't of Health, Educ. & Welfare*, 595 F.2d 1208 (2d Cir. 1979) (citing 28 U.S.C. § 1361 (1970)).

[48] *In re California Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001).

3.    Delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

4.    The court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

5.    The court should also take into account the nature and extent of the interests prejudiced by delay; and

6.    The court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"[49]

While these factors are not "ironclad," they are intended to provide "useful guidance in assessing claims of agency delay."[50]

**First**, the time agencies take to make decisions "must be governed by a 'rule of reason.'"[51] As a first line of inquiry, courts consider the time agencies generally take to make decisions.[52] This Court has explained that what constitutes a

---

[49] *TRAC*, 750 F.2d at 80 (outlining the "hexagonal contours" of the analytical framework applicable to claims of agency delay).

[50] *Id.*

[51] *Id.*

[52] While "[t]here 'is no *per se* rule as to how long is too long' to wait for agency action ... a reasonable time for agency action is typically counted in weeks or months, not years." *American Rivers,* 372 F.3d at 419 (internal citations omitted). In *American Rivers*, this Court put an end to a similar "marathon round of administrative keep-away" by ordering an agency to issue a judicially reviewable response within a certain time period. *Id.* In this case, it has been nearly a year since Petitioner filed its Application for Review, but these questions have been unresolved since early 2009 when Petitioner first received the inexplicable invoice.

"reasonable time" is counted in "weeks or months, not years."[53] "There is no *per se* rule as to how long is too long to wait for agency action."[54]

FCC rules provide a baseline expectation for how long it should take the Agency to issue a written decision – 90 days.[55] Rule 54.724(b) ("Time periods for Commission approval of Administrator decisions") provides, in pertinent part:

> The Commission shall issue a written decision in response to a request for review of an Administrator decision that involves novel questions of fact, law, or policy within ninety (90) days. The Commission may extend the time period for taking action on the request for review of an Administrator decision.[56]

This provision indicates not only that the Agency has determined for itself a reasonable time period for resolving USAC administration issues submitted to it, but also that the FCC must take some affirmative action to "extend" the time period, and that this extension must not occur simply due to the passage of time. This is reflected in the FCC's order adopting the specific rules for appealing USAC decisions:

---

[53] *American Rivers*, 372 F.3d at 419 (finding that an agency had engaged in a "marathon round of administrative keep-away" by failing to issue a judicially reviewable order).

[54] *Id.*; *see also In re Core Commc'ns, Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008) (citing range of lengths of delay found unreasonable in cases where private parties requested action).

[55] In *LaBonne v. Heckler*, 574 F.Supp. 1016 (D. Minn. 1983), the District Court found that where applicants were "caught in the administration's appeal process for as long as one to two years," the APA's reasonable time requirements mandated that agency answer complaints seeking review of denial of benefits "within the normal 60 days allotted to it").

[56] 47 C.F.R. § 54.724(b).

> For appeals that are properly before the Commission, a written decision will be issued within 90 days unless the Commission *takes action* to extend the period for review; under no circumstances will an appeal before the full Commission be deemed approved as a result of inaction on the part of the Commission. We expect that the Bureau and the Commission will act promptly to resolve appeals of USAC decisions.[57]

In this case, Petitioner's Application for Review, which relates to RHC Funding for FY16, is properly before the FCC and has been pending for more than three years. It is important to note that while the Bureau issued its Order denying TCC's Request for Review in January 2020, Rule 54.724(b) applies to the Commission's failure to address TCC's Application for Review as well. As stated by the FCC order cited above, a written decision must be issued by the FCC within 90 days on appeals that are properly before the *full Commission*.[58] TCC's Application for Review is before the full Commission, whereas its Request for Review was before the Bureau. Because both the Bureau and Commissions must "act promptly to resolve appeals of USAC decisions",[59] the subject "90 day rule" applies to the pending Application for Review. As the Commission's delay continues, Petitioner is more and more vulnerable to the possibility that its telecommunications supplier may demand payment in full and cut off service if such payment is not made.

---

[57] *USAC Third Report & Order*, ¶ 38.

[58] *Id.*

[59] *Id.*

Moreover, whether the delay encountered should be deemed unreasonable "will depend in large part...upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."[60] In this case, the facts and law are not complex. Petitioner challenges the decision by USAC not to accept TCC's Forms 466 for RHC funding for the HHC Clinics. While the significance of the outcome relative to this Petitioner is great, from the point of view of the FCC's management and oversight of the RHC program, review of Petitioner's Application for Review should be the type of task the Agency takes on in the ordinary course, and 90 days should be ample time to issue a judicially reviewable decision.

Further, the fact that the FCC has given no indication whatsoever as to when it will act, while ignoring all the comments favoring TCC's position, further supports the Court's taking action to compel the Commission to act. "[U]nder the 'rule of reason,'" if an agency has some projected timeline for acting and balancing its

---

[60] *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 115 (D.D.C. 2005) (internal citations omitted); *see also Razaq v. Poulos,* 2007 WL 61884 (N.D. Cal. Jan. 8, 2007) ("[I]n each case the court must determine what kind of decision the applicant was asking the government to make, what kind of information the government would reasonably need to acquire in order make that decision responsibly, how much time it might take to gather that information, whether the applicant could have provided needed information faster or more reliably, what competing demands were being made on the agency during the relevant period, and whether there were forces at work or barriers involved that were beyond the agency's control that disabled it from getting a sufficient information base to make the kind of decision it was being asked to make.").

competing priorities "that provides relief in the foreseeable future," this fact might "weigh[] against issuance of mandamus."[61] Here, the FCC has not proposed a timeline to rule on Petitioner's Application for Review, nor has it taken action to extend the 90 days ordinarily allotted for it to review an appeal. On the contrary, Petitioner's efforts to expedite this proceeding by meetings with the Commission's representatives have produced only silence.

**Second**, courts will evaluate whether the statutory scheme provides further content for applying the above "rule of reason."[62] While Congress has not adopted a specific timeframe within which the Agency must act on petitions such as the Application for Review, in keeping with Congressional intent, the FCC has established clear limits on USAC's authority.[63] One important way the FCC keeps USAC within the bounds of its ministerial role is an expedited review process. In adopting the process for review of USAC decisions, the FCC explained that

---

[61] *Liberty Fund*, 394 F. Supp. 2d at 116 (citing *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987).
[62] *See TRAC*, 531 F.3d at 855.
[63] The FCC has determined from the legislative history of Section 254 that Congress intended that USAC would not be permitted to "administer the programs in any manner that requires that entity to interpret the intent of Congress in establishing the programs or interpret any rule promulgated by the Commission in carrying out the programs, without appropriate consultation and guidance from the Commission." *USAC Third Report and Order*, 13 FCC Rcd. at 25066, ¶ 15 and n.41.

"Commission oversight will be strengthened by an appeals process that ensures that matters are brought *promptly* to the Commission."[64]

Part of this clear statutory mandate is that the FCC ensure that contributions into the Fund are "specific" and "predictable."[65] Thus the statutory scheme and the Congressional intent gives the FCC the clear duty to hold the reins of RHC fund administration, and a critical component of adequate oversight is the FCC's review process, which seems to have come to a halt over the past three years.

**Third**, courts will consider whether within the regulatory scheme, the delay could have an impact that extends beyond economic issues into the realm of human welfare.[66] In the Act, Congress set forth broad directives and guiding principles for the "preservation and advancement" of universal service,[67] a concept that existed in the Communications Act of 1934, calling for "wire and radio communication service with adequate facilities at reasonable charges" to "all people of the United States."[68] Congress gave the FCC responsibility to follow principles that address human welfare issues, including that "consumers in all regions of the Nation, including low-

---

[64] *USAC Third Report and Order* at ¶ 66 (emphasis added).

[65] 47 U.S.C. § 254(c)(1).

[66] In any event, "[e]conomic harm is clearly an important consideration and will, in some cases, justify court intervention." *Cutler,* 818 F.2d at 898.

[67] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended at 47 U.S.C. § 254(a)(1)).

[68] Communications Act of 1934, ch. 652 §1, 48 Stat. 1064 (codified as amended at 47 U.S.C. § 151).

income consumers and those in rural, insular, and high cost areas, have access to telecommunications and information services."[69]

The Agency's failure to act on Petitioner's Application for Review is particularly egregious because it harms not only Petitioner but Alaska Natives who are dependent upon telemedicine services at the HHC Clinics. Hence, it is axiomatic that in this instance the FCC's delay has had a profound impact that extends beyond economic issues into the realm of human welfare.

This Court has recognized that "delay in the resolution of administrative proceedings can also deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."[70] The public interest supports issuance of a writ of mandamus in this case.

**Fourth**, this Court may consider how spurring the FCC to resolve the issues raised in Petitioner's Application for Review might have a countervailing impact on FCC activities of a higher or competing priority.

The RHC program is one of – if not <u>the</u> – top program administered by the Commission. Former FCC Chairman Pai has, on numerous occasions, publicly announced his support for the RHC Program and the critical function it serves by

---

[69] 47 U.S.C. § 254(b)(3).
[70] *MCI*, 627 F.2d at 341.

ensuring critical telemedicine services to underserved, rural areas. One example is contained in a letter Chairman Pai wrote to Montana Senator Daines on this topic:

> As the son of two doctors in rural Kansas, I understand how connectivity can play a transformative role in the provision of medical care. I recall my father driving many miles at times to see patients.   Having seen today how telemedicine is being used to improve the well-being of rural Americans, I support the RHC program. As Chairman, I will work to ensure it efficiently provides needed connectivity to rural health care providers.[71]

More recently, the Commission has acknowledged the critical importance of fully funding the RHC program so that "health care providers participating in [the RHC] can continue providing [remote x-ray reading, videoconferencing between rural health care professionals] and other essential telemedicine services to their communities."[72]  In a release last year, the FCC further noted that:

> The RHC Program provides vital support to assist rural health care providers with the costs of broadband and other communications services. Reliable high speed connectivity is critical for rural health care providers to serve patients in rural areas that often have limited resources, fewer doctors, and higher rates for broadband and telecommunications services than urban areas. Recent years have also seen an explosion in demand for telehealth services, a trend accelerated by the COVID-19 pandemic, that has increased the bandwidth needs of rural health care providers.[73]

---

[71] *See* Letter from FCC Chairman Ajit V. Pai to Senator Steve Daines (Sept. 13, 2017) Text at https://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db0925/DOC-346882A1.pdf

[72] *In the Matter of Promoting Telehealth in Rural America*, *Report and Order*, FCC 18-82, WC Docket No. 17-310, (June 25, 2018) at ¶ 1 ("Telehealth R&O").

[73] *In the Matter of Promoting Telehealth in Rural America, Further Notice of Proposed Rulemaking*, FCC 22-15, WC Docket No. 17-310 (Feb. 22, 2022) at ¶ 1.

In spite of the FCC's concern for ensuring that rural health care providers have the necessary funding, it has not acted on TCC's Application for Review, a favorable decision on which will actually further the Commission's priority of universal telemedicine services in rural areas. Granting mandamus is essential to the true public interest that must be served by the RHC program. At the same time, there is nothing to suggest that acting on TCC's Application for Review would deny the FCC the opportunity to give its immediate attention to other competing obligations. In addition, the fact that the FCC subsequently adopted policies that have provided more funding for the RHC program beginning in FY17[74] should not act as a barrier to its current and ongoing duty to oversee USAC through the appeals process. The FCC might argue since it has added funding going forward, HCPs that were not provided full funding in FY16 RHC do not merit priority. Courts have rejected such arguments in the past.[75] As this Court has previously noted, "Agency inaction can be as harmful as wrong action."[76]

**Fifth**, this Court may take into account the nature and extent of interests prejudiced by the delay. Even though allegations of a "procedural injury" alone can

---

[74] Telehealth R&O, *passim*.
[75] *See Amer. Broadcasting Co., Inc.("ABC") v. FCC*, 191 F.2d 492, 500 (D.C. Cir. 1951).
[76] *ABC*, 191 F.2d at 500.

be sufficient to show that an agency has unreasonably withheld action,[77] the FCC's unreasonable and egregious delay exposes Petitioner to irreparable injury. By failing to act on the Application for Review, the FCC not only puts Petitioner at risk of being unable to pay its supplier, but also endangers the very lives of the HHC Clinic patients by putting their telemedicine services in jeopardy.

For this reason, the FCC's inertia is tantamount to a denial of Petitioner's Application for Review and tacit approval of USAC's decision

> When administrative inaction has precisely the same effect on the rights of the parties as denial of the requested agency action, an agency many not prevent judicial review by masking agency policy in the form of inaction rather than an order denying the action requested.[78]

**Finally**, this Court need not find anything nefarious in the FCC's failure to act on the Application for Review. Delays can be egregious regardless of the FCC's intentions, and therefore, the Court need not reach the question of whether there is any "impropriety lurking"[79] behind the FCC's apathy. Regardless of whether the Agency has acted improperly in declining to address the Application for Review, Petitioner is entitled to a writ of mandamus for all the above reasons.

---

[77] *Mountain States Legal Foundation v. Andrus*, 499 F. Supp. 383, 397 (D. Wyoming 1980).
[78] *Id.* at 396.
[79] *TRAC*, 531 F.3d at 80.

## CONCLUSION

Petitioner has reached the point of having nowhere else to turn. The FCC has not taken action on the Application for Review for more than three years. Further, the Commission delayed issuing its Order on TCC's Request for Review by more than two and a half years and only after being ordered by this Court to take action. Consequently, full resolution of the underlying matter by the FCC is still pending after nearly *six years*. Petitioner respectfully seeks mandamus from this Court because the FCC has failed to act to resolve issues pending before it, and its inaction is tantamount to a denial of relief. As long as the FCC delays resolving Petitioner's pending Application for Review, Petitioner and the patients of the HHC Clinics are suffering ongoing financial harm and uncertainty as to whether those clinics can continue providing critical telemedicine services.

The foregoing premises considered, Petitioner respectfully requests that the Court order the FCC to act within ninety (90) days on Petitioner's Application for Review. In the meantime, Petitioner requests that the Court retain jurisdiction over this matter to ensure that the FCC carries out its duty to address the issues Petitioner has put before it.

Respectfully submitted,

Tanana Chiefs Conference

By _____

Allison D. Rule
Ronald E. Quirk
Marashlian & Donahue, PLLC
1430 Spring Hill Road
Tysons, Virginia 22102
(703) 714-1300
adr@commlawgroup.com
req@commlawgroup.com
Its Attorneys

March 30, 2023

**Form 6.  Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with [the type-volume limit of Fed. R. App. P.
    [**27(d)(2)(a)**                                                          ]] [the word limit of
    Fed. R. App. P. [**21(d)(1)**                                                          ]]
    because, excluding the parts of the document exempted by Fed. R. App. P. 32(f)
    [and [                                                          ]]:

    ☑  this document contains **6545**                    words, or

    ☐  this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
    and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑  this document has been prepared in a proportionally spaced typeface using
       **Microsoft Word 2016**                                          in

       **14-point Times New Roman**                                    , or

    ☐  this document has been prepared in a monospaced typeface using

       _____ with

       _____.

       /s/**Allison D. Rule**

       Attorney for **Tanana Chiefs Conference**

       Dated: **March 30, 2023**

# CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2023, I caused a copy of the foregoing Petition for Writ of Mandamus to be served by hand delivery to the following:

Narda Jones, Chief of Staff
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Ramesh Nagarajan, Legal Advisor, Wireline and Enforcement
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Trent Harkrader, Chief, Wireline Competition Bureau
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Adam Copeland, Associate Bureau Chief, Wireline Competition Bureau
Federal Communications Commission
45 L Street NE
Washington, DC 20554

By: _____
    Allison D. Rule

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554

Accepted / Filed

FEB 14 2020

Federal Communications Commission
Office of the Secretary

STAMP & RETURN

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Request for Review and Waiver of a | ) |
| Decision by the Universal Service | ) |
| Administrator by | ) |
| | ) |
| Tanana Chiefs Conference | ) |
| Fairbanks, AK | ) |
| | ) |
| Interior Alaska Regional Health Consortium | ) |
| | ) |
| Rural Health Care Universal Service | ) |
| Support Mechanism | ) |

Application for Review of
Order of Wireline Competition Bureau
DA 20-64, January 15, 2020

HCPs Nos. 10720, et al.

WC Docket No. 02-60

To: The Commission

## APPLICATION FOR REVIEW

Allison D. Rule
Ronald E. Quirk
Marashlian & Donahue PLLC
1420 Spring Hill Road, Suite 401
Tysons, VA 22102
(703) 714-1305
www.commlawgroup.com

Counsel to Tanana Chiefs Conference

. **Summary**

In the Waiver Request at issue, Tanana Chiefs Conference ("TCC"), an intertribal consortium that provides health care services to clinics in rural Alaska serving Native Alaskans, many of whom have no other means of obtaining medical care, asked the Wireline Competition Bureau ("WCB" or "Bureau") to review and reverse a decision by the Universal Service Administrative Company ("USAC") denying TCC's request to file its Funding Request and Certification Forms 466 outside of the newly-imposed filing windows for the Rural Health Care ("RHC") Program for Funding Year 2016 ("FY16") – but within the window listed in the Commission's rules and on the USAC website - for three Alaska rural health care providers ("HCPs"), which are part of its consortium (collectively the "HHC Clinics"). USAC would not allow TCC to file the three Forms 466 for RHC funding, despite TCC's prior perfect record of compliance, the existence of an evergreen contract, and the fact that no disruption to the RHC program would occur. As stated in TCC's Waiver Request, the effect of USAC's decision was to deny TCC the necessary funds to provide telehealth services, putting Native Alaskans living in the most remote parts of the state at severe risk of losing the only source of health care they have.

TCC also requested that, if WCB did not reverse USAC's decision, the Bureau should waive Sections 54.623 and 54.675(c)(2) of the Commission's Rules to the extent necessary to permit TCC to file the Forms 466 and obtain the critical RHC funding, totaling $633,170.49, in order to pay its provider to continue to provide necessary telehealth services for the HHC Clinics.

TCC further requested that WCB waive Section 54.675(f) of its rules so that USAC would release full RHC funding to all 30 of the HCP clinics in its consortium, as USAC had determined that all Forms 466 submitted during the "second filing window" of September 1,

2016 through November 30, 2016 – the period in which TCC filed the Forms 466 for its other 27 HCPs - would be subject to a 7.5% RHC proration factor, which cost TCC $389,202.22.

In its January 15, 2020 Order, WCB wrongfully denied TCC's Waiver Request. Instead of engaging in reasoned decision-making, WCB offered very little explanation for its decision. WCB tersely and incorrectly concluded that "TCC has not presented special circumstances warranting a waiver of the FCC Form 466 application filing window deadline for funding year 2016 or the Commission's proration rules."

As shown herein, WCB abused its discretion by: (1) deviating from the Commission's rural health care policy by denying RHC funding to HCPs that are in desperate need of such funding; (2) conflicting with established precedents by denying TCC's Waiver Request despite having granted waivers to similarly situated applicants; (3) ignoring TCC's crucial arguments that (i) strict application of the filing deadline would be contrary to Section 254 of the Communications Act, (ii) granting the Waiver Request would serve the public interest, and (iii) USAC's multiple filing windows were impermissibly implemented; and (4) misstating and/or ignoring important and material facts raised by TCC. Accordingly, WCB's Order should be reversed and TCC should be granted the relief it requested in its Waiver Request.

# TABLE OF CONTENTS

Background ........................................................................................................................ 2

Scope of Review ............................................................................................................... 6

Application for Review – Questions Presented .............................................................. 7

Responses to Questions Presented .................................................................................. 8

   1.   Whether the Bureau's Order deviated from the Commission's established rural health care policy, resulting in an abuse of discretion? .................................................................. 8

   2.   Whether the Bureau's Order conflicted with established precedents by denying TCC's Waiver Request despite having granted such requests to similarly situated applicants, resulting in abuse of discretion? .................................................................................................... 11

   3.   Whether the Bureau's Order disregards a relevant statute by ignoring TCC's argument that strict application of the filing deadline would be contrary to the statutory requirements of Section 254 of the Communications Act of 1934, and disregarding TCC's public interest and other arguments, resulting in an abuse of discretion? ............................................................ 18

   4.   Whether the Bureau's Order misstates material facts raised by TCC in its Waiver Request, resulting in an abuse of discretion? ........................................................................................ 22

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Request for Review and Waiver of a | ) | |
| Decision by the Universal Service | ) | Application for Review of |
| Administrator by | ) | Order of Wireline Competition Bureau |
| | ) | DA 20-64, January 15, 2020 |
| Tanana Chiefs Conference | ) | |
| Fairbanks, AK | ) | HCPs Nos. 10720, et al. |
| | ) | |
| Interior Alaska Regional Health Consortium | ) | WC Docket No. 02-60 |
| | ) | |
| Rural Health Care Universal Service | ) | |
| Support Mechanism | ) | |

To: The Commission

## <u>APPLICATION FOR REVIEW</u>

Pursuant to 47 C.F.R. §1.115(a),(b)(2), Tanana Chiefs Conference ("TCC") files this application for review ("Application") of the January 15, 2020 decision ("Order")[1] issued by the Federal Communications Commission's ("FCC" or "Commission") Wireline Competition Bureau ("WCB" or "Bureau"), denying the Request for Review or Waiver ("Waiver Request") TCC filed on April 28, 2017.[2] For the reasons stated herein, the Commission should reverse the Order, and grant the relief TCC applied for in its Waiver Request.

---

[1] *In the Matter of Request for Review and Waiver of a Decision by the Universal Service Administrator by Tanana Chiefs Conference, Fairbanks, AK, Order*, DA 20-64, HCPs Nos. 10720, *et. al.*, WC Docket No. 02-60 (rel. January 15, 2020).

[2] TCC's Waiver Request is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.

## Background

The factual background of this proceeding is detailed in the Waiver Request and additional documents that TCC subsequently filed as part of the record, which are attached hereto.[3] For ease of reference, a summary is provided below.

TCC is a Fairbanks, Alaska-based, non-profit intertribal consortium which, among other things, operates and provides health care services for three sub-regional health clinics, and 27 rural village clinics, including the HHC Clinics. These HCPs are the only health care facilities in each of the rural communities they serve; providing service to approximately 15,000 Alaska Natives in the state's interior region.[4] The HCPs are strongly dependent on TCC's telehealth services, *e.g.*, electronic health record access, computerized physician order entry, physician teleconferencing, and the ability to dispense medication over long distances.[5] The communications facilities used to provide those services are facilitated by TCC's contracted telecommunications carrier, DRS and are paid for by RHC program funding.[6] Without the DRS-provided infrastructure and services to the HCPs, there would be no viable option for providing the health services in the corresponding communities, the disruption of which would be

---

[3] *See* Supplemental Letter to Radhika Karmarkar, Deputy Division Chief, Telecommunications Access Policy Division, WCB, from Nick Gaska, Deputy Counsel to TCC (dated Sept. 6, 2017), a copy of which is attached hereto as Exhibit B; Letter to Marlene H. Dortch, Secretary, FCC, from Ronald E. Quirk, Counsel to TCC (dated Oct. 6, 2017), a copy of which (including attachments) is attached hereto as Exhibit C; Letter to Radhika Karmarkar from Ronald E. Quirk (dated Oct. 18, 2017 (including attachment), a copy of which is attached hereto as Exhibit D; Letter to Ryan Palmer, Division Chief, Telecommunications Access Policy Division, WTB from Allison D. Rule and Ronald E. Quirk (dated May 2, 2019), a copy of which is attached hereto as Exhibit E; Letter to Marlene H. Dortch from Ronald E. Quirk (dated July 12, 2019), a copy of which is attached hereto as Exhibit F; and Letter to Marlene H. Dortch from Ronald E. Quirk (dated Aug. 22, 2019), a copy of which is attached hereto as Exhibit G. All of these documents are incorporated herein by reference. Most of them are listed in the Order at n.1.

[4] Exhibit A at 5.

[5] *Id.* at 6-7.

[6] Id. at 6.

2

disastrous for the thousands of rural Alaskans who depend on these HCPs as their sole source of health care.[7]

In 2006, TCC entered into a USAC-approved evergreen contract with DRS. Evergreen contracts are multi-year contracts which, among other things, provide for funding commitments during the terms of the contracts.[8] TCC had an evergreen contract with DRS during the period relevant to this proceeding.[9] The scope of that evergreen contract required DRS to provide circuits and build-out middle mile infrastructure to rural TCC communities for the purpose of connecting the HCPs; enabling the delivery of telehealth services.[10] TCC's provision of telehealth services to all its clinics, including the HHC Clinics, is almost completely dependent on RHC funding, which covers nearly 98% of the overall cost of the services.[11]

In the middle of FY16, and without fair notice, WCB authorized USAC to impose new Form 466 filing windows, in spite of the Commission's rules and USAC's website listing the sole annual Form 466 filing period as July 1 through June 30.[12] On August 26, 2016, five days before the end of the USAC-imposed "first filing window," the Bureau released a Public Notice ("August 26 Public Notice"), announcing that USAC would impose at least two Form 466 filing windows: (1) March 1, 2016 – September 1, 2016; and (2) September 1, 2016 – November 30, 2016.[13] The August 26 Public Notice also stated: "Based on historic trends, we currently

---

[7] *Id.* at 6-7.
[8] *Id.* at 7, citing 47 C.F.R. §§ 54.642(h)(4) and 54.644(b).
[9] *Id.* at 8.
[10] *Id.*
[11] *Id.*
[12] *Id.* at 9, *citing* 47 C.F.R. § 54.675; FCC Form 466 Instructions; USAC FAQ.
[13] *Id., citing Wireline Competition Bureau Provides a Filing Window Period for Funding Requests Under the Telecommunications Program and the Healthcare Connect Fund, Public Notice,* DA 16-979 (rel. Aug. 26, 2016).

anticipate that USAC will be able to open this third filing window period."[14]  That third filing window, as listed, would be February 1, 2017 – April 30, 2017.[15]  But the third filing window was not implemented, and USAC ceased accepting Forms 466 for FY16 after November 30, 2016.  That was a complete break from USAC's previous practice of having one filing window; accepting Forms 466 from July 1 until June 30 the following year.

TCC filed Forms 466 for 27 of its 30 clinics during the second filing window, but, due to inadvertent errors, it failed to file the Forms 466 for the three HHC Clinics during the first or second filing windows.[16]  In March 2017, immediately after discovering its omission, TCC contacted USAC, requesting that it be permitted to file the three outstanding Forms 466 for the HHC Clinics.  USAC refused TCC's request; stating that TCC had no recourse with USAC and that TCC would need to work with the FCC to resolve this issue.[17]  TCC filed its Waiver Request shortly thereafter, on April 28, 2017.  Also, USAC announced for the first time on April 10, 2017 that all the HCPs that filed their Forms 466 during the second filing window would have their funding pro-rated to 92.5% of their requested amounts.[18]

TCC representatives subsequently undertook several meetings and correspondence with WCB officials and other Commission administrators, providing additional information and citing FCC precedents that TCC hoped would help the Bureau expedite a decision in its favor.[19]  Those communications included TCC's request that WCB bifurcate this proceeding.[20]

---

[14] August 26 Public Notice at 4.
[15] *Id.*
[16] Exhibit A at 2.
[17] *Id.*
[18] *Id.* at 15 (*citations omitted*).
[19] *See* n.10 *supra* and associated exhibits.
[20] *See e.g.*, Exhibit E at 2.

Specifically, TCC asked for bifurcation in order to separate the Form 466 filing matter from the proration matter. That would enable WCB to expedite a decision solely on the Forms 466 matter – which is the most critical to TCC – and issue a decision on the proration matter later. If the Bureau had agreed to this proposal and granted a partial waiver enabling TCC to file the Forms 466, TCC would have been assured of having enough funding, $633,170.49, to pay its provider and ensure that telehealth services would continue for its HHC Clinics. TCC currently owes that provider the same amount for service to the HCC Clinics during FY16, and that service could be terminated if TCC does not pay the provider soon. TCC will ultimately have to pay the full amount owed to its communications provider, and if RHC funding is denied, funding for other critical health care need would be diverted, causing hardship to TCC's entire service area.

Despite TCC's multiple attempts to work with WCB, by October 2019, more than two and a half years had elapsed since TCC submitted the Waiver Request with no indication of when WCB would release a decision. In need of the funds to pay its provider, TCC had no choice but to file a Petition for Writ of Mandamus ("Mandamus Petition") with the U.S. Court of Appeals for the D.C. Circuit, requesting that the Court order WCB to expedited a decision.[21] On January 8, 2020, the D.C. Circuit issued an Order, directing the FCC to file a response to TCC's Mandamus Petition within 30 days.[22] Possibly in response to the D.C. Circuit's Order, the Bureau released its Order on January 15, 2020. TCC subsequently withdrew its Mandamus Petition.

---

[21] A copy of the Mandamus Petition (sans exhibits) is attached hereto as Exhibit H.
[22] A copy of the D.C. Circuit's Order is attached hereto as Exhibit I.

## Scope of Review

It is established that "a regulation which is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion."[23] "An abuse of discretion may be found in those circumstances where [an agency's] decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements; that is to say, where the [agency] has acted in an arbitrary or capricious manner."[24] Agency decisions must be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[25] In the present case, the Bureau's delay and ultimate denial if TCC Waiver Request unquestionably constitutes an abuse of discretion and is arbitrary and capricious. As such, the Bureau's denial cannot stand.

---

[23] *NTN Bearing Corp. v. U.S.,* 74 F.3d 1204, 1207 (Fed Cir. 1995) citing *Technoimport v. U.S.,* 766 F.Supp. 1169, 1178 (Ct. Int'l. Trade 1991).
[24] *Zhao v. DOJ,* 265 F.3d 83, 93 (2d Cir.2001) *(citations omitted).*
[25] 5 U.S.C. § 706 (2)(A); *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

## Application for Review – Questions Presented[26]

This Application presents the following questions:

1. Whether the Bureau's Order deviated from the Commission's established rural health care policy, resulting in an abuse of discretion?

2. Whether the Bureau's Order conflicted with established precedents by denying TCC's Waiver Request despite having granted such requests to similarly situated applicants, resulting in abuse of discretion?

3. Whether the Bureau's Order conflicted with a relevant statute and precedents by ignoring TCC's argument that strict application of the filing deadline would be contrary to the statutory requirements of Section 254 of the Communications Act, as well as TCC's public interest and other arguments, resulting in an abuse of discretion?

4. Whether the Bureau's Order misstated important and material facts raised by TCC in its Waiver Request, resulting in an abuse of discretion?

---

[26] This Application is submitted in accordance with 47 CFR §1.115(b)(1)-(2). In particular: Rule 1.115(b)(1) (requiring statements of the questions presented for review with reference to appropriate findings of fact or conclusions of law); Rule 1.115(b)(2) (requiring specification of the factors which warrant Commission consideration of the questions presented); Rule 1.115(b)(2)(i)(requiring specification of how the action taken pursuant to delegated authority is in conflict with statute, regulation, case precedent or established Commission policy); Rule 1.115(b)(2)(ii)(requiring specification of how the action taken pursuant to delegated authority involves a question of law or policy which has not previously been resolved by the Commission); Rule 1.115(b)(2)(iii)(requiring specification of how the action taken pursuant to delegated authority involves application of a precedent or policy that should be overturned or revised); Rule 1.115(b)(2)(iv)(requiring specification of how the action taken pursuant to delegated authority is based on an erroneous finding as to an important or material question of fact).

## Responses to Questions Presented

### 1. Whether the Bureau's Order deviated from the Commission's established rural health care policy, resulting in an abuse of discretion?

**Answer:** Yes. In its Waiver Request, TCC set forth detailed descriptions of the vital telehealth services it provides to its HCPs, explained that Alaska Natives who live in isolated rural areas have no alternative to those clinics for their health care, and detailed why disruption of TCC's services would be life-threatening for those Alaska Natives.[27] TCC also explained why it cannot provide the critical health care services without funding from the RHC program.[28] TCC clarified why granting its Waiver Request would comport with the Commission's rural health care policy (which reflects Congress's policy on the same issue[29]), the crux of which is to ensure that rural HCPs are fully funded for critical telehealth services through the RHC program.[30]

As an example of the FCC's RHC policy, TCC cited FCC Chairman Pai's March 9, 2017 letters to Congress discussing that program.[31] Chairman Pai emphasized the importance of the Commission's RHC policy when he stated that, "I am well aware of the difficulty so many in rural America have in getting adequate healthcare. I have long made ensuring the viability of the RHC program for rural participants a priority."[32] Many other examples exist of Chairman Pai's

---

[27] *See* Exhibit A at 5-7.

[28] *Id.* at 8.

[29] *Id.* at 21, citing S. Rep. No.102-392 at 21 (1992), reprinted in 1992 U.S.C.C.A.N., 3943, 3962, and 25 U.S.C. § 1602(a).

[30] *Id., citing* Chairman Pai's Response to Senators King, Collins, Shaheen, Hassan, Udall and Heinrich Regarding the Commission's Rural Healthcare Program. Texts of these letters are found at: file://iadfs01/tsredirect$/req/Downloads/DOC-343947A1.pdf

[31] *Id.*

[32] *Id.*

declaring and emphasizing the FCC's policy of ensuring that rural HCPs have full funding for broadband and other infrastructure necessary to provide telehealth services.[33]

An instructive illustration of the FCC's policy is the December 2017 Memorandum of Understanding ("MOU") between the Commission and the National Cancer Institute ("NCI"), focusing on "how increasing broadband access and adoption in rural areas can improve the lives of rural cancer patients . . . . [W]hen patients report symptoms electronically to their care providers they are almost twice as likely to report improvements to health-related quality of life than those in a disconnected control group . . . . Electronically connected patients were also less likely to be admitted to emergency rooms and had greater survival rates than patients in the control group."[34]  Hence, the FCC-NCI collaboration was formed to address "critical need" for broadband connections to provide rural health care services.[35]  TCC uses its RHC funding to provide the types of services described in the MOU, and more.[36]  TCC's HCP's have a critical need for broadband to provide telehealth services.

Full funding of rural HCPs is such an important Commission policy that six U.S. Senators wrote to the Commission in February 2017, stating shortfalls of RHC funding will harm their constituents as vital telehealth services could be reduced or eliminated if he HCPs cannot pay their communications providers:  "We ask you to address the future of RHC as soon as

---

[33] See e.g., "FCC plans to consider a funding boost for rural telehealth programs in 2017 and beyond," *Fierce Healthcare* (November 27, 2017); Remarks of FCC Chairman Ajit Pai at the Connected Health Conference (Oct. 18, 2018) ("Based on information provided by the Program administrator, we expect to fully fund out of the 2018 $581 million budget all eligible amounts for single-year 2018 funding requests from participating rural health care providers. In English: Every rural clinic or hospital seeking to lower its cost of service for this next year is eligible for full funding.") Text at: https://docs.fcc.gov/public/attachments/DOC-354635A1.pdf.

[34] *FCC and National Cancer Institute Champion Critical Role of Broadband in Rural Cancer Care, News Release* (December 12, 2017) at 1-2.

[35] *Id.* at 2.

[36] *See* Exhibit A at 5-7.

9

possible. The Commission can and should take steps to avoid flash cuts or sudden funding reductions for health care providers that use this vital program."[37]

The Order deviated from the Commission's established RHC policy because it denies crucial FY16 funding for the HHC Clinics. Indeed, the Order barely mentioned the FCC's RHC policy at all. Rather, WCB reduced discussion of the RHC program to a mere procedural topic.[38] The FCC is required to discuss important policy issues raised by petitioners, but WCB utterly failed to do so. Courts have held that this type of deviation from established policy is an impermissibly arbitrary agency action.[39]

In sum, the Order does not address TCC's arguments about why granting its Waiver Request would serve the Commission's RHC policy, nor does it consider the hardship on the HHC Clinics' patients if waiver of the Form 466 deadline is not granted. WCB's inexplicable deviation from the Commission's RHC policy and failure to address TCC's arguments on the adversity issue demonstrate an abuse of discretion.[40]

---

[37] *See* Letter dated February 27, 2017 from Senators Angus S. King, Jr., Jeanne Shaheen, Tom Udall, Susan M. Collins, Margaret Wood Hassan, and Martin Heinrich to Chairman Ajit Pai and Commissioners Mignon Clyburn and Michael O'Reilly, a copy of which is attached to Exhibit C.

[38] *See* Order at ¶¶ 15-16 (*citations omitted*).

[39] *AT&T v. FCC*, 974 F.2d 1351, 1355 (D.C. Cir. 1992) (FCC acted arbitrarily when it failed to acknowledge a change in policy); *Greater Boston Television Corp. v. FCC*, 444 F.2d, 842, 852 (D.C. Cir. 1970), *cert denied* 403 U.S. 923 (1971) (FCC must supply reasoned analysis that prior policies and standards are being deliberately changed and not casually ignored).

[40] *Motor Vehicle Mfrs. Ass'n* at 41-44 (an agency changing course must supply a reasoned analysis for the change).

2. **Whether the Bureau's Order conflicted with established precedents by denying TCC's Waiver Request despite having granted such requests to similarly situated applicants, resulting in abuse of discretion?**

**Answer:** Yes. It is axiomatic that the Commission is required to treat similarly situated entities in a similar manner.[41] The Bureau flouted binding legal precedents by declining to grant TCC's Waiver Request despite having granted waivers to similarly situated applicants.

In denying TCC's Waiver Request, WCB averred that in "certain instances the Commission has granted a waiver of an application filing deadline where the FCC Form was filed shortly after the deadline, the deadline was missed due to circumstances beyond the applicant's control, or when an application is filed within a reasonable period of time following the death or serious illness of the responsible person or death of a family member of the staff person. However, none of these special circumstances are present here."[42]

In describing what constitutes "special circumstances" warranting a waiver, WCB ignored Commission precedents cited by TCC in its Waiver Request and subsequent filings in this proceeding.[43] In *Bishop Perry*, the Commission granted waivers to numerous applicants who failed to file their applications for E-Rate funding within the applicable filing window, stating that "special circumstances exist to justify a waiver of the Commission's rules."[44] The Commission specifically stated that "special circumstances [include] when someone on the applicants' staff made a mistake [for example when] applicants whose staff members

---

[41] *See Melody Music, Inc. v. FCC*, 345 F.2d 730, 732-33 (D.C. Cir. 1965); *see also Greyhound Corp. v. ICC*, 551 F.2d 414, 418 (D.C. Cir. 1977) and *Garrett v. FCC*, 513 F.2d 1056, 1060 & n.25 (D.C. Cir. 1975).

[42] Order at ¶ 8, *citing Requests for Waiver and Review of Decisions of the Universal Service Administrator by Acorn Public Library District, et al., Schools and Libraries Universal Support Mechanism, Order*, 25 FCC Rcd. 7221 (WCB 2008).

[43] *See e.g.*, Exhibit A at 13 *citing Request for Review of the Decision of the Universal Service Administrator by Bishop Perry Middle School, New Orleans, LA et al., Order*, 21 FCC Rcd 5316 (2006).

[44] *Bishop Perry* at ¶ 1.

inadvertently failed to file the applications in a timely manner [and] petitioners [who] claim that the rules and instructions for filing an FCC Form 471 are vague and unclear and that resulting misunderstandings led to forms being filed outside the filing window."[45] The Commission found that good cause existed to grant waivers of the filing deadline due to "staff mistakes and confusion" and because "the violation is procedural and not substantive, there is no evidence of waste, fraud or abuse [and] a denial of funding would inflict undue hardship on the applicants."[46]

A more similar situation to TCC's is hard to imagine. As TCC explained in its Waiver Request, its failure to timely file the three Forms 466 was due to inadvertent errors, as well as misunderstandings concerning the USAC-imposed filing windows.[47] Moreover, as TCC explained, these errors were procedural, there was no issue of waste, fraud, or abuse, and undue hardship will result if TCC is unable to obtain RHC funding for the HHC clinics and its carrier denies service for failure to pay.[48] Accordingly, and as stated in binding precedent, special circumstances clearly exist for grant of TCC's Waiver Request.[49]

The Bureau also contended that: "Filing the FCC Forms 466 on a timely basis was . . . within TCC's control but for the mistake on the part of a TCC staff member . . . . "[I]n this instance, the Forms 466 were *never* filed for the HHC Clinics and the omissions were discovered over three months later."[50]

WCB's assertion that the situation was "within TCC's control" in the context of special circumstances warranting a waiver request is flatly contradicted by the very precedent relied

---

[45] *Id.* at ¶ 13
[46] *Id.* at ¶¶ 13-14.
[47] Exhibit A at 9-17 (*citations omitted*).
[48] *Id.* at 17-21 (*citations omitted*).
[49] *Bishop Perry* at ¶¶ 1, 12-14.
[50] Order at ¶ 8 (*citations omitted*).

upon by the Bureau.[51]     In *Acorn Public Library District,* WCB stated that "special circumstances" existed to grant waivers to entities seeking waiver of the Form 471 filing deadline, requesting the waivers to file outside the USAC deadline.[52] Those special circumstances included "circumstances beyond their control, including inclement weather, technical malfunctions, school reorganizations, *misunderstandings/confusion,* personal emergencies, or *inadvertent errors.*[53] WCB further stated that because the "violation at issue is procedural, not substantive, we find that complete rejection of these applications is not warranted."[54]

The *Acorn Public Library District* order clearly illustrates that, contrary to WCB's assertions, TCC's failure to file its three Forms 466 was indeed due to circumstances beyond its control, as TCC missed the deadline due to misunderstandings and confusion about the filing deadline and inadvertent errors.[55] Moreover, TCC's missing the filing deadline was a procedural, not substantive error.[56] As TCC's situation is very similar to applicants in *Acorn Public Library District* as well as *Bishop Perry*, WCB should have granted its Waiver Request. Moreover, WCB's assertion that the fact that the three Forms 466 were never filed somehow mitigates the "special circumstances"[57] is incorrect and irrelevant. WCB has granted waivers to applicants who did not file their forms with USAC and sought waiver to do so afterwards.[58] In fact, WCB has held that an applicant who failed to file his E-Rate application due to installation of

---

[51] *Id.* at ¶ 8, *citing Acorn Public Library District*
[52] *Acorn Public Library District* at ¶ 1, *citing Bishop Perry (other citations omitted).*
[53] *Id,* at ¶ 3 (emphasis added).
[54] *Id.* at ¶ 5, *citing Bishop Perry* at ¶ 14.
[55] Exhibit A at 10-11.
[56] *Id.* at 13 *(citations omitted).*
[57] *Order* at ¶ 8.
[58] *See Requests for Review of Decisions of the Universal Service Administrator by Canon-McMillian S School District, et al., Order,* 23 FCC Rcd 15555, ¶¶ 1, 5 (2008).

equipment so as to avoid confusion on the application constituted special circumstances, warranting a waiver of the USAC filing deadline.[59] That is precisely what occurred in TCC's situation regarding the Forms 466 for two of the three HHC Clinics.[60] Again, WCB ignored relevant precedent while treating TCC in an unlawfully discriminatory manner.

Further, as TCC explained, when it discovered its omission in March 2017, TCC immediately contacted USAC, requesting that it be permitted to file the Forms 466 for the HHC Clinics, but USAC refused.[61] And, USAC's website directed applicants to appeal filing deadline issues with the FCC, which is precisely what TCC did.[62] USAC did not permit TCC to file the Forms 466, which was another situation beyond TCC's control, *i.e.,* a special circumstance that warrants grant of TCC's Waiver Request.[63] Thus, through its denial, the WCB is effectively punishing TCC for adhering to the procedural directives of USAC and the Commission.

The Bureau's issue with TCC's discovering the omissions more than three months after the second filing deadline[64] is likewise irrelevant and misleading for several reasons. First, TCC filed its Waiver Request one month after USAC's decision to deny TCC's request to file the Forms 466.[65] The Commission's rules state that a party has 60 days to file a review of a USAC decision with the Commission.[66] TCC met that deadline; it followed the rules.

Second, WCB offered no legal reasoning for its implication that a period of a few months distinguishes a "valid" waiver request from one that should not be granted. And, the case to which WCB cites on this issue, *Bradford Regional Medical Center,* does not support the

---

[59] *Id.* at ¶ 5.
[60] Exhibit A at 10.
[61] *Id.* at 11 *(citations omitted).*
[62] *Id. (citations omitted).*
[63] *Acorn Public Library District* at ¶ 3 *(citations omitted).*
[64] Order at ¶ 8.
[65] *See* Exhibit A at 11.
[66] 47 C.F.R. § 54.720(a).

Bureau's position.[67]  In addition to not mentioning the matter of when a filing omission must be discovered to be timely enough to warrant a waiver (indeed, none of the cases WCB cited mentions that issue), that case concludes with the Bureau *granting* an HCP a Form 466 filing deadline waiver, while stating that "rigid adherence to filing procedures with respect to Bradford RMC does not further the public interest or the purpose of Section 254(h) of the Communications Act of 1934, as amended."[68]  As discussed herein, the Bureau ignored that same argument when presented by TCC.

Third, despite the factual scenario in that case where the applicant made a timely initial filing with USAC, nothing in *Bradford Regional Medical Center* suggests that the waiver would not have been granted if the filing had been untimely or had not been filed at all.  Rather, that case cites to the case TCC presented in its Waiver Request, *Bishop Perry*, in which the Commission granted waivers for applicants who did not make timely filings.[69]  Hence, the case cited by WCB is another example of the Bureau's inability to cite supportive precedent and it illegally treating TCC differently from similarly situated applicants.

The Order further asserted that the inadvertent omissions listed in TCC's Waiver Request that led to missing the filing deadline do not qualify as "ministerial or clerical errors, as suggested by TCC."[70]  That assertion is also contradicted by FCC precedent.  In *Bishop Perry*, the Commission specifically stated that "clerical or ministerial errors [include] failure to timely file an FCC Form 471,"[71] which is what occurred in TCC's situation.

---

[67] *See* Order at ¶ 8, *citing In the Matter of Bradford Regional Medical Center, Order*, 25 FCC Rcd. 7221 (2010).

[68] *Bradford Regional Medical Center* at ¶ 4.

[69] *Id.* at n.17 *citing Bishop Perry*.

[70] Order at ¶ 8 (*citations omitted*).

[71] *Bishop Perry* at ¶ 1.

WCB also ignored precedents cited by TCC in filings subsequent to the Waiver Request but are nonetheless part of the record in this proceeding,[72] wherein waivers were granted to applicants similarly situated to TCC.[73]

In the first of these cases, the Media Bureau agreed to accept a tardily filed renewal application in exchange for an applicant adopting a consent decree, agreeing to pay a forfeiture to the Treasury and commencing a compliance plan to prevent late filings in the future.[74] In accordance with that precedent, TCC proposed a consent decree including a suggested amount to be paid to the Treasury, and initiated a compliance plan, both of which were presented to WCB, which ignored them for over two years.[75]

In the second case, the FCC granted eight requests for waiver of the filing deadlines for high-cost universal service, including those that sought waiver based on a misunderstanding of the filing deadlines. The FCC held that waiver was warranted because strict enforcement of the filing deadlines was not in the public interest and the petitioners took steps to ensure they would not file late in the future.[76] That case is highly relevant, as TCC explained that its late filings were due, in part, to a misunderstanding of the new filing deadlines;[77] delineated why waiver

---

[72] *See* Order at n.1.

[73] *See e.g.,* Exhibit C, *citing Atlantic City Board of Education, Order,* 30 FCC Rcd 10583 (2015); *Federal-State Board Joint Board on Universal Service, Order,* 20 FCC Rcd 19212 (2005); *Requests for Review of Decisions of the Universal Service Administrator by Canon-McMillian S School District, et al., Order,* 23 FCC Rcd 15555 (2008).

[74] *Atlantic City* at ¶¶ 3, 9.

[75] The proposed consent decree and compliance plan (which TCC implemented in spite of the Bureau's lack of acknowledgement) are attached to Exhibit C.

[76] *Federal-State Joint Board* at ¶¶ 1, 12.

[77] Exhibit A at 10.

would be in the public interest,[78] and implanted a compliance program to ensure that it would not miss filing deadlines in the future.[79]

The third case concerns WCB granting 20 appeals of decisions by USAC to deny funding because E-Rate applicants' invoices were untimely filed or *not received by USAC*. WCB held that good cause existed to grant the waivers because, *inter alia*, the applicants missed a procedural deadline and did not violate a substantive rule; the goals of Section 254 of the Act would be served by waiving the rules; the applicants had a good record of compliance with the E-Rate rules; and denying the appeals would cause undue hardship and would prevent otherwise eligible schools from receiving the funds they need to bring advanced telecommunications and information services to their students.[80] All these factors are present in TCC's situation and were delineated in its Waiver Request.[81] The WCB failed to address, much less, distinguish clearly relevant precedent in denying TCC's Waiver Request.

The Bureau's unreasoned refusal to grant TCC's Waiver Request when it and the full Commission had granted waivers to similarly situated applicants, as well as the Bureau's failure to even mention, let alone distinguish, the precedents cited by TCC, constitutes abuse of discretion.[82]

---

[78] *Id.* at 17-19 (*citations omitted*).
[79] *Id.* at 20-21 and Exhibit C Appendix (compliance plan).
[80]*Cannon-McMillan School District* at ¶¶ 1,4, 6-8.
[81] Exhibit A at 10-12, 13 (*citations omitted*).
[82] *Marin TV Service Partners v. FCC*, 936 F.2d 1304, [] (D.C. Cir. 1991) (*citation omitted*) (issue remanded because the FCC did not adequately distinguish an apparently contradictory agency precedent); *Green County Mobilephone, Inc. v. FCC,* 765 F.2d 235, 238-39 (D.C. Cir. 1985) (FCC abused its discretion when it arbitrarily waived a deadline in one case but not in another).

3. **Whether the Bureau's Order disregards a relevant statute by ignoring TCC's argument that strict application of the filing deadline would be contrary to the statutory requirements of Section 254 of the Communications Act of 1934, and disregarding TCC's public interest and other arguments, resulting in an abuse of discretion?**

**Answer:** Yes. The Commission is required to address all significant issues raised by petitioners.[83] TCC stated in its Waiver Request that granting same would, in the words of the Commission, promote "the statutory requirements of Section 254(h) of the Communications Act of 1934" and allow TCC to "realize the intended benefits of [the Universal Service] program."[84] TCC also made a detailed public interest argument, explaining how upholding USAC's decision would directly and adversely affect the health care available to the Interior Region Alaska Natives.[85] The Bureau ignored both of those arguments.

Section 254(h) of the Act states, in pertinent part, that a telecommunications carrier shall, upon request, "provide telecommunications services which are necessary for the provision of health care services in a State, including . . . to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State."[86] And such a carrier shall be duly compensated for providing rural service "as a part of its *obligation to participate in the*

---

[83] *David Ortiz Radio Corp. v. FCC*, 941 F.2d 1253, 1254 (D.C. Cir. 1991) (decision remanded because the FCC "skated past the accusers' central argument"); *Illinois Public Telecommunications Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997), *clarified on reh'g*, 123 F.3d 693 (D.C. Cir. 1997), *cert. denied*, 118 S.Ct.1361(1998) ("FCC's *ipse dixit* conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking"); *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992), *cert. denied* 113 S.Ct. (1992) (case remanded because the FCC inadequately addressed challenge to the viability of a portion of its comparative hearing policy); *City of Brookings Municipal Telephone Co. v. FCC*, 822 F.2d 1153, 1171 (D.C. Cir. 1987) (case remanded because FCC, *inter alia* "ignored petitioners' argument that the "flash cut" proposed by NECA was grounded on an inaccurate figure").

[84] *See* Exhibit One at 13, *citing Bishop Perry* at ¶ 2.

[85] *Id.* at 17-19 (*citations omitted*).

[86] 47 U.S.C. § 254(h)(1)(A).

*mechanisms to preserve and advance universal service. "[87]*

Section 254(h) thus mandates that telehealth services should be available to any rural HCP that requests it and that carriers providing such service should be duly compensated through RCH funding. Consequently, any decision made by the Commission regarding RHC and other universal service programs, including requests for waiver of USAC filing deadlines, must further the statutory requirements of Section 254(h).[88]

In its Waiver Request TCC explained why granting same would further the statutory requirements of Section 254(h), as it would enable the HHC Clinics to "realize the intended benefits of the universal service program."[89]  The Order makes no mention of TCC's Section 254(h) argument.   That critical omission conflicts with many FCC precedents addressing requests for waivers of USAC filing deadlines.   The FCC considered the Section 214(h) argument in granting waivers in *Bishop Perry, Acorn Public Library District, Bradford Regional Medical Center,* but the Bureau chose to ignore its requirement to consider TCC's Section 214(h) statements. [90]

The Order also does not address TCC's argument about why granting its Waiver Request would serve that public interest.[91]  WCB itself states that waiver of an FCC rule is appropriate

---

[87] *Id.* (emphasis added).

[88] *Bishop Perry* at ¶ 14 (rigid compliance with USAC's application procedures does not further the purposes of section 254(h) or the public interest); *Bradford* at ¶ 4 (rigid adherence to filing procedures with respect to Bradford Regional Medical Center does not further the public interest or the purposes of section 254 of the Act); *Cannon-McMillan School District* at ¶ 7 (rigid adherence certain requirements that are "procedural" in nature does not promote the goals of section 254 of the Act - ensuring access to discounted telecommunications and information services to schools and libraries - and therefore does not serve the public interest").

[89] Exhibit A at 13, *citing Bishop Perry* at ¶ 2.

[90] *See Bishop Perry* at ¶¶ 2-3, 14; *Acorn Public Library District* at ¶¶ 2, 9; *Bradford Regional Medical Center* at ¶ 4.

[91] Exhibit One at 17-19 *(citations omitted).*

when the particular facts make strict compliance inconsistent with the public interest.[92] "The Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis."[93] And "[w]aiver of the Commission's rules is appropriate only when (i) special circumstances warrant a deviation from the general rule; and (ii) such deviation will serve the public interest."[94]

With WCB making those contentions and citing relevant precedent, it is astounding that WCB failed to even mention TCC's public interest argument or explain how denying the Waiver Request serves the public interest. This egregious omission in and of itself warrants reversal of the Order.[95]

WCB also failed to address TCC's argument that, regarding the multiple filing window matter, the FCC's Rules and USAC's website state there is one annual Form 466 filing window, *i.e.*, that Forms 466 will be accepted by USAC until June 30 of each funding year, and the August 26 Public Notice conflicts with that.[96] Rather, WCB merely contended that TCC should have known about the new filing windows because of the August 26 Public Notice and USAC's outreach program; hence "fair notice" of the new filing windows was given.[97] WCB did not mention TCC's assertion that information conflicting the August 26 Public Notice existed in the Commission's Rules and on USAC website, which violated established precedent.[98]

---

[92] Order at n.4 *citing Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir.) 1990.

[93] *Id. citing WAIT Radio* at 1159.

[94] *Id. citing Northeast Cellular* at 1116.

[95] *See Flagstaff Broadcasting Foundation v. FCC*, 979 F.2d 1566 (D.C. Cir. 1992) (FCC must respond to any serious alternative proposal that purports to serve the public interest than current FCC practice).

[96] Exhibit A at 13-15 (*citations omitted*)

[97] Order at ¶¶ 9-10, 13.

[98] *See McElroy Elecs. Corp. v. FCC*, 990 F.2d 1351, 1353, 1363 (D.C. Cir. 1993) (the Commission should adhere to deadlines and application timeframes it previously set).

The Bureau may waive rules for good cause shown, in accordance with the Administrative Procedure Act.[99] But, when the Bureau released the August 26 Public Notice, wherein it authorized USAC to impose multiple filing windows for Forms 466, it effectively waived the Commission's rule which permits only one filing window,[100] without undergoing the necessary procedures for a waiver of that rule. The August 26 Public Notice incorrectly states that the Commission has rules to permit multiple filing deadlines.[101] The precedent cited therein cites FCC rule 53.623(c), which in 1997 stated that the "Rural Health Care Corporation may implement such additional filing periods as it deems necessary."[102] But, WCB failed to state the critical point that in 2017 that rule *no longer existed*. Because the current FCC rule allows for only one filing window and WCB changed the rule without effectuating the proper waiver procedures, it is does not appear that the multiple filing windows were even legal.[103]

In any event, as discussed herein, the Commission has granted filing deadline waivers to applicants on the basis of confusion about those deadlines under circumstances that were less confusing that this one and where an applicant consulting the Commission's rules would find filing information that conflicts with that which was later published by USAC.

Special circumstances exist to grant TCC's Waiver Request.[104] By failing to consider TCC's public interest argument and ignoring the examples of hardship on the Alaska Natives if lack of RHC funding causes disruption in service to the HHC Clinics, WCB did not conduct an

---

[99] *See* 47 C.F.R. §1.3.

[100] *See* 47 C.F.R. § 54.675.

[101] *See* August 26 Public Notice at 1, n.6, *citing Federal-State Joint Board on Universal Service, Third Report and* Order, 12 FCC Rcd 22485 (1997).

[102] *Id.*

[103] *See Environmental, LLC v FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011 (the Commission must comply with its own regulations).

[104] *See supra* pp. 11-13.

essential analyses required by binding precedents.[105]   The Bureau's failure to address TCC's arguments concerning Section 254(h), public interest, and the filing windows is an abuse of discretion.[106]

### 4. Whether the Bureau's Order misstates material facts raised by TCC in its Waiver Request, resulting in an abuse of discretion?

**Answer:**  Yes.  The Commission's rules provide that an "erroneous finding as to an important or material question of fact" is grounds for review of a decision by delegated authority.[107]  The Bureau's Order contains several misstatements of material facts.

One such misstatement concerns the amount of RHC funding available for FY16, specifically the $35,380,855 held in "reserve."[108]  In response to TCC's request that part of the reserve fund could be used to pay out the $633,170.49 for the HCC clinics' telehealth services, as well as making up the $389,202.22 for the proration,[109] WCB stated: "The funds held in 'reserve' were fully allocated for appeals of funding requests that were denied or reduced and funding requests that remained pending for further review.  Accordingly, no funding year 2016 funds remain to provide additional support for funding year 2016 requests, as TCC suggests."[110] The Bureau's contention is a misstatement on many levels.

---

[105] *See WAIT Radio* at 1157 (waiver should be granted when it is demonstrated that strict compliance with a rule is inconsistent with the public interest and the requested relief would not undermine the policy objectives of the rule); *see also, Northeast Cellular* at 1166 (waiver is appropriate when special circumstances exist and deviation from the rule will serve the public interest) and *Astroline Communications Co. v. FCC*, 857 F.2d 1556, 1573 (D.C. Cir. 1988) (FCC's failure to follow guidelines from a statute and court decisions was arbitrary and capricious).

[106] *See* precedents cited in n.83 *supra*; *see also* 47 C.F.R. § 1.115(b)(2).

[107] 47 C.F.R. § 1.115(b)(2)(iv).

[108] Order at ¶ 14.

[109] *See* Exhibit A at 9, 17-19.

[110] Order at ¶ 14.

First, contrary to WCB's contention, TCC's Waiver Request *is* an appeal of a denied funding request for FY16. As explained herein and in the Waiver Request, USAC refused to allow TCC to file its three Forms 466, and USAC's website instructs applicants who appeal filing deadlines to do so at the FCC.[111]  Consequently, part of the reserve fund should be allocated for TCC's appeal.

Second, WCB discussed the reserve fund solely in the context of the proration issue, stating that TCC is asking for "additional support" for FY16.[112]  That is not true; TCC never asked for any "additional support." In its Waiver Request, TCC stated that USAC could have accepted the three Forms 466 for the HHC Clinics because, *inter alia*, it had "more than 35 million in reserve."[113]  TCC also discussed the reserve fund in context of proration,[114] but TCC did not ask for any "additional funding," *i.e.*, more that it would have received if USAC had accepted the three Forms 466 and had not prorated the FY16 funding. The distinction is that WCB could have ordered USAC to appropriate $633,170.49 out of the reserve fund for TCC's appeal of USAC's funding denial when it refused to accept TCC's Forms 466. The proration issued could have been decided separately – as TCC suggested. That could have been accomplished by a partial grant of FCC's Waiver Request or if WCB had bifurcated the proceeding as TCC requested.

Third, WCB stated that "no funding year 2016 funds exist" to accommodate TCC. That is also untrue. Even if it were assumed for the sake of argument that the FY16 reserve funds were depleted, in February 2017, six U.S. Senators wrote to the Commission, stating that "USAC is reporting that $90 million from the Pilot program may be available" [to replenish any

---

[111] Exhibit A at 11, 16-17 (*citations omitted*).

[112] Order at ¶ 14.

[113] Exhibit A at 9.

[114] *Id.* at 16-17.

shortfalls in FY16 RHC funding.[115]  WCB did not mention this source of funding, but a year later, the Commission decided to adopt a process for carrying over unused funds from prior years to shore up shortfalls for subsequent years.[116]  This same action could have been taken to allocate part the $90 million from the pilot program for FY16.

WCB further misstated an issue pertaining to TCC's evergreen contracts.  While TCC did, as WCB stated, argue that TCC's HCPs are deemed eligible for full RHC funding because USAC earmarks funding for them, TCC did not state, as WCB avers, that having an evergreen contract allows HCPs to "avoid submitting a request for discounts by filing a full funding application each year."[117]  In fact, TCC stated just the opposite.[118]  In any event, WCB did not dispute TCC's claim that USAC earmarks funding for evergreen contract holders, which is the reason why evergreen contract holders are exempt from competitive bidding.[119]  WCB's misstatements of fact constitute an abuse of discretion.

For all the foregoing reasons, the Commission should reverse WCB's Order and grant the relief requested in its Waiver Petition.

---

[115] *See* Exhibit H.
[116] See In the Matter of Promoting Telehealth in Rural America, Report and Order, FCC 18-82 (June 25, 2018) at ¶ 24.
[117] Order at ¶ 11.
[118] Exhibit A at 7-8.
[119] *Id. (citations omitted).*

Respectfully submitted,

Tanana Chiefs Conference

By _____

Allison D. Rule
Ronald E. Quirk
Its Counsel
Marashlian & Donahue, PLLC
1420 Spring Hill Road, Suite 401
Tysons, VA 22102
(703) 714-1305
www.commlawgroup.cpm

# VERIFICATION

I am Deputy General Counsel of the Tanana Chiefs Conference and am authorized to make this verification on its behalf. The statements in the foregoing Application for Review are true of my own knowledge, except as to matters which are therein stated on information or belief, and as to those matters, I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 2/14/2020

Nicholas J. Gasca
Deputy General Counsel
Tanana Chiefs Conference
122 1st Avenue, Suite 600
Fairbanks, AK 99701

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I caused a copy of the foregoing Application for Review to be served on the following persons:

Ryan B. Palmer
Chief
Telecommunications Access Policy Division
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554
(Hand Delivery)

Ajit Pai
Chairman
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554
(Hand Delivery)

Jessica Rosenworcel
Commissioner
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554
(Hand Delivery)

Michael O'Reilly
Commissioner
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554
(Hand Delivery)

Brendan Carr
Commissioner
Federal Communications Commission
445 12th Street, SW
Washington, DC 20054
(Hand Delivery)

Geoffrey Starks
Commissioner
Federal Communications Commission
445 12th Street, SW
Washington, DC 20054
(Hand (Delivery)

Yasamin Kubba
Marashlian & Donahue, PLLC
1420 Spring Hill Road
Tysons, VA 22102
(703) 714-1310

# EXHIBIT A

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of )<br>)<br>Request for Review and Waiver by )<br>Tanana Chiefs Conference of Decision )<br>By the Universal Service Administrative Company )<br>)<br>Interior Alaska Regional Health Consortium )<br>HCPs 10720, 10721, 11022, 10715, 10716, 10717, )<br>10718, 10722, 10723, 10724, 10726, 10727, 10729, )<br>10730, 10731, 10732, 10733, 10735, 10736, 10737, )<br>10738, 10739, 11011, 12804, 15464, 15465, 16362, )<br>10736, 176991, 10719 ) | WCB Docket No. 02-60 |

## REQUEST FOR REVIEW AND WAIVER

Victor Joseph
Chief / Chairman
Tanana Chiefs Conference
122 1st Avenue
Fairbanks, AK 99701
(907) 452-8251

April 28, 2017

## SUMMARY

Recent decisions by the Rural Health Care Division of the Universal Service Administrative Company ("USAC") have resulted in a greater than $1 million shortfall for Funding Year 2016 ("FY 2016") for certain rural Alaskan health clinics that are part of the Tanana Chiefs Conference ("TCC"), an intertribal consortium based in Fairbanks, Alaska. This is a tremendous amount of money for these rural health clinics, and losing the money will severely harm residents of the rural communities served by these clinics, where TCC's clinics are the only health care providers available. Accordingly, TCC submits this request to the Commission to reverse the USAC decisions.

First, TCC requests that the Commission review and reverse USAC's decision denying TCC's request to file certain FCC Forms 466 outside of USAC-imposed deadlines; or in the alternative waive Sections 54.623 and 54.675(c)(2) of its Rules to the extent necessary to permit TCC to file the subject Forms 466. TCC inadvertently failed to file Form 466 within the USAC imposed deadline for reasons described below, but the results of this error are devastating to the rural communities that rely on rural health care services, and strict enforcement of the deadline is contrary to the public interest.

TCC also requests that the Commission waive Section 54.675(f) of its Rules so that USAC will release full rural health care funding to all of TCC's consortium of rural health care provider clinics. USAC prorated FY 2016 funding to 92.5% for second filing window applicants, in order to meet funding demands. The FCC should waive this decision as it applies to TCC's rural health care provider clinics because TCC holds a USAC-approved evergreen contract; TCC did not receive fair notice that USAC planned to prorate funding; and USAC has the money to fully fund TCC's providers.

## TABLE OF CONTENTS

SUMMARY ........................................................................................................................... i

REQUEST FOR REVIEW AND WAIVER ................................................................................... 1

I.          FACTUAL BACKGROUND ........................................................................................... 3

   A.     TCC Provides Vital Health Services to Fifteen Thousand Alaskan Natives and
       American Indians in the State's Interior Region. ................................................. 3

   B.     The TCC-Run HCPs Are the Only Health Care Facilities That Serve the Residents of
       Their Rural Communities. ........................................................................... 5

   C.     TCC Relies Greatly on Telecommunications to Bring Health Care to These Remote
       Communities. .................................................................................................... 5

   D.     TCC's Evergreen Service Contract with DRS ...................................................... 7

   E.     TCC Cannot Provide Services Without RHC Funding. ........................................ 8

   F.     Form 466 Filing Deadline Issues. ........................................................................ 9

II.         STRICT ENFORCEMENT OF THE FILING DEADLINE IS CONTRARY TO
       THE PUBLIC INTEREST. ............................................................................................. 11

   A.     Standard of Review ........................................................................................... 11

   B.     The Commission Should Waive the FY16 Filing Deadline. .............................. 12

   C.     The Commission Should Enable TCC to Obtain Full Funding for All Its HCPs. .... 14

   D.     Waiver Serves the Public Interest Because USAC's Actions, if Upheld, Will Directly
       and Adversely Affect the Health Care Available to the Interior Region Alaska
       Natives. ............................................................................................................. 17

   E.     The Special Circumstances in This Case Demonstrate Good Cause for Waiver. ...... 19

   F.     Congressional and Commission Policy Favor Grant of This Waiver Request. ........ 21

III.        CONCLUSION ............................................................................................................. 21

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, DC 20554

| | |
|---|---|
| In the Matter of )<br>)<br>Request for Review and Waiver by )<br>Tanana Chiefs Conference of Decision )<br>By the Universal Service Administrative Company )<br>)<br>Interior Alaska Regional Health Consortium )<br>HCPs 10720, 10721, 11022, 10715, 10716, 10717, )<br>10718, 10722, 10723, 10724, 10726, 10727, 10729, )<br>10730, 10731, 10732, 10733, 10735, 10736, 10737, )<br>10738, 10739, 11011, 12804, 15464, 15465, 16362, )<br>10736, 176991, 10719 )<br>) | WCB Docket No. 02-60 |

## REQUEST FOR REVIEW AND WAIVER

Pursuant to Sections 1.3, 54.719, and 54.722 of the Commission's Rules,[1] the Tanana

Chiefs Conference ("TCC") hereby seeks review of a decision by the Rural Health Care Division

of the Universal Service Administrative Company ("USAC"), denying TCC's request to file

FCC Forms 466 ("Form 466") outside of the USAC-imposed filing windows for the Rural

Health Care ("RHC") Program for Funding Year 2016 ("FY16") for three of the rural health care

providers ("HCP") which are part of its consortium. These clinics are: (1) Hughes Village

Health Clinic ("HCP 10720"); (2) Huslia Village Health Clinic ("HCP 10721"); and (3)

Chalkyitsik Village Clinic ("HCP 11022") (collectively the "HHC Clinics").

In the alternative, TCC requests that the Commission waive Sections 54.623 and

54.675(c)(2) of its Rules[2] to the extent necessary for waiver of the USAC-imposed deadline, and

permit TCC to file the subject Forms 466 for FY16 funding.

---

[1] 47 C.F.R. §§ 1.3, 54.719, and 54.722.

[2] 47 C.F.R. §§ 54.623 and 54.675(c)(2).

TCC also requests that the Commission waive Section 54.675(f) of its Rules[3] so that USAC will release full RHC funding to all 30 of the HCP clinics in its consortium.[4] The Forms 466 for 27 of TCC's HCPs were filed during USAC's second FY16 filing window of September 1, 2016 – November 30, 2016. On April 10, 2017, USAC first announced that all HCPs that filed during the second filing window would have their RHC funding cut by 7.5%.[5]

As discussed more fully below, good cause exists for the requested review and waiver of the subject rules. Due in large part to confusion about USAC's new Form 466 filing policies (which varied substantially from previous years), some TCC officials inadvertently failed to file on behalf of the HHC Clinics during the first or second USAC-imposed deadlines. Shortly after discovering the omission, on March 23, 2017, a TCC official contacted a USAC RHC Tribal Liaison, explaining the issue and requesting that TCC be permitted to file the Forms 466 for the HCC Clinics. The USAC official informed TCC that there was nothing USAC could do to assist TCC because USAC does not have authority to grant such an extension or waive the Form 466 filing deadlines. This official had told TCC that there is no recourse and that USAC could provide no assistance.

Regarding the pro-rated funding matter, TCC has a multiyear contract with its telecommunications provider, DRS Technical Services, Inc. ("DRS") to provide vital telecommunications health services to all its HCPs. USAC granted this contract "evergreen" status.[6] Because USAC designates evergreen contract holders as automatically eligible for

---

[3] 47 C.F.R. § 54.675(f).

[4] A full list of the subject HCPs is attached hereto as *Exhibit One*.

[5] *See* USAC email dated April 10, 2017: "FY2016 September–November Filing Window Period Funding Information and Pro-Rata Factor Announced." A copy of this email is attached hereto as *Exhibit Two*.

[6] *See* USAC email dated April 12, 2017: "RHC Telecommunications Program – Funding Commitment Letter . . . ." A copy of this email is attached hereto as *Exhibit Three*.

funding, and exempts them from competitive bidding for RHC funding for every year the contracts are in effect,[7] USAC has earmarked funds available for evergreen contract holders. Hence, TCC's HCPs should not be subject to pro-rata RHC funding.[8]

It is critical to the health of thousands of Alaskan Natives that TCC's requested review/waiver be granted. TCC's HCPs stand to lose a total of $1,022,372.71 in eligible rural health care funding if USAC's decisions are permitted to stand. Specifically, USAC's refusal to allow the HHC Clinics to file their Forms 466 resulted in a shortfall of $633,170.49. The 7.5% reduction in funding results in TCC's HCPs losing a total of $389,202.22.[9] This is a tremendous amount of money for the HCPs; losing it will cause severe harm to the residents of the rural communities served by these clinics.

TCC's HCPs are the only health care providers in the subject communities; without the needed RHC funding, Alaska Natives in those villages will be denied critical health care services, which would result in an unnecessary increase in untreated illnesses and could cost lives. This is an extremely serious situation. TCC's requested review / waiver should be granted because good cause and unique circumstances exist, the public interest would be served, and severe hardship on the clinics and rural communities they serve would result if this request is not granted.

I.    FACTUAL BACKGROUND

A. TCC Provides Vital Health Services to Fifteen Thousand Alaskan Natives and American Indians in the State's Interior Region.

---

[7] *Id.* at 2.

[8] As illustrated below, USAC has the funds available to issue full RHC funding for evergreen contract holders such as TCC. Hence, USAC's reasoning for pro-rating funds for entities filing during the second filing window, the "total dollar value of all qualifying funding requests" (*See Exhibit Two)* is inapplicable to TCC.

[9] *See Exhibit Two.*

Tanana Chiefs Conference ("TCC"), is a Fairbanks, Alaska-based, non-profit intertribal consortium charged with advancing tribal self-determination and enhancing regional Native unity.[10] TCC's region covers an area of 235,000 square miles in interior Alaska, which is equal to 37% of the entire state and is just slightly smaller than the size of the state of Texas.

TCC provides a wide range of health and social services in a way that balances traditional Athabascan and Alaska Native values with modern demands, to forty-two Alaskan communities, including thirty-seven federally-recognized tribes[11] in Alaska's vast interior region. TCC is a signatory to the Alaska Tribal Health Compact with the U.S. Secretary of Health and Human Services, and carries out federal programs for Alaska Natives, American Indians, and other eligible individuals, through funding agreements with the Indian Health Service and the Bureau of Indian Affairs, as authorized by, *inter alia*, the Indian Health Care Improvement Act, 25 U.S.C. § 1601, *et seq.*, P.L. 94-437, as amended, and Titles V and IV of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq.*, P.L. 93-638, as amended ("ISDA"). Pursuant to ISDA, TCC operates and provides health care services at Chief Andrew Isaac Health Center, a state-of-the-art regional health clinic in Fairbanks, Alaska, three

---

[10]   *See generally* Tanana Chiefs Conference, https://www.tananachiefs.org/.

[11]   The federally recognized tribes located in the Tanana Chiefs Conference region are as follows: Alatna Village, Allakaket Village, Anvik Village, Arctic Village, Beaver Village, Birch Creek Tribe, Chalkyitsik Village, Circle Native Community, Evansville Village (aka Bettles Field), Galena Village (aka Louden Village), Healy Lake Village, Holy Cross Village, Hughes Village, Huslia Village, Koyukuk Native Village, Manley Hot Springs Village, McGrath Native Village, Native Village of Eagle, Native Village of Fort Yukon, Native Village of Minto, Native Village of Ruby, Native Village of Stevens, Native Village of Tanacross, Native Village of Tanana, Native Village of Tetlin, Native Village of Venetie Tribal Government, Nenana Native Association, Nikolai Village, Northway Village, Nulato Village, Organized Village of Grayling (a.k.a. Holikachuk), Rampart Village, Shageluk Native Village, Takotna Village, Telida Village, Village of Dot Lake, and Village of Kaltag. *See* Native Entities Within the State of Alaska Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 81 Fed. Reg. 26830 (May 4, 2016).

subregional health centers, and twenty-seven rural village clinics throughout the interior region, including Huslia, Hughes, and Chalkyitsik, to approximately 15,000 eligible beneficiaries.

### B. The TCC-Run HCPs Are the Only Health Care Facilities That Serve the Residents of Their Rural Communities.

The village of Huslia is in TCC's Yukon Koyukuk Subregion and is on the Koyukuk River, off of the Alaskan road system, and is approximately 258 miles northwest of Fairbanks. In 2016, TCC's telecommunications service provider, DRS, transitioned HCP 10721 from satellite connectivity to terrestrial microwave to improve its health care communications services.

The village of Hughes is located in TCC's Yukon Tanana Subregion, located 205 miles northwest of Fairbanks. None of the village residents live on the Alaskan road system. HCP 10720 was also transitioned from satellite to terrestrial microwave at the end of 2016 in order to upgrade its communications services.

The village of Chalkyitsik is in TCC's Yukon Flats Subregion. It is located 172 miles northeast of Fairbanks and is not on the Alaskan road system. This area does not have any terrestrial microwave services; connectivity to and from HCP 11022 is provided through a satellite connection.

TCC – through the HHC Clinics – is the only health care provider in all three of the subject rural communities. The same situation exists in the rural communities of TCC's other 27 HCPs.

### C. TCC Relies Greatly on Telecommunications to Bring Health Care to These Remote Communities.

Huslia, Hughes and Chalkyitsik are among the vast majority of village communities in the TCC region that are not connected by roads and are only accessible by air or water. Bad weather routinely prevents air travel to and from these communities for days at a time. The delivery of health care to these rural areas strongly depends on services such as electronic health record access, computerized physician order entry, and the ability to dispense medication over long distances. These vital services are accomplished through the rapid and reliable communications provided by TCC's contracted service provider DRS.

For example, physicians located in Fairbanks are in daily communication with TCC's HCPs' health care workers through the electronic health record service provided by Telehealth, which enables, via telecommunications, a wide variety of digital applications to deliver and document health care assessments, treatment, and medical records generated by health care providers. In addition to the aforementioned services, these applications include a wide array of tools used to enhance patient safety and continuity of care including teleradiology, telebehavioral health, telepharmacy, and distance learning systems.

One of the most critical communications services Telehealth provides is video teleconferencing for medical evaluation of patients when a provider cannot be on site for physical or mental health evaluation. Village clinics have pharmacy pickpoint machines, which enable pharmacists in TCC's main urban health center in Fairbanks to review the prescriptions requested by the health aides in the villages under authorization of their referral physician. Upon satisfactory review of the documentation and the prescription request in an electronic health record, the pharmacist electronically dispenses the medication in the subject clinics via the pickpoint machine.

DRS provides TCC high speed communications, which TCC requires in order for all the aforementioned services to function at the HCPs. Without the DRS-provided circuits to the HCPs, there would be no reliable options for connecting the HCPs to vital medical staff, records, and other necessary healthcare services.

Deprived of these services, the only way the residents of all these villages would be able to obtain necessary health services would be to take long and costly small commercial aircraft flights – when they are available – to hospitals and clinics located hundreds of miles away. Under that scenario, the overall health and well-being of the people in these remote villages would be severely degraded, as patients, many of whom are severely impoverished, would be forced to delay seeking health care until their illnesses became life-threatening. The inconvenience, unreliability, and prohibitive costs of air travel would render preventative care virtually unavailable, and many residents of these remote villages would avoid seeking healthcare altogether, with tragic results.

### D.  TCC's Evergreen Service Contract with DRS

In order to better serve the needs of its healthcare providers and patients, in 2006, TCC entered into a contract with DRS which USAC approved as an evergreen contract.[12] Evergreen contracts are multi-year contracts which provide for funding commitments during the terms of the contracts.[13] USAC is required to earmark $150 million per funding year for upfront payments and multi-year commitments for evergreen contract holders in the Healthcare Connect Fund ("HCF").[14] Moreover, evergreen contract holders in both the HCF and Telecommunications Program are exempted from having to engage in competitive bidding for

---

[12] *See Exhibit Three.*
[13] *See* 47 C.F.R. §§ 54.642(h)(4) and 54.644(b).
[14] *See* 47 C.F.R. § 54.675(a).

RHC funds during the term the evergreen contract is in effect.[15]  While these entities are automatically deemed eligible for full funding, USAC requires eligible HCPs with evergreen contracts in the Telecommunications Program to submit Forms 466 annually as an administrative requirement.[16]

TCC has had three consecutive evergreen contracts with DRS.  The current evergreen contract between TCC and DRS was effective December 2014, and runs through December 2019.  The scope of this contract provides for DRS to, in addition to providing the aforementioned services, build out middle mile infrastructure to rural TCC communities for the purpose of connecting the village clinics.  Those connections go directly from the clinics to TCC's urban office in Fairbanks, where physicians and other health care professionals can work with the HCPs to provide necessary health services.

### E.  TCC Cannot Provide Services Without RHC Funding.

RHC funding is a critical financial resource that offsets the exceedingly high cost of communications circuits to clinics, such as the HCPs, in isolated rural Alaskan villages.  The cost per circuit ranges from $7,000 to $42,500 a month, depending on the size of the village and clinic.  RHC subsidies cover close to 98% of the overall monthly cost, which dramatically lowers the cost to a few hundred dollars per month, per circuit.

If USAC does not release the FY16 funds to TCC, the HCPs would lose funding essential to narrow the financial gap between TCC's resources and the unmet medical needs of the Alaska Natives.  In short, the HCPs cannot provide the subject services without RHC funding.

---

[15] *See* 47 C.F.R. § 54.623; *see also Exhibit Three* at 2.
[16] *See* USAC Evergreen Contract – Rural Health Care Program. Text can be found at https://usac.org/rhc/telecommunications/health-care-providers/evergreen-contracts.aspx.

### F. Form 466 Filing Deadline Issues

The Funding Year for the RHC program is July 1 through June 30.[17] Every year since the inception of the RHC program, the annual deadline for filing a Form 466 for a given FY has been June 30. USAC would continue to accept Forms 466 after their annual filing windows.[18] The Commission's rules still list June 30 as the 466 filing deadline for a given FY,[19] as does the Form 466 instructions.[20] USAC's website, in the FAQ section, also states that the deadline for Form 466 submission is June 30.[21]

As discussed in an FCC *Public Notice* released in August 2016, for FY16, USAC imposed two Form 466 filing windows: (1) March 1, 2016 – September 1, 2016, and (2) September 1, 2016 – November 30, 2016.[22] The Commission anticipated that there would be a third filing window of February 1, 2017 – April 30, 2017.[23] But, USAC refused to accept any funding requests after the second filing window, even though USAC's RHC fund still has nearly $15 million remaining in the fund for FY16, plus more than $35 million in reserve.[24] It was not until April 10, 2017 that USAC announced that qualifying funding requests received during the second funding window would be pro-rated at 92.5%.[25]

---

[17] *See* 47 C.F.R. § 54.675(c)(4).

[18] *See* 47 C.F.R. §54.675(b)-(c).

[19] *See* 47 C.F.R. § 54.675(c)(4).

[20] *See* FCC Form 466 Instructions (July 2014) at 1, a copy of which is attached hereto as *Exhibit Four*. This version of the Form 466 was in effect in 2016. USAC switched to e-filing only in January 2017.

[21] See Answer to Q 12 USAC FAQs, a copy of which is attached hereto as *Exhibit Five*.

[22] *See Wireline Competition Bureau Provides a Filing Window Period Schedule for Funding Requests Under the Telecommunications Program and the Healthcare Connect Fund, Public Notice*, FCC, DA 16-979 (rel. Aug. 26, 2016) at 4.

[23] *Id.*

[24] *See* Funding Information – Rural Health Care – USAC.org, a copy of which is attached hereto as *Exhibit Six*.

[25] *See Exhibit Two*.

-9-

Unaware that USAC planned to prorate funds for entities – apparently including evergreen contract holders – that filed during the second filing window, TCC timely filed funding requests in the second filing window for all of the clinics it helps to support, except for the HHC Clinics.

The newly-imposed USAC filing deadlines for the HHC Clinic were missed due to administrative errors. The Form 466 filings for HCP 10720 and HCP 10721 were delayed because those locations were transitioning from satellite connections to terrestrial microwave, and the TCC official responsible for those filings put off filing the Forms 466 until after the transitions in order to avoid confusion in filing the Forms 466. That official was unaware of the filing windows and thought that TCC could file the Forms 466 after November 30, 2016 pursuant to the FCC rules and Form 466 instructions, which state that Forms 466 may be submitted until June 30 for the subject FY.

The filing for HCP 11022 was missed because of an oversight of the primary account holder who did not have that particular HCP on its list of HCPs for which a Form 466 should be filed.

In years past, it was not unusual for TCC to file its Forms 466 in December, because its current evergreen contract was executed in December 2014. That had not been an issue, because, pursuant to the FCC's rules, USAC accepted applications on a "first come, first serve" basis" until June 30 each funding year.

Prior to this situation, TCC had never missed a Form 466 filing deadline. TCC had made timely filings for more than ten years. The responsible officials for the subject clinics missed the USAC-imposed FY16 deadlines due to clerical errors, and some confusion over the filing deadlines.

TCC discovered its inadvertent omissions in late March 2017 and immediately took action to try to rectify the situation. On March 20, 2017, in preparation for filing Forms 466 for FY17 RHC funding, the primary account manager for TCC sought assistance from DRS on some technical matters. On March 22, 2017, DRS staff contacted the TCC primary RHC account manager to notify him of the discovery that the filing windows for FY16 had closed and that the Forms 466 for the HHC Clinics had not been filed. On the following Monday, March 27, 2017, a TCC account manager called the Office of Native Affairs and Policy to ascertain the correct USAC contact who could assist with this matter.

The same day, a TCC official contacted USAC RHC Tribal Liaison, Rebecca Schwartzman. When the official explained the situation and requested that TCC be able to file its Forms 466s, Ms. Schwartzman stated that the deadline was closed and there is nothing that USAC could do to assist TCC. TCC considered filing an appeal of Ms. Schwartzman's decision directly to USAC, but USAC's website states that any issue pertaining to a filing deadline or FCC rules should be appealed directly to the Commission.[26] As this request contains a rule waiver, filing it with the FCC comports with Commission rules.[27]

## II.     STRICT ENFORCEMENT OF THE FILING DEADLINE IS CONTRARY TO THE PUBLIC INTEREST.

### A. Standard of Review

The Commission's Rules provide that the Wireline Competition Bureau ("WCB") reviews decisions by USAC divisions *de novo*.[28] The Commission may waive its rules if good

---

[26] *See* Appeals at USAC.Org. Text can be found at http://usac.org/about/about/program-integrity/appeals.aspx.

[27] *See* 47 C.F.R. § 54.719(c).

[28] *See* 47 C.F.R. §§ 54.719 and 54.723.

cause is shown.[29]  The Commission has discretion to waive rules where the particular facts make strict compliance inconsistent with the public interest.[30]  The Commission may also take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.[31]  Waiver of the Commission's rules is appropriate if special circumstances warrant a deviation from the general rule, and such deviation will serve the public interest.[32]

### B. The Commission Should Waive the FY16 Filing Deadline.

The Commission should not allow TCC's inadvertent error to prevent it from receiving the subsidies necessary for vital telecommunications services.  TCC is a non-profit, charitable tribal organization, providing critical federally-funded health services to isolated Alaska Native communities that desperately need them.  If funding to which it is otherwise entitled is denied on the basis of an inadvertent administrative oversight, TCC will be forced to: (a) cut critical telecommunications service for its clinics; and (b) divert funds intended for healthcare for Alaska Natives to pay its service provider.  As described herein, this would cause severe hardship to Alaska Natives affected by this situation.

TCC respectfully requests that the Commission review USAC's decision to strictly enforce its Form 466 filing deadline and direct USAC to permit TCC to file the Forms 466 for the HCC Clinics.  In the alternative, TCC requests that the Commission waive Sections 54.623 and 54.675(c)(2) of its Rules [33] to permit TCC to file Forms 466 for RHC FY16 funding for its HHC Clinics.

---

[29] *See* 47 C.F.R. § 1.3.
[30] *See Northeast Cellular Telephone Co. v. FCC.* 897 F.2d 1164, 1166 (D.C. Cir. 1990).
[31] *See WAIT Radio v. FCC, 418 F.2d 1153, 1159 (D.C. Cir. 1969); Northeast Cellular* at 1166.
[32] *See Northeast Cellular* at 1166.
[33] 47 C.F.R. §§ 54.623 and 54.675(c)(2).

Review of the adverse USAC official's decision and/or waiver of these rules would be consistent with the Commission precedents in matters such as this. The Commission has permitted recipients to cure clerical and ministerial errors, *including failure to timely file forms*, in the context of receiving universal service support.[34] The Commission explained that relief from these types of errors promotes "the statutory requirements of Section 254(h) of the Communications Act of 1934" and allows intended recipients to "realize the intended benefits of the universal service program."[35] Accordingly, for several years, the Commission has granted waivers to allow applicants to cure inadvertent oversights when the circumstances warranted same.[36] The Commission also stated its intention to apply the policy of allowing filers to cure inadvertent errors respecting the RHC Pilot Program.[37]

The Commission's rules,[38] the Form 466 instructions,[39] and the FAQ section of USAC's website,[40] each state that Forms 466 will be accepted by USAC until June 30, the end of FY16.

Section 54.702(c) of the Commission's Rules states that USAC does not have the authority to make policy or interpret unclear provisions of FCC rules.[41] Federal courts have acknowledged the limited role of USAC; acting in contravention of FCC rules is not permitted.[42]

---

[34] *See Request for Review of the Decision of the Universal Service Administrator by Bishop Perry Middle School, New Orleans, LA, et al., Order*, 21 FCC Rcd 5316 (2006) at ¶¶ 1-2 (emphasis added).

[35] *Id.* at ¶ 2.

[36] *See Request for Waiver and Review of Decisions of the Universal Service Administrator by Academy of Math & Science Tucson, AZ et al., Order*, 25 FCC Rcd 9256 (2010); *Request for Review Bradford Regional District Hemet, CA, Order*, 24 FCC Rcd 12725 (2009); *Request for Review Bradford Regional Medical Center, Order*, 25 FCC Rcd 7221 (2010).

[37] *See Rural Health Care Support Mechanism, Order*, 22 FCC Rcd 20360 ¶ 97 n.310 (2007) (*citing Bishop Perry* at ¶ 23).

[38] See 47 C.F.R. § 54.675(c)(4).

[39] *Exhibit Four* at 1.

[40] *Exhibit Five* at 1.

[41] *See* 47 C.F.R. § 54.702(c).

[42] *See e.g., In re Incomnet, Inc.*, 463 F3d 1064, 1072 (9th Cir. 2006) (*citations omitted*).

-13-

USAC's sudden and unilateral decision to cut off the acceptance and processing of Forms 466 after the second filing window was an arbitrary decision to create policy, and unlawfully contravenes the Commission rule stating that the deadline for submitting Forms 466 is June 30.[43]

Moreover, USAC's action violates the "fair notice" requirement that it and the FCC are bound to honor. Federal courts have held that the fair notice standard is determined "whether 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform…'"[44]

The fact that the Commission's rules, the Form 466 instructions, and even sections of USAC's website list June 30 as the deadline for filing funding requests, USAC's refusal to accept any Forms 466 after November 30, 2016 represents the kind of prohibited "baffling and inconsistent fashion" of depriving a party of its rights under the rules that the U.S. Court of Appeals for the D.C. Circuit stated were prohibited, when it held that the FCC had failed to give fair notice of [an] interpretation and thus could not "use that interpretation to cut off a party's right."[45] There was no fair notice in these circumstances – a party acting in good faith by reviewing the Commission's rules, the Form 466 instructions and/or the FAQ section of USAC's website would conclude that the filing deadline was June 30.

C. The Commission Should Enable TCC to Obtain Full Funding for All Its HCPs.

TCC also requests that the Commission waive Section 54.675(f) of its Rules[46] so that USAC will release full RHC Program funding for all 30 of the HCPs in TCC's consortium.

---

[43] *See* 47 C.F.R. § 54.675(c)(4).
[44] *Trinity Broadcasting of Florida, Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (*citations omitted*).
[45] *Id.* (*citations omitted*).
[46] 47 C.F.R. § 54.675(f).

USAC approved TCC's multiyear contract as an evergreen contract, and consequently all of TCC's HCPs were deemed eligible; full funding for them was earmarked by USAC.[47]

In the past, TCC had always received full RHC funding for each funding year, as long as it filed by June 30, in accordance with the pertinent Commission's rule which is still in effect.[48] The Commission's August 26, 2016 *Public Notice* raised the unlikely but possible *pro rata* situation for entities filing after the first filing window.[49] But this *Public Notice* was released *after* the first filing window was closed.[50]

TCC filed the Forms 466 for all its HCPs (except the HHC Clinics) during the second filing window. On April 10, 2017, USAC announced for the first time that all the funding for HCPs who filed during the second filing window would be pro-rated to 92.5% of the requested funding.[51] This funding reduction adversely affected all of TCC's rural health care clinics.[52]

TCC understands that USAC is directed, pursuant to Section 54.675(f) of the Commission's Rules, to prorate funding if the demand exceeds the amount allocated during a given filing window.[53] But the unusual circumstances here warrant waiver of this rule, as well as the other rules for which waiver is requested herein.

First, full funds were/are available for all of TCC's HCPs because of, among other things, TCC's USAC-approved evergreen contract. By virtue of USAC's authorization of the subject contract as evergreen, USAC deemed TCC an eligible RHC funding recipient for the entire term

---

[47] *See* 47 C.F.R. § 54.642(h)(4) and *Exhibit Three at 2.*

[48] *See* 47 C.F.R. § 54.675(c)(4).

[49] *See Public Notice* at 5.

[50] *Id.* at 4.

[51] *See Exhibit Two.*

[52] *See Exhibit One.* The HHC Clinics will be impacted if the Commission permits them to file their Forms 466, but does not grant the request for full funding. *Id.*

[53] 47 C.F.R. § 54.675(f).

of the contract: 2014-2019. USAC knew that it had to set aside the funds for evergreen contract holders; the funds were already earmarked for TCC. This is illustrated by language in the most recent Funding Commitment Letter to TCC on behalf of one of its HCPs: "Note that the funding end date will coincide with the contract expiration date."[54] Hence, USAC should fully fund TCC for FY16, no matter when it filed its Forms 466, as long as it filed before June 30, 2017.[55]

Second, TCC did not receive the required fair notice that USAC had planned to pro rate funding for every HCP, even evergreen contract parties, who filed during the second filing window.[56] It was not until April 10, 2017 that TCC had any idea that it would have had to file during the first filing window to obtain full funding.[57] If TCC had had fair notice prior to the end of the first filing window, it would have filed during that window. As of this filing more than three-quarters of FY16 is over, and TCC has no time to budget or adjust budgeting to limit the impact of USAC's action.

Third, USAC has the money to fully fund telecommunications services for TCC's HCPs. USAC's own funding information for FY16 shows that this is the case. The total amount of FY16 RHC Program funds is $387,242,870 ($400,000,000 minus $12,700,000+ for admin expenses). The total amount of pending funding commitments is $241,466,119 plus commitments made $131,023,258 = $372,489,377. Hence, $14,753,493 remains in the RHC

---

[54] *See Exhibit Three* at 2.

[55] TCC has received its 2016 funding commitment letters and has started the process of filing the form 467's for funding at the prorated level. Because funding has been delayed three quarters of the year already, TCC is filing the forms to avoid additional USAC funding delays. The filing of the form 467's does not constitute agreement that the pro-rated funding is final and reserves its right to petition for waiver of the applicable rule and believes USAC should fully fund its HCPs, for the reasons stated herein.

[56] *See Trinity Broadcasting* at 628.

[57] *See Exhibit Two.*

fund after paying the pending commitments and the commitments made. Plus, USAC has $35,280,855 in reserve for FY16.[58]

Commission precedent states that reviews/waivers such as this one can be granted, and will have a "minimal effect on the overall federal Universal Service Fund... because the monies needed to fund these appeals have already been collected and held in reserve."[59] Accordingly, USAC could use a small part of its $35,280,855 RHC Program reserve fund to pay TCC the requested $1,022,372.71 in eligible rural health care funding which is badly needed to provide services to its HCP's rural communities.

### D. Waiver Serves the Public Interest Because USAC's Actions, if Upheld, Will Directly and Adversely Affect the Health Care Available to the Interior Region Alaska Natives.

TCC provides desperately needed health care services to Alaska Natives in extremely remote and hard-to-serve areas. Denial of TCC's request for RHC support would cause great hardship on TCC, which would not be able to purchase services from DRS or any other telecommunications service provider in the absence of RHC-funded discounts and subsidies. This would have a direct, substantial, and adverse impact on the Alaska Native populations TCC serves.

The $1,022,372.71 in RHC funding support that TCC seeks for eligible services received from DRS represents a substantial portion of the budget on which TCC relies to provide essential services to Alaska Native children, elders, and families throughout the Interior Region. Because the delay in filing the Forms 466 was due to administrative oversights, and because TCC did not have fair notice of the *pro rata* possibility until after the first filing window had closed, the

---

[58] See Funding Information – Rural Health Care – USAC.org.   A copy of which is attached hereto as *Exhibit Six*.
[59] *Bishop Perry* at ¶ 2.

shortfall was unbudgeted and TCC will be forced to re-budget health care funds to make up for the unexpected loss. The amount would pay for, among other things: air ambulance emergency transports, physician visits to the HCP's villages, patent visits to mid-level providers, and preventative care.

The RHC Program is intended to ensure that rural health care providers are able to obtain affordable telecommunications services on the same basis as urban providers.[60] The program is part of a crucial national effort to promote and expand the use of telemedicine and to encourage rural health care connectivity. The Commission has found that "too many clinics and hospitals lack affordable access to broadband connectivity adequate to handle basic telehealth tasks, like transmitting an x-ray, MRI, or other electronic medical records, or consulting remotely with a doctor."[61]

This is precisely the connectivity for which TCC seeks support: connectivity that provides critical links between the remote villages in which the HCPs are located to TCC's Fairbanks clinic.

Telemedicine and other healthcare technologies, "usually grouped together under the name health information technology ("IT") offer the potential to improve health care outcomes while simultaneously controlling costs and expanding the reach of the limited pool of health care professionals."[62] Broadband, which "enables efficient exchange of patient and treatment information by allowing providers to access patients' electronic health records (EHRs) from onsite or hosted locations removes geography and time as barriers by enabling video consultation

---

[60] *See* 47 U.S.C. § 254(h)(1)(A).
[61] *See Rural Health Care Support Mechanism, Notice of Proposed Rulemaking,* 25 FCC Rcd 9371, 9475 (2010).
[62] *See Connecting America: The National Broadband Plan,* 50 CR 1 (2010) at 199.

and remote patient monitoring and provides the foundation for the next generation of health innovation and connected-care solutions," is essential to the cause.[63]

The Commission further stated that the aim is to encourage "maximum utilization" of health IT solutions.[64] To do so, the Commission should be willing to occasionally waive strict application of its rules to HCPs when, as here, waiver would serve the public interest by alleviating hardship on TCC and the Alaskan Native communities, and more effective implementation of the Commission's overall policy on the RHC Program would be effectuated on an individual basis.

### E. The Special Circumstances in This Case Demonstrate Good Cause for Waiver.

Special circumstances exist in this case that support granting TCC its requested waiver. As discussed herein: (a) TCC's delays in filing the Forms 466 were the result of simple administrative errors[65] that should not result in a denial of funding;[66] (b) USAC provided inadequate notice that it would stop accepting Forms 466 after November 30, 2016, and that it would prorate funding;[67] and (c) TCC has an evergreen contract and USAC has the money to subsidize TCC as requested.[68]

Moreover, TCC has a solid record of complying with RHC Program rules and policies. For more than ten years TCC has been part of the RHC Program, and until this past year it had never missed a filing deadline. RHC has displayed diligence for several years; some inadvertent administrative errors during one Funding Year should not result in denial of funding.

---

[63] *Id.* at 201.

[64] *Id.* at 199.

[65] *Supra* pp. 10-11

[66] *See Bishop Perry* at ¶¶ 1-2.

[67] *Supra* pp. 10-11, 14-15.

[68] *Supra* pp. 15-16.

When TCC discovered its Form 466 filing error, it immediately contacted USAC. It attempted to work with USAC to resolve the issues, but USAC told TCC that there was nothing that can be done to assist them. TCC did not drop the matter, and immediately followed up by filing this waiver request with the Commission. In short, TCC was prompt and diligent in seeking to correct its error at every step.

The Commission is rightfully concerned with the efficiency and effectiveness of the RHC Program, and it seeks to prevent waste, fraud, and abuse in the program. Grant of this waiver will not in any way diminish the efficiency and effectiveness of the program, nor is there any risk of waste, fraud, or abuse.

As discussed herein, the Commission has granted waivers under similar circumstances, and due to the fact that USAC has more than sufficient money in reserve to enable full funding for TCC, grant of this waiver will have "minimal effect on the overall federal Universal Service Fund…"[69] Grant of this waiver will not result in any unwarranted gain for TCC; it is requesting only that it receive the funding for which it is eligible. All the money it receives through the RHC program is used for healthcare telecommunications services to serve its Alaska Native communities.

Recognizing the seriousness of this situation, TCC has implemented a quality control program to prevent missing any further filing deadlines and to ensure compliance with all USAC and Commission requirements going forward. TCC has increased the number of subject matter experts to keep track of the filing deadlines, ensure complete and accurate filings, and to file on time. TCC has also implemented a training program on USAC filing procedures; all of its subject matter experts are required to attend that training. Further, TCC has created a checklist

---

[69] *See Bishop Perry* at ¶ 2.

of all HCP locations and USAC filing requirements. More coordination with TCC's service provider is also being implemented. TCC's RHC Program training and compliance process will be documented, shared, and evaluated internally with a goal of continuous improvement to ensure complete conformance with all of its regulatory requirements.

TCC has a solid record of compliance and it is working diligently to fill in any gaps in its internal processes. TCC is working hard to ensure full compliance.

### F.  Congressional and Commission Policy Favor Grant of This Waiver Request.

Congress has repeatedly expressed its support for "assur[ing] the availability of adequate funds to address the unmet Indian health care needs."[70] Congress has stated:

> This Congress hereby declares that it is the policy of this Nation, in fulfillment of its special responsibilities and legal obligation to the American Indian people, to assure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy.[71]

The Commission has also expressed strong support for ensuring that rural communities have access to quality health care. In a letter to Congress, FCC Chairman Pai stated, in regards to the RHC:

> That program provides funding to eligible health care providers (HCPs) for telecommunications and broadband services necessary for the provision of health care. I deeply appreciate the importance of these HCPs serving rural communities and the need for universal service funding in making sure all Americans have access to state-of-the-art healthcare. As the son of a doctor in Kansas, who often travelled many miles to see his patients, I am well aware of the difficulty so many in rural America have in getting adequate healthcare. I have long made ensuring the viability of the RHC program for rural participants a priority.[72]

### III.  CONCLUSION

For all the foregoing reasons, TCC respectfully requests that the Commission reverse USAC's decision not to allow TCC to file its Forms 466 (tantamount to denial of funding) and to

---

[70] See S. Rep. No. 102-392 at 21 (1992), reprinted in 1992 U.S.C.C.A.N., 3943, 3962.

[71] See 25 U.S.C. § 1602(a).

[72] See Chairman Pai's Response to Senators King, Collins, Shaheen, Hassan, Udall and Heinrich Regarding the Commission's Rural Healthcare Program (Mar. 9, 2017).

prorate TCC's funding for all its HCPs; and grant waiver of the filing deadline and its other rules as stated herein, to enable TCC to obtain full funding to support eligible communications services from DRS. Denying this waiver request would result in severe hardship to the Alaska Natives of the Interior Region by preventing TCC from committing as many resources as possible to the provision of desperately needed health care services.

Respectfully submitted,

Victor Joseph
Chief / Chairman
Tanana Chiefs Conference
122 1st Avenue
Fairbanks, AK 99701

Date: April 28, 2017

## VERIFICATION

I am the Chief / Chairman of the Tanana Chiefs Conference, and am authorized to make this verification on its behalf. The statements in the foregoing Request for Review and Waiver are true of my own knowledge, except as to matters which are therein stated on information or belief, and as to those matters I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on    4/28/17

Victor Joseph
Chief / Chairman
Tanana Chiefs Conference
122 1st Avenue
Fairbanks, AK 99701

-23-

# EXHIBIT ONE

| July 1 2016 - June 30 2017 | | |
| --- | --- | --- |
| **TCC Monthly Service** | | |
| **Description** | **HCP#** | **Prorated Funding Delta** |
| Allakaket Village Health Clinic | 10715 | $ 6,086.36 |
| Evansville Village Health Clinic | 10716 | $ 6,086.36 |
| Eagle Village Health Clinic | 10717 | $ 6,086.36 |
| Louden (Galena) Village Health Clinic | 10718 | $ 37,658.68 |
| Kaltag Village Health Clinic | 10722 | $ 14,973.81 |
| Koyokuk Village Health Clinic | 10723 | $ 14,973.81 |
| Manley Village Health Clinic | 10724 | $ 14,973.81 |
| Minto Village Health Clinic | 10726 | $ 14,973.81 |
| Nenana Village Health Clinic | 10727 | $ 37,658.68 |
| Nulato Village Health Clinic | 10729 | $ 22,510.92 |
| Northway Village Health Clinic | 10730 | $ 12,309.01 |
| Rampart Village Health Clinic | 10731 | $ 6,086.36 |
| Ruby Village Health Clinic | 10732 | $ 22,510.92 |
| Stevens Village Health Clinic | 10733 | $ 6,086.36 |
| Tetlin Village Health Clinic | 10735 | $ 6,086.36 |
| Upper Tanana Health Clinic (Tok) | 10736 | $ 30,073.14 |
| Chief Andrew Issac - FAI-ANC Link | 10737 | $ 8,697.36 |
| Dot Lake Village Health Clinic | 10738 | $ 6,086.36 |
| Alatna Village Health Clinic | 10739 | $ 6,086.36 |
| Circle - CATG | 11011 | $ 6,086.36 |
| Tanacross Health Clinic | 12804 | $ 6,086.36 |
| Anaktuvuk Pass Counseling Center | 15464 | $ 12,309.01 |
| Tanana Health Clinic | 15465 | $ 22,510.92 |
| Allakaket Mental Health Clinic | 16362 | $ 6,086.36 |
| UTHC to Tok | 10736 | $ 1,362.89 |
| Tok Area Mental Health | 176991 | $ 1,362.89 |
| Healy Lake Health Clinic | 10719 | $ 6,086.36 |
| **No 466** | | |
| Hughes Village Health Clinic | 10720 | $ 13,662.90 |
| Huslia Village Health Clinic | 10721 | $ 21,334.33 |
| Chalkyitsik - CATG | 11022 | $ 12,309.01 |
| | | **$389,202.22** |

# EXHIBIT TWO

**From:** USAC Rural Health Care Program [mailto:outreach@usac.org]
**Sent:** Monday, April 10, 2017 1:28 PM
**To:** Maki, Joshua (Josh)
**Subject:** New MessageFY2016 September – November Filing Window Period Funding Information and Pro-Rata Factor Announced

Total Qualifying Funding Requests Exceeded the Total RHC Program Funding Available for FY2016 September – November Filing Window Period
View this message as a web page - Manage my subscription - Opt in



# FY2016 September - November Filing Window Period Funding Information and Pro-Rata Factor Announced

After review of funding request forms (FCC Forms 462 and 466) received during the second filing window period for FY2016 (i.e., September 1 – November 30, 2016), USAC will begin issuing funding commitments today, based on the total dollar value of all qualifying funding requests received during the September – November filing window period. All qualifying funding requests received in this filing window period will be pro-rated at 92.5% (reduction of 7.5%). The exact amount of funding each qualifying funding request will receive will be detailed in the funding commitment letters (FCLs).

The RHC Program team appreciates your patience over the past few months as we conducted our review of the FCC Forms 462 and 466 and determined the total dollar value of qualifying funding requests received during this filing window period.

## Pro-rata Factor and Commitments for the FY2016 September – November Filing Window Period

The total dollar value of all qualifying funding requests for the September 1 – November 30, 2016 filing window period was $274,725,249. Because this amount exceeds the RHC Program funding available of $254,255,017 at the beginning of the September – November filing window period, funding requests submitted during this filing window period will receive a pro-rated percentage of the qualifying funding requested. The pro-rata percentage for the FY2016 September – November filing window period is 92.5% (reduction of 7.5%). The exact amount of funding each qualifying funding request will receive will be detailed in the FCLs. Please be sure to review the FCL and verify that all information is accurate.

All qualifying requests submitted prior to the September – November filing window period will receive 100% of the requested funding.

**For more information:**

- View the <u>FY2016 funding webinar recording</u>
- Read about the <u>calculation of the pro-rata factor</u> for the September – November filing window period
- See <u>FY2016 Funding Information</u>

Need Help? Contact Us!
If you have any questions about the FY2016 pro-rata factor and how it was calculated please contact our RHC Help Desk by email at <u>RHC-Assist@usac.org</u>

© 1997-2017, Universal Service Administrative Company, All Rights Reserved.

This message was sent to <u>jmaki@drs.com</u> from: USAC Rural Health Care Program, <u>outreach@usac.org</u>, Universal Service Administrative Co. | 700 12th Street NW, Suite 900 | Washington, DC 20005

**Manage Your Subscription**

# EXHIBIT THREE

**Rasmussen, Renae**

| | |
|---|---|
| **From:** | rhc-assist@usac.org |
| **Sent:** | Wednesday, April 12, 2017 12:29 AM |
| **To:** | Rasmussen, Renae |
| **Subject:** | RHC Telecommunications Program - Funding Commitment Letter (FCL) - HCP # 15465 - FRN 16986871 |

| | |
|---|---|
| Date: | 11-Apr-2017 |
| Program: | Telecommunications Program |
| Funding Year: | 2016 |
| Health Care Provider (HCP) Name: | Tanana Health Center |
| HCP Number: | 15465 |
| HCP Contact Name: | Joshua Peter |
| HCP Contact Email: | joshua.peter@tananachiefs.org |
| HCP Contact Phone: | (907) 452-8251 |
| FCC Form 465 Application Number: | 43146323 |
| Funding Request Number (FRN): | 16986871 |

The Universal Service Administrative Company (USAC)'s Rural Health Care (RHC) Program completed the review of the Funding Request and Certification Form (FCC Form 466) submitted on behalf of the HCP referenced above. Based on the information provided, USAC determined that the HCP is eligible for the funding shown below. Additionally, if the HCP submitted a contract or service agreement with the form, the outcome of the contract review is included in this letter.

| | |
|---|---|
| HCP Physical Location: | 40 River Street, Tanana, AK, 99777 |
| Service Type: | Microwave Service |
| Bandwidth: | 15 Mbps |
| Service Provider Name: | DRS Technical Services Inc. |
| SPIN/498 Filer ID: | 143021118 |
| Billing Account Number: | tcctanana |
| Contract ID: | 769451 |
| Contract Friendly Name: | DRS WAN 20141201 |
| Contract Expiration Date: | 30-Nov-2019 |

| Funding Start Date | Funding End Date | Months of Funding | Non-Recurring Funding Amount | Monthly Recurring Funding Amount | Total Funding Amount | Committed Funding Amount* |
|---|---|---|---|---|---|---|
| 01-Jul-2016 | 30-Jun-2017 | 12.00000 | $0.00 | $25,106.00 | $301,272.00 | $278,761.08 |

The pro-rata factor for this filing window period is 92.52804%*

*This funding request was submitted during the FY2016 Filing Window 2 period. All qualifying requests (i.e., FCC Forms 466) submitted by the close of the filing window period are guaranteed to receive at least a

percentage of the funding requested. For each filing window period, if the total demand for RHC Program funding exceeds the total remaining funding available for the funding year, USAC will apply a pro-rata factor to each funding request. Learn more about funding request filing window periods here.

**Note that the funding end date will coincide with the contract expiration date. Therefore, if the contract ends during this funding year, the HCP must participate in competitive bidding before selecting a new service provider (or continuing formerly contracted services on a month-to-month basis) to be eligible for funding for the entirety of the funding year.**

It is the HCP's responsibility to review and verify that all information on this FCL is accurate. All account holders and the service provider listed on the form have received this FCL, and it is saved in the *My Documents* section of *My Portal*.

**Contract/Service Agreement Endorsement Determination: Evergreen**

Evergreen: For the life of the contract, the HCP is exempt from competitive bidding for the service(s) identified above, and therefore is not required to post a FCC Form 465 (Description of Services Requested and Certification Form). However, the HCP must submit the FCC Form 466 (and the FCC Form 467) to receive funding each year.[1]

**The Evergreen endorsement and competitive bidding exemption end when the contract expires.** The HCP must participate in competitive bidding at the expiration of the contract. This means that the HCP must post a new FCC Form 465 and wait 28 days before selecting a new service provider (or when continuing the formerly contracted service on a month-to-month basis). Funding Requests (FCC Form 466) must be subsequently submitted in all cases.

If, at any time, the funded services are not provided to the HCP, or the HCP is not otherwise receiving the approved funding, the HCP must notify USAC immediately.

The HCP entered Billing Account Number, certifications, and all other information provided on FCC Forms 465, 466, and 467 may be subject to audit by USAC and the FCC.[2] HCPs are subject to audits and other reviews that USAC and/or the FCC may undertake to ensure that the universal service support is used in compliance with FCC program rules. If the funded service(s) is not used in compliance with program rules, program participants will be subject to enforcement activities and other means of recourse by USAC and other appropriate federal, state, and local authorities.

**Next Steps**
Submit an FCC Form 467 (*Connection Certification Form*), which confirms receipt of the services for which funding has been approved, and the date on which the service provider began providing those services (and when those services ended, if prior to the end of the funding year). To submit the FCC Form 467, go to the *My Forms* tab of *My Portal* and find the applicable Form 466 or FRN, and click on the "Create 467" button. Once the Form 467 is approved, the HCP and the service provider will receive a copy of the HCP Support Schedule (HSS). Receipt of the HSS means that the service provider must begin crediting the HCP for the funding amount (if it has not yet done so) and may begin to invoice USAC.

**Errors and Corrections:**
If the funding amount, funding dates, or contract information is incorrect or missing, please contact the Rural Health Care Program Help Desk immediately by phone at (800)-453-1546 or by email at RHC-Assist@usac.org.

**Appeals:**

Before appealing a funding decision, contact the RHC Help Desk. To appeal this funding decision, deliver a letter of appeal to USAC within 60 days of the date of this letter. Detailed instructions for filing appeals are available at: http://www.usac.org/about/about/program-integrity/appeals.aspx. Details about and definitions of all terms used in this FCL are provided on the USAC website (www.usac.org/rhc).

**For More Information:**

Please do not reply directly to this email, as emails to this account will not be delivered to the RHC Program team. For questions or assistance, contact the Rural Health Care Program Help Desk at (800)-453-1546 or by email at RHC-Assist@usac.org.

For more information about the Telecommunications Program application process, refer to the Telecom Program Process Overview web page on the USAC web site at http://www.usac.org/rhc/telecommunications/process-overview/default.aspx/.

For more information about the FCC Form 467, visit the Telecommunications Program Forms web page at http://www.usac.org/rhc/telecommunications/tools/forms/.

The primary account holder will be copied on this and all correspondence from USAC related to this HCP.

---

[1] 47 C.F.R. 54.623(d).
[2] 47 C.F.R. 54.619(c).

# EXHIBIT FOUR

Approved by OMB
3060—0804
Estimated time per response: 3 hours
July 2014

# Form 466 Instructions
### Rural Health Care Universal Service Mechanism[1]

## PURPOSE OF FORM

The universal service support program for rural health care providers enables telecommunications carriers to provide service to rural health care providers (HCP) at reduced rates. Form 466 is the means by which an applicant identifies the telecommunications service, rates, carrier(s), and the date(s) of carrier selection. The applicant must submit one Form 466 for each service (i.e., circuit) for which the HCP is seeking a reduced rate. The Rural Health Care Division (RHCD) cannot commit Universal Service funds for the benefit of the HCP until Form 466 is received.

## FILING REQUIREMENTS AND GENERAL INSTRUCTIONS

### Who Must File

Only the HCP or its authorized representative may file Form 466.

HCPs cannot receive support directly from the universal service fund. Rather, HCPs may receive the benefit of reduced rates for telecommunications service from their selected telecommunications carriers, who will be compensated for the reduced rates by the Universal Service Rural Health Care Support Mechanism.

### When to File

Beginning with Funding Year 2004 (July 1, 2004-June 30, 2005), the FCC has set the June 30th end of the funding year as the deadline by which all Form 466s must be submitted. RHCD cannot accept Form 466s for a funding year after the June 30th end of that funding year.

Although RHCD will accept Form 466 and accompanying documentation at any time during the funding year, an HCP should strive to submit its Form 466 during the "initial funding request filing period." The "initial filing period" is a period during which all Forms 466 received by RHCD will be treated as if they had arrived on the first day for purposes of funding priority. The opening and closing dates of the initial filing period are announced each year on the RHCD website. Forms received after the close of the initial filing period will be processed and prioritized according to the date of receipt by RHCD. RHCD will continue to accept and process Forms 466 throughout the funding year, until RHCD reaches the annual funding cap established by the FCC.

Please note that there are certain prerequisites to completing Form 466. The HCP or its authorized representative must select the carrier(s) before completing Form 466. However, to satisfy the FCC's competitive bidding requirement, an HCP must wait at least 28 days after the descriptions set

---

[1] Rural Health Care Pilot Program Participants should consult the 2007 *Rural Health Care Pilot Program Selection Order*, WC Docket No. 02-60, Order, 22 FCC Rcd 20,360 (2007) (2007 RHC PP Selection Order), available at http://www.fcc.gov/cgb/rural/rhcp.html, concerning form completion and related program requirements. Additional information concerning the Rural Health Care Pilot Program is available on the Universal Service Administrative Company's (USAC) website at http://www.usac.org/rhcp/default.aspx and on the Federal Communications Commission's website at http://www.fcc.gov/cgb/rural/rhcp.html. Note, Pilot Program participants are instructed to complete FCC Form 466-A, not FCC Form 466.

forth in the HCP's Form 465 are posted on the RHCD website, before signing a contract or otherwise selecting the telecommunications carrier(s) to provide the services. RHCD will send a "Receipt Acknowledgement Letter" to each applicant who submits a Form 465. This letter will expressly identify the earliest date (Allowable Contract Selection Date) on which the HCP may sign an agreement or otherwise select a carrier to provide services to the HCP.

### Where to File

The FCC Form 466 must be filed with the Rural Health Care Program online through the online application system, My Portal (https://forms.universalservice.org/usaclogin/login.asp).

DO NOT FILE THIS OR ANY UNIVERSAL SERVICE FORM WITH THE FEDERAL COMMUNICATIONS COMMISSION.

### Compliance

Anyone filing false information may be subject to penalties for false statements, including fine or forfeiture, under the Communications Act, 47 U.S.C. 502, 503(b), or fine or imprisonment under Title 18 of the United States Code, 18 U.S.C. 1001.

### Where to Get More Information

You may contact RHCD at (800) 453-1546 for more information on how to complete this and other universal service forms. Information is also available on the RHCD website at www.usac.org/rhc.

### SPECIFIC INSTRUCTIONS FOR FILING FORM 466

Type or print clearly in spaces provided. Attach additional sheets if necessary.

### Block 1: HCP Information

Block 1 will help the applicant and RHCD identify each Form 466 filed.

Line 1 requires providing the HCP name. This name must be used consistently on all universal service forms (i.e., Forms 465, 466, 466-A, and 467). The HCP name should match the HCP name in Line 3 of Form 465.

Line 2 requires providing the HCP number. The HCP number is a unique identifier given by RHCD to each HCP applying for support. RHCD will assign an HCP number to each new applicant upon receipt of the Form 465. The HCP number entered on Line 2 must match the HCP number in Line 1 of the associated Form 465.

Line 3 requires providing the Form 465 Application Number. The Form 465 Application Number should match the Form 465 Application Number at the top of the Form 465.

Line 4 requires providing the name of the consortium, **if the HCP is a consortium member.** Leave Line 5 blank if the HCP is not a consortium member. If an HCP belongs to more than one consortium, it may have different points of contact, different connections, and different billing numbers. **In such a case, it is essential that different consortia names and different Bill Payer Information be provided to avoid processing delays.**

### Block 2: Bill Payer Information

Line 5 requires providing the billed entity's name. The "billed entity" is the entity that actually pays the bills of the service provider for the HCP. It may be the HCP itself, or it may be a "parent" organization or consortium to which the HCP belongs.

Line 6 requires providing the Billed Entity's FCC Registration Number (FCC RN). All participants in the Rural Health Care Program must have an FCC RN to be eligible for participation. Information on how to get an FCCRN is available on the FCC website at www.fcc.gov.

Line 7 requires providing the name of a contact person at the billed entity location. This person should be able to answer questions or verify the information submitted on this form, in the event that RHCD needs to contact the billed entity during the application process.

Lines 8-15 require providing the contact person's mailing address, city, state, ZIP code, telephone number, fax number, and email address.

### Block 3: Funding Year Information

Line 16 requires indicating the funding year (July 1 through June 30) for which the HCP is requesting support. Check ONLY one box. This information should match the information in Block 3 Line 26 of the Form 465 for the same funding year.

### Block 4: Service Information

Line 17 requires identifying the services for which the HCP is seeking reduced rates, and the circuit bandwidth if applicable. If ordering multiple circuits, e.g., 2 T-1s, the applicant must file a separate Form 466 for each circuit. The HCP must submit to RHCD a bill, contract, service offer or letter from the telecommunications carrier, which clearly identifies the service, bandwidth, and cost for which support is requested. The submitted document must be dated, and the date must be within the funding year for which support is requested. If the applicant does not have such documentation, or is unsure of the type of service or bandwidth, contact the service provider representative for clarification.

Line 17 is also used by an HCP seeking support for long distance toll charges to reach an Internet service provider, if the HCP does not have toll-free Internet access. Such support may equal the lesser of $180 or 30 hours of toll charges per month. To receive this support the HCP need not be located in a rural area, but must demonstrate the lack of toll-free Internet access and be an eligible health care provider. Only telecommunications toll charges, not support for monthly Internet access, can be so requested on Form 466. (Form 466-A is used to request support for Internet access charges). Any HCP using Form 466 to request such toll charge support should contact RHCD at (800) 453-1546 for assistance in how to document the need for such support.

Line 18 requires entering the total billed miles. Total billed miles must always be entered, for both mileage-based charges requests and comprehensive rate comparison requests. Billed miles identify the miles for which the service provider requires the payment of mileage charges. **Total billed miles are the sum of all miles billed by all telecommunications carriers as described in Line 36 or Line 42**

below. For instance, if one service provider bills for 100 miles and a second service provider bills for 150 miles, the total billed miles are 250 miles.

If a service provider bills for interoffice mileage only, the total billed miles will equal the interoffice portion of the circuit. If a service provider bills for local channel charges for local channel mileage and interoffice mileage, the total billed miles will equal the interoffice channel(s) mileage plus the local channel(s) mileage. Billed miles are determined by and may be obtained from your service provider if you do not have this information.

Line 19 requires entering the Maximum Allowable Distance (MAD) for the HCP. This is the maximum circuit distance for which support can be provided. The MAD is the distance from the HCP's location to the farthest point on the jurisdictional boundary of the largest city in the HCP's state. (Before July 1, 2004, the MAD was calculated from the HCP's location to the nearest large city of population 50,000 or more in the HCP's state. The Maximum Allowable Distance is determined by RHCD when Form 465 is posted initially on the RHCD website and will be shown on Line 8 following the HCP's County Name on the posted Form 465 on the RHCD website at www.usac.org/rhc.

Line 20 requires entering the percentage of the circuit in Line 17 that is used by the HCP for the provision of health care. If the percentage is less than 100%, briefly explain in the lines below how the percentage was derived (time of use, number of uses, bandwidth used, etc.).

The FCC has determined that non-profit entities functioning as eligible health care providers on a part-time basis are eligible for prorated support from RHCD commensurate with their provision of eligible health care services. These part-time non-profit rural health care clinics are eligible to receive supported services during the time that they function as a rural health clinic, even when they are associated with ineligible entities such as nursing homes, hospices, or other long-term care facilities.

The FCC also determined that dedicated emergency departments in rural for-profit hospitals constitute eligible rural health clinics, and as such are eligible for prorated RHCD support. These facilities must have indicated that they are a "dedicated emergency department of a rural for-profit hospital" on their Form 465.

If the applicant indicated on Line 27of Form 465 that it is a "part-time eligible entity," Line 20 should be used to explain how the prorated support portion was determined.

## Connection Information

The Connection Information section requires information about each of the connections that together comprise the entire circuit. Most circuits only contain one connection (i.e., one service provider for the entire circuit). If the HCP's circuit contains one connection, complete only the first column. However, some circuits contain multiple connections. There are usually multiple connections when there are multiple bills (i.e., more than one service provider) for the same circuit.

This form accommodates up to four service providers. The information for each connection should be entered in separate columns. Carrier A must be the service provider that provides the segment of the circuit connecting directly to the HCP. Carrier B should be the service provider for the next segment, Carrier C is service provider for the next and Carrier D is service provider furthest from the HCP.

Line 21 requires providing the full legal name of the selected service provider. Provide a service provider name for each segment of the circuit.

4

**Line 22** requires entering the 9-digit Service Provider Identification Number ("SPIN") for the service provider(s) listed in Line 21 above. Each service provider should provide its SPIN upon request.

**Line 23** requires providing the name of a contact person for the service provider. This person should be able to answer questions or verify rates or other information provided on this form, in the event that RHCD needs to contact the service provider during the application review process.

**Line 24** requires providing the telephone number of the contact person for the service provider(s).

**Line 25** requires providing the email address of the contact person for the service provider(s).

**Line 26** requires providing the address of the physical location where each service provider's circuit starts.

**Line 27** requires providing the address of the physical location where each service provider's circuit terminates.

**Line 28** requires providing the account number that the service provider has created to bill for the service. This information will help the service provider apply the credit to the proper account. Often, this is called the billed telephone number ("BTN") associated with the service. If there are multiple account numbers for a particular service, provide one main number. If the service has been established, the applicant should be able to find the account number on past bills, or the account number may be requested from the service provider. If the carrier has not yet established an account number for a new service, ask the service provider for a "pre-account" identifier for the service, and use that identifier.

**Line 29** requires providing a tariff, contract, or other document identification number for each segment of the circuit. Please contact the service provider representative and ask him/her for a contract or tariff reference number, if the applicant does not have this information. If the HCP is receiving service based upon a master contract signed by a state, regional, or local procurement agency, use either the master contract number or the number of the specific purchase agreement for the HCP's service under the master contract. If the HCP is receiving service under a contract, a copy of the contract must be attached to the Form 466.

**Line 30** requires identifying the date the HCP or its authorized representative entered into an agreement with a service provider, or the date the HCP or its authorized representative otherwise selected the service provider. For instance, this may be the date the HCP or its authorized representative signed a contract or requested that the service be installed.

The HCP or its authorized representative **must not select a service provider** or enter into a contract or purchase agreement with a service provider until at least 28 days have elapsed since the Form 465 was posted on the RHCD website. This is the Allowable Contract Selection Date (ACSD). An HCP with existing service may continue to receive (non-supportable) service during the 28-day posting period, but must not select a service provider to continue the service beyond the ACSD until the ACSD. Entering into an agreement prior to the ACSD could disqualify the HCP from receiving benefits under the universal service support mechanism for services under those agreements. If an HCP signs a long-term contract after their ACSD, they will be exempt from the 28-day posting for the original term (no optional extensions) of the contract. However, applicants are encouraged to post Form 465 each year, since reliance on an expired, or otherwise inadequate or non-binding contract to avoid the 28-day posting requirement could result in denial of support.

**Line 31** requires entering the date (mm/dd/yyyy) the contract expires (not counting any optional extensions). For tariff services identified as such in Line 29, enter "NA" for month-to-month (MTM) service.

Line 32 requires entering the date the service started or was installed, or for a new service, the date the applicant expects it to start.

Line 33 requires entering the amount the HCP pays per month, or the amount the HCP expects to pay per month for the service. This information should be taken from the service provider's bill, or from the new service offer or contract received from the service provider. The applicant must submit to RHCD a bill, contract, service offer or letter from the service provider, from which this information was taken. Please exclude from this amount any toll (per minute) charges, equipment charges, or other non-eligible charges that may be on the bill. Taxes and regulatory or related fees incurred in obtaining telecommunications service, which are assessed as a percentage rather than a fixed per line or per account charge, may be included in the rural rate for which support is requested. However, as noted below, the same taxes or fees must be included in the urban rate used for comparison.

Line 34 requires providing a circuit diagram if the HCP is part of a consortium or has multiple service providers for the service. The diagram need not be detailed, but must identify the individual sites and service providers, so RHCD can verify there is no overlap in support requests from multiple consortium members or multiple carriers involved in the service.

Line 35 requires the applicant to indicate if the HCP is a mobile rural health care provider. If not, check "NO" and proceed to Block 5. If the HCP is a mobile rural health care provider, check "YES" and provide an attachment listing the names and full addresses of all sites expected to be served by the mobile HCP during the funding year. For each site, indicate the expected schedule and duration of visiting each site. The HCP must verify that each of the sites is rural, or prorate the support request to cover only the time when the mobile health care provider will operate in a rural area. The HCP must maintain records of the supported services, any proration of support, and sites served for five years.

## Block 5: Mileage-based Charge Discount Request

Block 5 of Form 466 requires information about monthly mileage charges billed by the service provider. An HCP may choose to calculate support based on mileage only in Block 5, or the actual urban/rural rate difference in Block 6, but not both. **Complete either Block 5 or Block 6, depending on which is easier or provides the most support. RHCD cannot make that determination for an HCP. Processing of an application may be delayed if both Blocks are completed or support may be less than expected because RHCD will process the request using the information in only one of the blocks, which may not be what the HCP expected.**

Block 5 presumes that most of the disparity between urban and rural rates is due to distance-based charges. Thus, HCPs may be able to simplify their applications by requesting support for only the distance-based charges for their service, which constitutes most or all of the urban/rural difference in the cost of their selected service.

Line 36 requires entering the billed miles for each connection. The sum of billed miles for all connections should equal the "total billed miles" on Line 18. If the billed miles exceed the MAD (Line 18 exceeds Line 19), RHCD will limit supportable mileage to the MAD. The Standard Urban Distance (SUD) for the HCP's state will also be deducted from supportable billed miles. (Standard Urban Distances can be found on the RHCD website.)

Line 37 requires entering the monthly mileage charges for the service. Monthly mileage charges are the monthly cost to the HCP for the billed miles in Line 36. Monthly mileage charges do not include fixed charges for the circuit, such as channel termination charges. The fact that a circuit is distance sensitive does not make the entire billed amount a monthly mileage charge. Monthly mileage charges should

include taxes and regulatory fees that are applied as a percentage of the per mile charge. If the service has been established, the monthly mileage charges may be shown on the bill, or the applicant may need to ask the service provider's representative for mileage charge information. If the amounts on Line 37 and Line 33 are identical, please consult the service provider, because non-mileage charges may be incorrectly included on Line 37. If the service provider affirms that under their rate structure, the HCP does not pay any fixed, non-mileage charge for the service, please enclose documentation from the service provider certifying to that effect. The application cannot be processed without such documentation if the amounts on Line 37 and Line 33 are identical, as it will be presumed that the form contains incorrect information.

**Line 38** requires entering the cost per mile per month (e.g. $11.50 per mile) for each connection. If a circuit uses banded mileage, for example the first 10 miles are $10 per mile and the next 25 miles are $5 per mile, the monthly mileage charges should be listed that way. The applicant may need to ask the service provider for this information. This information should be consistent with the information on Lines 36 and 37, that is, the applicant should be able to derive monthly mileage charges (Line 37) by applying the cost per mile information on line 38 to the billed miles on Line 36.

## Block 6: Comprehensive Rate Comparison Request

**If the applicant completed Block 5, do not complete Block 6.** If both Blocks are completed, processing of the application may be delayed or support may be less than expected. If a service provider's rural rates are greater than urban rates for reasons that are not just due to mileage, the HCP may choose to use a comprehensive rate comparison of all elements of the service to determine the supportable urban/rural difference.

**Line 39** requires entering the one-time urban rate charge for the service listed in Line 17 **in any large city in the HCP's state** with a population of 50,000 or more. The one-time urban rate charge is the amount a service provider would charge to install the service in that large city. This should be documented in the same manner as for Line 40 below.

**Line 40** requires entering the actual one-time rural rate charge for the service listed in Line 17. The one-time rural rate charge is what the service provider will charge the billed entity to install the service listed in Line 17. If service was installed before the Allowable Contract Selection Date, the HCP is not eligible to receive installation support and Lines 39 and 40 blank should be left blank.

**Line 41** requires entering the monthly urban rate for the service listed in Line 17. Prior to Funding Year 2004, urban/rural rate comparison required the services to be as identical as possible. However, the FCC has now determined that comparability of urban and rural services may be based on functionality, from the end user's perspective. That means the urban service type and bandwidth should functionally match the actual service for which support is requested, even if the services are not identical.

For RHCD purposes only, the FCC created "safe harbor" categories of functionally equivalent services based on the advertised speed and nature of the service:

- Low        144-256 kbps
- Medium     257-768 kbps
- High       769-1400 kbps
- T-1        1.41-8 mbps
- T-3        8.1-50 mbps

7

Telecommunications services will be considered functionally similar when operated at advertised speeds within the same category (see above) and when the nature of the service is the same (symmetrical or asymmetrical). For example, a symmetrical fractional T-1 service operating at an advertised speed of 144 kbps would be considered functionally similar to a symmetrical DSL transmission service with an advertised speed of 256 kbps.

For HCPs seeking support for satellite service where a less expensive wireline service would be available, the amount of support for satellite is capped at the amount the HCP would receive for a functionally similar wireline service. HCPs seeking such support must document the urban and rural rates for the functionally similar wireline service. For example, if an HCP pays $10,000 per month for satellite service and the rural rate for a functionally similar rural wireline service is $1,500 per month while the comparable urban rate is $500 per month, the HCP could receive $1,000 per month in support for the satellite service. However, this limitation on support does not apply to mobile health care providers who can demonstrate that although wireline service might be available, satellite is a more cost-effective option over the course of a funding year in view of their mobile nature and the need for multiple changes to a wireline connection.

If an applicant procures service on a month-to-month rate, the comparison urban rate should be a month-to-month rate, whereas if the rural rate is for a multi-month contractual obligation of the HCP, the urban rate should use the same multi-month commitment. HCPs that procure service under a master contract that does not obligate the HCP to a multi-month commitment should base the urban rate on month-to-month service.

Applicants MUST document the urban rate. However, the RHCD website provides a "safe harbor" urban rate for many services and many locations. If an urban rate is on the RHCD website for the selected service in the HCP's state, the HCP can use that rate as documentation. An HCP may also document the urban rate offered by any common carrier in any large city of 50,000 or more in the HCP's state. An HCP may do this to show a lower urban rate (meaning a larger urban/rural rate difference and more support), or the HCP must do this if the RHCD website does not list an urban rate for the selected service/bandwidth in the HCP's state. When an HCP submits its own urban rate documentation, the urban rate should price a circuit of the Standard Urban Distance (SUD) in the HCP's state. (The SUD can be found on the RHCD website). Check the appropriate box on line 41 to indicate that other rate documentation is being submitted. Documentation may include tariff pages, contracts, a letter on company letterhead from the urban service provider, rate pricing information printed from the urban service provider's website, or similar documentation showing how the urban rate was obtained. The source of the documentation and the date must be clearly identifiable on the document. Please use arrows, circles, or otherwise point out the exact numbers or rates on which the rate comparison is based. (Do not use "highlighter" that will not copy). Tariff pages, without annotations and without carrier identification, are not acceptable. Please include only summary pages where possible.

If taxes and regulatory or related fees are included in the rural rate for which support is requested, the same taxes or fees must be included in the urban rate used for comparison. Taxes and fees are NOT included in the urban rates on the RHCD website, so if an applicant uses RHCD's posted urban rates, the tax or fee percentages that apply to the rural rate must be applied to the urban rate in the support calculation. Unless an applicant's supporting documentation makes it clear that taxes or regulatory fees are assessed as a percentage rather than as fixed, per line assessment, RHCD will not include them in the support calculation.

Lines 42 to 44 need only be completed if Line 18 exceeds Line 19, that is, if the HCP's billed mileage exceeds the Maximum Allowable Distance, in which case support must be reduced by the cost-per-mile times the excess miles. (Note that Lines 42 to 44 are identical to Lines 36 to 38. If Lines 36 to 38 were completed, DO NOT complete Lines 42 to 44, because only Block 5 or Block 6, but not both, should be completed.)

Line 42 requires entering the billed miles for each connection. The sum of billed miles for all connections should equal the "total billed miles" on Line 18.

Line 43 requires entering the monthly mileage charges for the service. Monthly mileage charges are the monthly cost to the HCP for the billed miles in Line 42. Monthly mileage charges do not include fixed charges for the circuit, such as channel termination charges. The fact that a circuit is distance sensitive does not make the entire billed amount a monthly mileage charge. Monthly mileage charges should include taxes and regulatory fees that are applied as a percentage of the per mile charge. Monthly mileage charges may be shown on the bill, or the applicant may need to ask the service provider representative for mileage charge information.

Line 44 requires entering the cost per mile per month (e.g. $11.50 per mile) for each connection. If a circuit uses banded mileage, for example the first 10 miles are $10 per mile and the next 25 miles are $5 per mile, the monthly mileage charges should be listed that way. The applicant may need to ask the service provider for this information. This information should be consistent with the information on Lines 42 and 43, that is, the applicant should be able to derive monthly mileage charges (Line 43) by applying the cost per mile information on Line 44 to the billed miles on Line 42.

**Block 7: Bid Documentation**

Line 45 requires confirmation of whether or not bids were received for the services requested. If bids were received, the applicant must submit copies to RHCD. **For identification purposes, write the HCP number on the first page of each bid copy.**

**Block 8: Certification**

Line 46 requires certification that the HCP or its authorized representative has considered all bids received (see Line 45) in response to the RHCD website posting of the HCP's Description of Services Requested and Certification Form (FCC Form 465). Line 46 also requires the applicant to certify that the HCP or its authorized representative has selected the most cost-effective method of providing the requested service(s). The most cost-effective service is defined in the FCC's *Universal Service Order*[2] as the method that costs the least after consideration of the features, quality of transmission, reliability, and other factors that the HCP deems relevant to choosing a method of providing the required health care services.

Line 47 requires certification that the HCP satisfies each of the specific requirements set forth in Form 466 and its instructions, and that the HCP will abide by the relevant requirements of 47 U.S.C. § 254.

Line 48 requires certification that the billed entity will maintain records necessary to document compliance with all Commission rules, including complete billing records for the service provided to the HCP at reduced rates, for a period of five years. Such records will be needed if the HCP is subject to audit, as provided by 47 CFR 54.619. Service providers shall also retain documents related to the delivery of discounted telecommunications and supported services for at least five years after the last day of the delivery of discounted services.[3]

---

[2]*Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order, 12 FCC Rcd 8776, 9134 (1997), as corrected by Federal-State Joint Board on Universal Service, Errata, CC Docket No. 96-45, FCC 97-157 (rel. June 4, 1997) (Universal Service Order) (subsequent history omitted).

[3]47 C.F.R. § 54.619(d); *Comprehensive Review of the Universal Service Fund Management, Administration, and Oversight*, WC Docket Nos. 05-195, 02-60, 03-109, CC Docket Nos. 96-45, 02-6, 97-21, Report and Order, 22 FCC Rcd 16372, 16385, at para. 26 (2007) (*Comprehensive Review Report and Order*).

Line 49 requires certification that the person signing the Form 466 is authorized to submit the information contained in the Form 466 on behalf of the HCP, and that the information contained in the Form 466 is true to the best of his/her knowledge, information, and belief. *Persons willfully making false statements on this form may be punished by fine, imprisonment, or forfeiture under federal law.*

Line 50 requires the authorized person to sign his/her name to certify all of the information contained in Form 466 and all attachments.

Line 51 requires the authorized person signing to identify the date that the Form 466 was signed. **Line 52** requires the printed name of the authorized person signing Form 466.

Line 53 requires the authorized person signing to identify his/her title or position.

Line 54 requires the name of the organization employing the signer of Form 466.

Line 55 requires the FCC RN of the organization employing the signer of Form 466.

### REMINDERS

- An applicant may not sign Form 466 until **after** Form 465 has been posted on the RHCD website for 28 days.

- The person signing the Form 466 must be authorized to provide the information required by Form 466 on behalf of the HCP, and must sign and date the form.

- The applicant must provide data for all items that apply. Incomplete applications will result in processing delays. Include additional information as supporting documentation if necessary. Any attachments to Form 466 must be clearly labeled.

- The applicant must submit the required documentation of the service or cost.

- If the applicant checked *Other rate* on Line 41, thereby indicating that he/she is submitting an urban rate other than the one provided on the RHCD website for the HCP's large city, the applicant must submit the required documentation to support the rate submitted.

- If the applicant answered *Yes* to Block 7 Line 45, copies of the bids received in response to the Request for Services must be submitted.

### FCC NOTICE FOR INDIVIDUALS REQUIRED BY THE PRIVACY ACT AND THE PAPERWORK REDUCTION ACT

Part 3 of the Commission's Rules authorize the FCC to request the information on this form. The data reported will be used to ensure that health care providers have selected the most cost-effective method of providing the requested services as set forth in 47 C.F.R. § 54.603(b)(4). The information will be used by

the Universal Service Administrative Company and/or the staff of the Federal Communications Commission, to evaluate this form, to provide information for enforcement and rulemaking proceedings and to maintain a current inventory of applicants, health care providers, billed entities, and service providers. No authorization can be granted unless all information requested is provided. Failure to provide all requested information will delay the processing of the application or result in the application being returned without action. Information requested by this form will be available for public inspection. Your response is required to obtain the requested authorization.

The public reporting for this collection of information is estimated to average 3 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information. If you have any comments on this burden estimate, or how we can improve the collection and reduce the burden it causes you, please write to the Federal Communications Commission, AMD-PERM, Paperwork Reduction Act Project (3060-0804), Washington, DC 20554. We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to pra@fcc.gov. PLEASE DO NOT SEND YOUR RESPONSE TO THIS ADDRESS.

Remember - You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB control number of 3060-0804.

THE FOREGOING NOTICE IS REQUIRED BY THE PRIVACY ACT OF 1974, PUBLIC LAW 93-579, DECEMBER 31, 1974, 5 U.S.C. 552a(e)(3) AND THE PAPEWORK REDUCTION ACT OF 1995, PUBLIC LAW 104-13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507.

# EXHIBIT FIVE

Frequently Asked Questions (FAQs) - Rural Health Care Program - USAC.org



USAC Home    Rural Health Care Program    Telecommunications Program    Frequently Asked Questions (FAQs)

## FREQUENTLY ASKED QUESTIONS (FAQS)

Funding Year
Electronic Certification
Eligibility
Services Eligible for Discount
Applying for Supported Services
Forms Assistance
Calculating Support
My Portal
My Portal - Consultants

Show All Answers

**Funding Year**

Q1: When can I apply for support for each funding year?

Q2: I have submitted an FCC Form 465. What do I do next?

Q3: What other documentation do I need to send in with the FCC Form 466?

Q4: Where do I enter the rural rate for the urban/rural rate comparison?

Q5: How do I obtain the urban rate?

Q6: How do I e-certify my form?

Q7: Can I submit the prefilled form as-is if there are no changes?

Q8: I've electronically certified my FCC Form 466. Now what?

Q9: What is acceptable documentation?

Q10: Does the bill have to be signed? Must it be an original copy? How recent should it be?

Q11: How do I submit my documentation?

**Q12: Is there a deadline for applications?**

A12: Forms must be received by RHC in time to meet program year requirements. The absolute deadline to submit an FCC Form 466 is June 30, the end of the funding year. Although FCC Forms 465 and 466 may be filed at any time during the funding year, all forms received by RHC during the form Filing Window will be treated as if they had arrived on the same day for purposes of funding priority.

Back to top

Q13: If an HCP is receiving support during the current funding year, how can it ensure there will not be an interruption of support for the upcoming funding year?

# EXHIBIT SIX

Funding Information - Rural Health Care Program - USAC.org



**Universal Service Administrative Co.**     **Universal Service Administrative Co.**

USAC Home    Rural Health Care Program    Telecommunications Program    Funding Information

### FUNDING INFORMATION

Funding Information Archive

The Rural Health Care (RHC) Program has a cap of $400 million per funding year to provide support for telecommunications and broadband services for eligible healthcare providers through the Telecommunications (Telecom) and Healthcare Connect Fund (HCF) Programs. Of the $400 million in funding, up to $150 million per funding year is available to support upfront payments and multi-year commitments under the HCF Program. Annual administrative expenses, representing the amount necessary for USAC to administer the RHC Program, are deducted from the annual cap to determine the total funding available per funding year.

For FY2016, USAC is now reporting "Total Funding Requests Received," and "Total Amount of Qualifying Funding Requests," instead of solely reporting on the "Commitment Requests Received" as done previously. "Total Funding Requests Received" more accurately reflects the original total funding amount as requested by applicants, and "Total Amount of Qualifying Funding Requests" describes the total qualifying funding after adjustments have been made by USAC.

 The total dollar value of qualifying funding requests for March 1 – August 31, 2016 was $133,044,983. Because this dollar amount was lower than the total amount available for the RHC Program for the funding year, qualifying funding requests submitted during that time will receive 100% funding.

 The total dollar value of qualifying funding requests for the September 1 – November 30, 2016 filing window period was $274,725,249. Because this dollar amount exceeded the total amount available for the RHC Program at the beginning of that filing window period, each qualifying funding request submitted during that time will receive a pro-rated amount of 92.5% of the qualifying funding request.

View previous funding years' HCF Program funding commitments and disbursements.
View previous funding years' Telecom Program funding commitments and disbursements.

**FY2016 Funding Information**

| RHC Program Funding – FY2016 | Funding Requests Received March 1 – Aug. 31, 2016 (Before Sept. 1 – Nov. 30, 2016 Filing Window Period)* | Funding Requests Received During Sept. 1 – Nov. 30, 2016 Filing Window Period | FY2016 Total |
|---|---|---|---|
| RHC Program Cap | $400,000,000 | $400,000,000 | $400,000,000 |
| USAC Administrative Expenses | $12,700,000 | N/A | $12,700,000 |
| RHC Program Funding Available | $387,242,870** | $254,255,017 | $387,242,870** |
| Total Funding Requests Received | $161,755,861 | $394,492,690 | $556,248,551 |
| Total Amount of Qualifying Funding Requests | $133,044,983 | $274,725,249 | $407,770,232 |
| Commitments Pending | $0 | $241,466,119 | $241,466,119 |
| Commitments Made | $131,023,258 | $0 | $131,023,258 |
| Reserve | $2,021,725 | $33,259,130 | $35,280,855 |
| Pro-Rata Factor | No Pro-Ration | 92.5 %*** (7.5% funding reduction) | N/A |

*Includes the FY2016 initial filing window period (March 1, 2016 – June 1, 2016) and the time period from June 2, 2016 – August 31, 2016.

**The $400M Rural Health Care (RHC) Program cap was reduced by approximately $12.7M in administrative expenses, representing the total amount of funding necessary for USAC to administer the RHC Program for FY2016.

***The pro-rata factor is based on the Total Amount of Qualifying Funding Requests of $274,725,249, which exceeds $254,255,017 (i.e., the total RHC Program funding available at the beginning of the September 1 – November 30 filing window period).

**FY2016 Funding Information Glossary of Terms**

## Funding Information - Rural Health Care Program - USAC.org

**RHC Program Funding Available** – *RHC Program Funding Available* for the time period before the Sept. 1 – Nov. 30, 2016 Filing Window Period is the total amount of funding available for the RHC Program for FY2016, which is calculated by subtracting the administrative expenses from the RHC Program's $400 million cap. For the Sept. 1 – Nov. 30, 2016 Filing Window Period, *RHC Program Funding Available* was calculated by subtracting the *Total Amount of Qualifying Funding Requests* before the Sept. 1 – Nov. 30, 2016 Filing Window Period from *RHC Program Funding Available* at the start of that same time period.

**Total Funding Requests Received** – Total amount of all original funding requests as submitted by applicants, before USAC reviews and makes adjustments.

**Total Amount of Qualifying Funding Requests** – Total demand for RHC Program funding from requests received during the two time periods after USAC review. This total includes the sum of *Commitments Pending, Commitments Made,* and *Reserve.* If the *Total Amount of Qualifying Funding Requests* in the filing window period exceeds the *RHC Program Funding Available* for the filing window period, all funding requests filed within the filing window period will be prorated, based on the *Total Amount of Qualifying Funding Requests* received during the filing window period. See the FY2016 Filing Window page.

**Commitments Pending** – Total amount of approved funding requests that are waiting to be committed.

**Commitments Made** – Total amount of approved funding requests that have been committed.

**Reserve** – Sum of total amount reserved for funding requests that require further review, and total amount of funding requests that have been denied and subsequently appealed or could potentially be appealed.

**Pro-Rata Factor** – The percentage of each qualifying funding request that will be approved for commitment. This percentage is applied to funding requests after they have been reviewed by USAC, which may have resulted in prior adjustments. This percentage is calculated by dividing the *RHC Program Funding Available* by the *Total Amount of Qualifying Funding Requests* for a filing window period, when the Total Amount of Qualifying Funding Requests exceeds the *RHC Program Funding Available.*

### Pro-rata Factor for FY2016

All qualifying FY2016 funding requests received by the close of the September 1 – November 30 filing window period will be pro-rated at 92.5% (reduction of 7.5%). An explanation of how the pro-rata factor was calculated is below.

| RHC Program Funding Annual Cap | Admin Expenses | Total Amount of Qualifying Funding Requests before Sept. - Nov. Filing Window Period | Funding Available for Sept. - Nov. Filing Window Period |
|---|---|---|---|

$$\text{Pro-rata Factor} = \frac{\text{Funding Available for Sept. - Nov. Filing Window Period}}{\text{Total Amount of Qualifying Funding Requests for Sept. - Nov. Filing Window Period}} = \frac{\$254,255,017}{\$274,725,246} = 92.5\%$$

The exact amount of funding each qualifying funding request will receive is detailed in each funding commitment letter issued beginning April 10, 2017.

---

**Universal Service Administrative Co.**

The Universal Service Administrative Company (USAC) is dedicated to achieving universal service. As a not-for-profit corporation designated by the Federal Communications Commission (FCC), we administer the $10 billion Universal Service Fund. With the guidance of the FCC policy, we collect and deliver funding through four programs that are focused specifically on places where broadband and connectivity needs are acute.

**SUBMIT**
Forms
Payments

**NAVIGATE**
Home
About USAC
Contributors
Service Providers
USAC En Español
High Cost
Lifeline
Rural Health Care
Schools and Libraries

**EXPLORE**
Trainings & Outreach
Subscription Center
Careers
Media
Appeals & Audits
Annual Report
Tools
FCC Orders
FCC Filings
Contact USAC



© 1997-2017, Universal Service Administrative Company, All Rights Reserved.

Website & Privacy Policies | Website Feedback

# EXHIBIT B

# Tanana Chiefs Conference
## Chief Peter John Tribal Building
122 First Avenue, Suite 600
Fairbanks, Alaska 99701-4897
(907) 452-8251    Fax: (907) 459-3850

**SUBREGIONS**

**UPPER KUSKOKWIM**
McGrath
Medfra
Nikolai
Takotna
Telida

**LOWER YUKON**
Anvik
Grayling
Holy Cross
Shageluk

**UPPER TANANA**
Dot Lake
Eagle
Healy Lake
Northway
Tanacross
Tetlin
Tok

**YUKON FLATS**
Arctic Village
Beaver
Birch Creek
Canyon Village
Chalkyitsik
Circle
Fort Yukon
Venetie

**YUKON KOYUKUK**
Galena
Huslia
Kaltag
Koyukuk
Nulato
Ruby

**YUKON TANANA**
Alatna
Alakaket
Evansville
Fairbanks
Hughes
Lake
Minchumina
Manley Hot
Springs
Minto
Nenana
Rampart
Stevens Village
Tanana

**Sent Via Email**

September 6, 2017

Ms. Radhika Karmarkar
Deputy Divisions Chief
Telecommunications Access Policy Division
Federal Communications Commission
445 12th Street SW
Washington, DC 20554

Re:    WCB Docket No. 02-60 Supplemental Letter

Dear Ms. Karmarkar,

I hope all is well. I am following up on our August 18, 2017, discussion regarding Tanana Chiefs Conference's (TCC) Request for Review and Waiver filed on April 28, 2017.

In the course of our last discussion, you noted the existence of Commission precedent supporting the denial of waiver requests based on inadvertent missed deadlines. While we acknowledge such precedent, we also want to again highlight the fact that there is also ample precedent supporting the pending request for a waiver.

Specifically, TCC's Request for Review and Waiver cited to the attached FCC Order. In the *Bishop Perry Middle School et al. Order*, the Commission stated as follows (at Para. 14):

- Under Bureau precedent deadlines have been strictly enforced for the E-rate program, including those pertaining to the FCC Form 471. We nevertheless find that good cause exists to waive the deadline.

- Notably, at this time, there is no evidence of waste, fraud or abuse, misuse of funds, or a failure to adhere to core program requirements.

- Furthermore, we find that denial of funding in these cases would inflict undue hardship on the applicants. In these cases, the applicants have demonstrated that rigid compliance with USAC's application procedures does not further the purposes of section 254(h) or serve the public interest.

The Commission's findings in the attached Order are directly relevant to our waiver request – namely, the same justifications for granting those waiver requests exist in our case. Here, there is absolutely no evidence or indication of waste, fraud, or abuse on the part of TCC. Moreover, as carefully set forth in our Request for Review and Waiver, denial would result in undue hardship to vulnerable rural communities. As the Commission itself has recognized, strict adherence to filing deadlines is not always necessary and can be contrary to the public interest. Granting our waiver request would have no detrimental impact on the

---

Tanana Chiefs Conference is a unified voice advancing Tribal governments, economic and social development, promoting physical

program because: (1) funds have been set aside as a result of the grant of an evergreen contract and (2) there is a sufficient reserve in place to address shortfalls in the program. Indeed, the use of the existing reserve to address shortfalls has been recommended by the Schools, Health & Libraries Broadband Coalition and members of Congress in their comments to and correspondence with the Commission.

Additional precedent for granting our waiver is found in the attached *PinPoint Communications* case. In that case, the Commission granted a petition for reconsideration by a paging company, which had filed a waiver request, asking the Commission to waive a post-auction application filing deadline that the petitioner had missed due to an administrative error. In granting the petition for reconsideration, the Commission determined that the public interest would not be served by strict enforcement of a filing deadline because such rigid enforcement would result in the denial of service to rural areas. The Commission also determined that petitioner's unique circumstances, *i.e.*, prior record of compliance and prompt action to remedy its delinquent filing, warranted a waiver (*see* paras 9-10).

The similar facts in our case demonstrate that a waiver is warranted. As stated in our Request for Review and Waiver, TCC has a long record of compliance with the Rural Health Care Program rules and policies. In the 10+ years that TCC has been a part of the Program, we have never missed a filing deadline until this incident. Moreover, once we discovered our filing error, we immediately contacted USAC and attempted to remedy the situation. And, as discussed below, we implemented a quality control program to prevent future mishaps (*see* pp.19-21).

We would like to also point out the issues raised in DRS Global Enterprise Solutions, Inc.'s ("DRS"), Petition for Reconsideration in Docket No. 02-60, filed on July 31, 2017; as those issues likewise bear on the Commission's decision on the instant request. Specifically, DRS is wholly correct in citing to inadequate notice of changes that were made to applicable filing windows and deadlines and resulting denial of due process to program participants (*see* pp 7-13).

Moreover, as we explained in pp. 20-21 of our Request for Review and Waiver, we fully recognize the seriousness of this situation and have implemented a quality control program to prevent missing any further deadlines and ensure compliance with all USAC and FCC requirements going forward. TCC will shortly submit to the Commission evidence and details about its compliance program and implementation of same. By this action, TCC will fully demonstrate to the Commission our commitment to regulatory compliance, including application filing deadlines.

We would very much like to schedule follow up discussions with you and other pertinent FCC staff members in order to arrive at a mutually acceptable resolution. Please let us know your availability for a meeting and the names of other staff that you believe should attend. Since this issue is of the upmost importance to Tanana Chiefs Conference and the communities we serve, we can attend this meeting in person.

Thanks for your time and consideration.

Sincerely,

Nick Gasca
Deputy General Counsel

# EXHIBIT C

 **MARASHLIAN & DONAHUE,** LLC
THE COMMLAW GROUP



October 6, 2017

**Ex Parte**

Mr. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, SW
Washington, D.C. 20554

       Re: *Rural Health Care Support Mechanism,* WC Docket No. 02-60

Dear Ms. Dortch,

       On October 5, 2017, Nicolas J. Gasca, Associate Counsel of Tanana Chiefs Conference ("TCC"), Allison D. Rule, Partner as Marashlian & Donahue, LLC, and I met with Radhika Karmarkar, Regina Brown, Jonathan Lechter, Dana Bradford, Soumitra Das, Carol Pomponio, and Preston Wise of the Wireline Competition Bureau.

       We discussed various topics related to the Request for Review and Waiver in the above-referenced docket that TCC filed on April 28, 2017. The attached summary provides additional information about the topics discussed at the meeting. Two documents that were presented at the meeting are also attached hereto.

       Should you have any questions regarding this matter, please feel free to contact me directly.

               Sincerely,

               Ronald E. Quirk, Jr.
               Counsel to Tanana Chiefs Conference

cc:     Radhika Karmarkar
         Regina Brown
         Jonathan Lechter
         Dana Bradford
         Soumitra Das
         Carol Pomponio
         Preston Wise

## Summary - FCC Meeting 10/5/2017

### Review/Waiver Request Factual Summary

- TCC, through its HCPs provides health care services to 15,000 rural Alaskans who would otherwise be without it. TCC has an evergreen contract with USAC. RHC funding covers 98% of telemedicine costs in Alaska. USAC's actions cost TCC over $1 million in health care funding for FY16: $633,171 by not letting TCC file its 466s for three of its rural clinics and $389,202.22 in prorated reduction in funding. **TCC CANNOT PROVIDE TELEMEDICINE SERVICES WITHOUT THIS FUNDING.** Services include electronic health record access, videoconferencing, computerized physician order entry, and dispensing medicine over long distances.

- USAC's new and suddenly announced filing deadlines for FY16 resulted in TCC missing filing windows for three of its clinics due to clerical errors (two were transitioning from satellite services during the windows, one involved a primary account did not have that clinic listed for 466 filing). TCC filed all its remaining 466s during the second filing window; USAC did not provide fair notice of, among other things, the proration possibility for filing in the second window.

- USAC reports that more than $90 million of unused funding from the RHC Pilot Program is available for reallocation (U.S. Senate's estimate). USAC is required by FCC rules to earmark $150 million per funding year for evergreen contract holders. Plus, USAC has more than $35 million in reserve funding for FY16.

- TCC has a more than decade-long record of perfect compliance with the RHC Program's rules and policies, including timely filing. TCC has implemented a training and compliance plan to ensure that all future RHC filings will be timely and complete. A summary of that plan has been submitted to the Commission.

### TCC's Requested Actions

- Order USAC to accept TCC's Forms 466 for the three subject rural health clinics.

- Fully fund TCC for FY16 by releasing $1,022,373 for all of TCC's HCPs.

### Legal, Regulatory and Policy Precedents for Granting Review/Waiver

- Letter to FCC dated February 16, 2017 from six U.S. Senators urged the FCC to release previously committed but unexpended funding from previous years to FY16 RHC applicants. The senators stated need for the additional funding to ensure rural HCPs do not face reductions in funding and flash cuts in services. The Senators averred that the FCC could immediately take this action on an interim basis and, because the money has already been allocated but not disbursed, there is no need to increase the USF Factor.

Denying TCC's requested actions will result in a devastating financial shortfall. Flash cuts to healthcare services to thousands of rural Alaskans cannot be avoided if TCC lacks the money to obtain the necessary telecommunications services.

• The Commission has granted waivers under similar circumstances. For example, the Commission permitted Universal Service Fund recipients to cure clerical and ministerial errors, *including late filing*, to receive full funding, in order to promote the requirements of Section 254 of the Communications Act. *See Request for Waiver and Review of Decisions of the Universal Service Administrator by Bishop Perry Middle School*, 21 FCC Rcd 5316 (2006) at ¶¶ 1-2. Section 254 states, in pertinent part, that consumers in rural areas should have access to telecommunications and information services. The Commission also stated that waivers such as this (allowing filers to submit Forms 466 after the deadline) can be granted, because they: (a) have a minimal effect on the Universal Service Fund (b) denial of the requested funding would inflict undue hardship on the applicants; and (c) there is no evidence of waste, fraud, or abuse. *Id.* at ¶¶ 2, 14.

All those factors are present in this case: (a) fully funding TCC would have a minimal effect of the Universal Service Fund because TCC is asking for funds that have already been collected but not disbursed; (b) denial of funding would have a devastating impact on the patients that use TCC's HCPS, as they would be forced forego critical medical treatment, as well as being unable to access prescription medicines; and (c) TCC asks only for what it would have received under the RHC if USAC had not refused to accept its three Forms 466 and had not prorated funding for those filing in the second window.

• The Commission has stated that, respecting RHC Pilot Program, recipients should be able to cure inadvertent application errors to ensure full funding. *See Rural Health Care Support Mechanism*, 22 FCC Rcd 20360 (2007) at ¶ 97, n.310.

TCC's errors were inadvertent ministerial errors. And, TCC has implemented a rigid training and compliance plan to ensure that these types of errors will not recur.

• The Commission waived its Form 466 filing deadline when the applicant's violation was a minor procedural error because "rigid adherence to filing procedures, which would have resulted in funding refusal, "does not further the public interest or the purposes of Section 254(h) of the Communications Act . . . ." *See* In *Request for Review Bradford Regional Medical Center Rural Health Care Universal Service Support Mechanism*, 22 FCC Rcd 7221 (2010) at ¶ 10.

Rigid adherence to the rules & USAC's procedures in this case would violate the statutory requirement and purpose of Section 254(h), which is to ensure that residents in rural areas have access to telecommunications and broadband services.

• The Commission implemented procedures for evergreen contracts so that HCPs can *ʃ* benefit from lower prices due to longer contract terms and streamlined administrative burdens. *See Rural Health Care Support Mechanism*, 27 FCC Rcd 16678 (2012) at ¶ 262. This is especially important in Alaska, "because the state's vast size, harsh winter

weather and sparse population make it challenging to deploy fiber or wireless networks in many rural areas [hence] [t]elecommunications services can thus be much more expensive to provide in rural Alaska locations than in urban Alaska locations." *Id.* at ¶ 92, n.251.

The benefits of TCC's evergreen contracts for its HCPs will be eviscerated if the TCC is not fully funded. Lack of funding will result in much higher prices for health care. Release of the funds already earmarked for TCC's evergreen contracts will alleviate that problem.

ɕ    The Commission has expressed concerns about the reliability of satellite communications to provide advanced telecommunications services to rural areas. Particularly problematic are the relatively low transmission speeds and latency of satellite communications. *See Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans*, 30 FCC Rcd 1375 (2015) at ¶¶ 9, 14, 24.

TCC is working with its service provider to install microwave links for communications to its HCPs. Many of its HCPs are/have been dependent on expensive and unreliable satellite services. The FY16 funding shortfall has halted this effort. TCC needs full funding in order to continue the transition from satellites to microwave links. If/when this transition is complete, it will result in lower prices and more reliable telehealth services for the HCPs.

ɕ    Chairman Pai has, on numerous occasions, publicly announced his support for the RHC Program and the critical function it serves by ensuring critical telemedicine services to underserved, rural areas. One example is contained in a letter Chairman Pai wrote to Senator Daines on this topic:

> As the son of two doctors in rural Kansas, I understand how connectivity can play a transformative role in the provision of medical care. I recall my father driving many miles at times to see patients. Having seen today how telemedicine is being used to improve the well-being of rural Americans, I support the RHC program. As Chairman, I will work to ensure it efficiently provides needed connectivity to rural health care providers. *See* Letter from FCC Chairman Ajit V. Pai to Senator Steve Daines (Sept. 13, 2017). Text may be found on the FCC's website.

Granting TCC's Review/Waiver Request will go a long way toward ensuring the rural Alaskans have access to the health care they desperately need.



Tanana
Chiefs
Conference

122 1ST Ave. Suite 600
Fairbanks, AK 99701
907-452-8251

**Memorandum re USAC Filing Deadlines**

**To:**    Victor Joseph, Tanana Chiefs Conference (TCC) Chief and President

**From:**    Michael Humphrey, TCC Acting Executive Director of Information Technology (IT)

**Cc:**    TCC IT Governance Committee, TCC Executive Managers

**Re:**    TCC IT Plan to Comply with USAC & FCC Deadlines

Below is TCC Information Technology's plan to ensure compliance with USAC & FCC filing deadlines.

- **IT Governance Committee (ITG):** Created FCC / USAC standing agenda items for TCC's IT Governance committee's monthly meetings.
  - Standing Agenda Items:
    - Provide summary reports each month detailing USAC & FCC timelines and filing applications by the Executive Director of Information Technology to ensure all deadlines have been met.
    - Provide summary reports from ITG members of timeline / filing tasks and updates on recent USAC & FCC news and developments.

  - ITG Members include key personnel from TCC's Health and Administration Departments.
    - George Bird – Dental Director
    - Michael Humphrey – Acting Executive Director of Information Technology
    - Ben Shilling – Deputy Financial Officer
    - Brian Ridley – Executive Finance Officer
    - Caleb Posey – Information Security Manager
    - Crystal Stordahl – CHAP/CHC Director
    - Chris Simon – Deputy Director of Health Services
    - Heather Rogers – Executive Director of Human Resources
    - Jacoline Bergstrom – Executive Director of Health Services
    - Jennifer Eden – Chief Andrew Isaac Health Center Director
    - Robert Lucas – Corporate Information Security Officer
    - Robin Fowler – Corporate Compliance Officer
    - Marilyn Andon – Behavioral Health Director
    - Will Mayo – Executive Director of Tribal Government
    - Tiffany Simmons – Tribal Development and Planning Director
    - Victor Joseph – President

- **Tracking Spreadsheet:** Created and shared a circuit tracking spreadsheet to reconcile TCC villages with FCC & USAC records.

- **Calendaring:** Added all pertinent filing deadlines to the calendars of the following key IT staff:
  - Michael Humphrey – Acting Executive Director of Information Technology
  - Caleb Posey – Information Security Manager
  - Richard Stevens – ERP Systems Administrator
  - Pam Stewart – Help Desk Manager

# United States Senate

WASHINGTON, DC 20510

February 27, 2017

Chairman Ajit Pai
Commissioner Mignon Clyburn
Commissioner Michael O'Rielly
Federal Communications Commission
445 12th Street SW
Washington, DC 20554

Dear Chairman Pai and FCC Commissioners:

Too many health care providers today – especially in rural areas – do not have access to affordable broadband of sufficient quality to support today's health care needs. Because rural areas have fewer doctors, aging populations, continuing economic challenges, and higher rates of serious injuries, chronic illnesses, and chemical dependency, increasing access to care in rural communities via broadband-enabled telemedicine has never been more important.

Unfortunately, health care providers that rely on the Federal Communications Commission's (FCC) Rural Health Care (RHC) program for broadband funding may see their support reduced or eliminated in the next few months. We ask that you take steps to leverage existing funding to avoid these reductions. Due to an unexpected recent surge in applications, the $400 million cap on the RHC program has already been met or exceeded for FY 2016. The Universal Service Administrative Company (USAC) which administers the RHC program announced on January 13, 2017 that the third filing window for FY 2016 funding has been cancelled because all of the funding for FY 2016 has been exhausted, due to high demand.

As a result, there is no funding available in FY 2016 for new applicants including "Skilled Nursing Facilities" (SNFs), which are now eligible for program support due to recent federal legislation. In addition, existing healthcare providers that have relied on funding over the last several years may not receive the same funding they have received in years past and may have to drop some of their broadband connections, causing disruption and harm to patient care.

Furthermore, because of the high demand for funding and the $400 million cap, applicants for FY 2017 funding are likely to apply early in the funding year, which could lead to an exhaustion of FY 2017 funds even earlier than in FY 2016.

The Rural Health Care program was initially used to enable rural healthcare providers simply to connect to the internet and send low-resolution X-rays and other medical tests to experts in urban healthcare facilities. Now that the technology has matured and innovation in telehealth continues to bring new services to rural areas, patients can have real-time two-way videoconferences with

medical experts, reducing their need to travel hours for a 30-minute consult at a physician's office, and doctors in rural America can collaborate with experts in their fields anywhere in the world. The growth in demand for funding for these high-capacity broadband circuits is strong evidence that broadband services provide tremendous value to rural patients, health care clinics and hospitals.

Unfortunately, the lack of funding for rural health care telemedicine services will harm several of our constituents, as these examples show:

- Using the Rural Health Care Pilot Program funding, New England Telehealth Consortium (NETC) built a successful telehealth network that currently serves 321 hospitals, clinics, and behavioral health sites in Maine, New Hampshire and Vermont. This network, which provides high bandwidth private broadband telehealth connectivity and internet connectivity, is critical to the operational communications between health care sites in New England and to the continuation of care to several hundred thousand patients. The NETC network is reliant on the RHC program support and would be harmed if funding is delayed or reduced.

- The New Mexico Telehealth Alliance is managing the Southwest Telehealth Access Grid (SWTAG) consortium. The consortium serves several healthcare organizations in the region, such as the Primary Care Association and close to 100 Federally Qualified Health Centers, as well as over 200 hospitals and clinics in the region and even in other states that are joining the consortium beyond the Southwest. The funding provided through the FCC's RHC Fund are critical to providing telehealth services and health information exchange needed by resource-limited healthcare providers. Without this funding, many of the members could not afford the broadband needed to support their network requirements and address the healthcare needs of their patients. This will especially impact Native Americans who reside on Indian reservations where behavioral health services and suicide prevention efforts are underway using telehealth. Furthermore, lack of affordable broadband will impact tele-stroke programs that can evaluate and treat acute stroke patients in distant or rural hospitals, preventing avoidable brain damage.

We ask you to address the future of the RHC as soon as possible. The Commission can and should take steps to avoid flash cuts or sudden funding reductions for health care providers that use this vital program. Specifically, we encourage you to act on the letter recently filed by the New England Telehealth Consortium and the Schools, Health & Libraries Broadband ("SHLB") Coalition and other requestors in the RHC docket. The SHLB letter proposes the FCC establish a mechanism similar to that in the E-rate program to allow previously committed RHC funds from prior years be made available for current applicants. In addition, USAC is reporting that $90 million of unused funding from the Pilot program may be available. Because previously committed funds have already been collected, re-allocation of these funds will not

require increased universal service fund collections. The Commission could take such action immediately on an interim basis to ensure that health care providers and consortia do not face funding reductions, thereby giving the Commission time to work on strengthening the future of the RHC program.

We appreciate your attention on this important matter and your efforts on behalf of improving healthcare in rural America.

Sincerely,

Angus S. King, Jr.
United States Senator

Susan M. Collins
United States Senator

Jeanne Shaheen
United States Senator

Margaret Wood Hassan
United States Senator

Tom Udall
United States Senator

Martin Heinrich
United States Senator

# EXHIBIT D

 **MARASHLIAN & DONAHUE,** LLC
THE *COMMLAW* GROUP



October 18, 2017

<u>**Via Email**</u>

Radhika Karmarkar
Deputy Division Chief
Telecommunications Access Policy Division
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, D.C. 20554

Re:     *Tanana Chiefs Conference – Proposed Consent Decree & Compliance Plan*
        *Rural Health Care Support Mechanism*, **WC Docket No. 02-60**
        *Confidential*

Dear Ms. Karmarkar,

Tanana Chiefs Conference ("TCC"), by its counsel, hereby submits a proposal to resolve the Rural Health Care Program ("RHC") funding matter concerning TCC's attempted filing of three FCC Forms 466 for FY16, as described in TCC's Petition for Review and Waiver ("Petition") filed on April 28, 2017. TCC's proposal consists of the attached Consent Decree and Compliance Plan.

TCC respectfully requests that TAPD consider this proposal as a full and complete resolution to the matter at issue. Alternatively, TCC requests that TAPD grant its pending Petition respecting the instant matter.[1]

TCC submits that ample precedent exists to resolve this matter as requested. For ease of reference, TCC has attached a summary of its *ex parte* meeting with TAPD on October 5, 2017. That summary contains legal, regulatory, and policy precedents for granting TCC's Petition. Those precedents can also be applied to resolving this matter by consent decree. Additional precedents are briefly summarized below:

> ♦     Media Bureau adopts consent decree to grant a licensee's tardily filed renewal application when petitioner agrees to pay a forfeiture to the Treasury and abide by a compliance plan to prevent such mishaps in the future. *Atlantic City Board of Education, Order*, 30 FCC Rcd. 10583, ¶¶ 3, 9 (2015).

---

[1] As stated in the attached Consent Decree, TCC requests that, in order to resolve the instant matter, the Commission bifurcate the funding proration matter discussed in its Petition and keep that pending as a separate appeal.

TCC's proposal is very similar to the one accepted by the Media Bureau in that case. TCC attempted to file three Forms 466 in March of 2017, but USAC would not accept them. TCC is proposing that the TAPD direct USAC to accept the Forms 466 as part of a consent decree in which TCC agrees to pay a forfeiture and abide by a compliance plan.

• Commission grants eight requests for waiver of filing deadlines for high-cost universal service support and directs USAC to disburse support to the petitioners for the relevant filing periods, including those that sought waiver based on a misunderstanding of the filing deadline rules. The Commission reasoned that waiver was warranted because strict enforcement of the filing deadline rules would not be in the public interest, and the petitioners took steps to ensure that they would not file late in the future. *Federal-State Joint Board on Universal Service (Requests for Waiver of Filing Deadlines), Order*, 20 FCC Rcd 19212, ¶¶ 1, 12 (2005).

This case is apropos to TCC's situation. As discussed in TCC's Petition (p. 10), the subject Forms 466 were not filed because of a misunderstanding about the newly-imposed FY16 filing deadlines and some administrative errors. TCC had never missed a filing deadline prior to FY16. If the deadline had remained as stated on the USAC website and other sources, TCC could have timely filed its Forms 466 (p. 9). And, TCC has taken steps vis-à-vis its compliance plan to ensure that it will not miss another deadline.

• TAPD grants 20 appeals of decisions by USAC to deny funding because E-Rate applicants' invoice forms were untimely filed or not received by USAC. TAPD directed USAC to accept the subject applications and remit payment to the applicants within 90 days of release of the Order. TAPD acknowledged that the applicants were confused about the funding year based on correspondence by USAC that prevented or delayed timely filing of the invoice forms. TAPD reasoned that good cause existed to grant the appeals because: (a) the applicants showed good faith efforts to comply with the rules; (b) the applicants missed a procedural deadline and did not violate a substantive rule; (c) the goals of Section 254 of the Act (ensuring access to discounted telecommunications and information services to schools and libraries) of the Act would be served by granting the appeals; (d) the applicants had a good record of compliance with the E-Rate rules; and (e) denying the appeals would cause undue hardship and prevent otherwise eligible schools and libraries from receiving the funding they need to bring advanced telecommunications and information services to their students ant patrons. *Requests for Review of Decisions by the Universal Service Administrator by Canon-McMillan School District, et al., Order*, 23 FCC Rcd 15555, ¶¶ 1, 4, 6-8 (2008).

Page 3

This case is right on point, as illustrated by the facts and arguments raised in TCC's Petition (pp. 9-11, 12-14, 17-20). Because TCC's situation involves health care, it is at least as critical, if not more so, for TCC to receive its funding as it was for the applicants who received theirs in *Canon-McMillan*.

Thank you very much for your attention to this critical matter. While TCC obviously hopes that TAPD will agree to resolve this situation as requested herein, TCC is willing to engage in further discussions with TAPD on this matter if necessary. TCC looks forward TAPD's response.

Sincerely,

Ronald E. Quirk, Jr.
Counsel to Tanana Chiefs Conference

Attachments (3)

cc:    Regina Brown
       Jonathan Lechter
       Dana Bradford
       Soumitra Das
       Carol Pomponio
       Preston Wise

# APPENDIX

## COMPLIANCE PLAN FOR TANANA CHIEFS CONFERENCE

TCC will institute the following procedures to ensure compliance with the FCC's Rules and USAC's filing deadlines. Unless otherwise provided, all terms defined in the Consent Decree will apply to this Compliance Plan.

## I.    IT Governance Committee Meetings

TCC's IT Governance Committee (IGC), consisting of sixteen (16) high-level officers and directors, has implemented a mandatory standing agenda items for its monthly meetings. These items include:

- The Executive Director of Information Technology will provide reports detailing upcoming FCC and USAC RHC filing deadlines, as well as recent applications filed to ensure that all applicable deadlines have been tracked and that filings have/will be timely made; and

- Provide summary reports from ITG members on recent FCC and USAC news and developments regarding the RHC and all administrative requirements in order to ensure compliance with same.

## II.    FCC Counsel

In-house FCC counsel will be engaged by IGC on an ongoing basis to provide guidance on all applicable FCC and USAC compliance matters. FCC counsel will review TCC's applications prior to filing with the FCC or USAC.

## III.    Training

IGC will conduct in-house training for all pertinent TCC employees and management on compliance with FCC Rules and USAC policies, particularly those associated with RHC. This training will be completed within thirty (30) days of the Effective Date. IGC will designate a management-level employee as Compliance Officer responsible for responding to TCC employees' questions and to consult with outside counsel familiar with communications law and compliance. To augment this training, the Compliance Officer and/or in-house FCC counsel will conduct a live workshop for all pertinent TCC employees and management, also within thirty (30) days of the Effective Date. ICG will repeat this workshop and use it as a refresher course for staff and management once every twelve (12) months.

## IV.     Tracking Worksheet

ICG will create and circulate internally a tracking spreadsheet to reconcile all the TCC HCPs with FCC and USAC records, filing requirements and deadlines, and all existing pertinent records.

## V.     FCC Reporting

TCC shall submit reports to the FCC on a quarterly basis during the two-year term of this Compliance Plan. The reports shall include an affidavit or declaration to the Bureau certifying that since the commencement of the Compliance Plan or the filing of the last such report, TCC is in compliance with the FCC's Rules and with the Consent Decree. The reports shall be signed by the Compliance Officer and in-house FCC counsel and shall contain the certification of each signatory that the representations in the reports are true.

## VI.     Supervision

The Compliance Plan, set forth above, shall be under the direct supervision of Michael Humphrey, TCC's Acting Executive Director of Information Technology or any TCC officer or director designated by Mr. Humphrey.

## CONSENT DECREE

### I.  Introduction

1.  This Consent Decree is entered into by and between the Wireline Competition Bureau of the Federal Communications Commission and the Tanana Chiefs Conference, by their respective authorized representatives, for the purpose of resolving certain issues regarding TCC's attempted filing of FCC Forms 466 outside of the FY16 filing windows. Successful filing of the Forms 466 is necessary to obtain funding from the Rural Health Care Program for three Alaskan rural health clinics that are part of TCC's Consortium.

### II.  Definitions

2.  For purposes of this Consent Decree, the following definitions shall apply:

    (a) "Act" means the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et. seq.*;

    (b) "Bureau" means the Wireline Competition Bureau of the Federal Communications Commission;

    (c) "Cap" means annual $400 million RHC funding cap, 47 C.F.R. § 54.675(a);

    (d) "Commission" or "FCC" means the Federal Communications Commission;

    (e) "Compliance Plan" means the processes and procedures developed by TCC in an effort to ensure compliance with the File Date Rule, as summarized in the Appendix hereto;

    (f) "Consortium" means a group of two or more eligible rural health care providers that request funding from the RHC through a single application, 47 C.F.R. § 54.604;

    (g) "Effective Date" means the date on which the Bureau releases the Order;

    (h) "Evergreen Contract" means a multi-year contract for eligible rural health care expenses, which exempts the applicant from having to undergo competitive bidding for rural health care funding during the contract term, 47 C.F.R. §§ 54.642(h)(4), 54.644(b);

    (i) "Execution Date" means the date on which this Consent Decree is executed by the last of the parties to do so;

(j) "Filing Window" means USAC-imposed RHC application window, during which HCPs' filings will be treated as if their applications were received simultaneously, *see* 47 C.F.R. §§ 54.675(c)(2), 54.675(c)(4);

(k) "Filing Date Rule" means Section 54.675(c)(2) of the Commission's Rules, 47 C.F.R. § 54.675(c)(2);

(l) "Form 466" means FCC Form 466, Rural Health Care Universal Service Funding Request and Certification Form;

(m) "FY16" means Funding Year 2016, the period of July 1, 2016 through June 30, 2017, the funding year for HCPs pertinent to this Consent Decree, *see* 47 C.F.R. § 54.675(b);

(n) "HCP" means rural health clinic that is eligible for funding under the RHC, 47 C.F.R. § 54.600(a)(5);

(o) "Order" means Order of the Bureau adopting the Consent Decree;

(p) "Parties" means the Bureau and TCC;

(q) "Petition" means the Petition for Review and Waiver filed by TCC on April 28, 2017;

(r) "RHC" means Universal Service Support Program for Rural Health Care Providers, 47 C.F.R. § 54.600 *et. seq.*;

(s) "Rules" means the Commission's Rules, found in Title 47 of the Code of Federal Regulations;

(t) "TCC" means the Tanana Chiefs Conference, a consortium of Alaska HCPs;

(u) "USAC" means the Universal Service Administrative Company;

(v) "Violation" means violation of the Filing Date Rule.

## III.    Background

3. On August 26, 2016, the Bureau announced that for the first time since the inception of the RHC in 1998, demand for RHC funding might exceed the $400 million cap in FY16. In order avoid a potential shortfall, the Bureau directed USAC to implement multiple Filing Windows for Forms 466: the first period ranging from 3/1/16 – 6/1/16, the second period covering 9/1/16 – 11/30/16; and, at USAC's discretion, a third filing window covering 2/1/17 – 4/30/17. During all previous funding years, the Filing Window ran from July 1 through June 30. *See* 47 C.F.R. § 54.672(c)(4).

4. With the exception of the three Forms 466 at issue, TCC filed all the required Forms 466 for the HCPs in its consortium within the second FY16 filing window.[1] Due to administrative errors, TCC missed the Filing Windows for the following HCPs: (a) HCP 10721 located in Hulisa, AK; (b) HCP 10720 located in Hughes, AK; and (c) HCP 11022 located in Chalkyitsik, AK.

5. TCC discovered its errors in March 2017. On March 27, 2017, TCC contacted USAC to request that TCC be permitted to file the three subject Forms 466, but USAC refused; stating that the Filing Windows had closed, and that any appeal should be filed with the FCC.[2]

6. On April 28, 2017, TCC filed its Petition, stating, among other things, that: (a) it has a multiyear contract with its service provider that USAC approved as an Evergreen Contract; (b) its failure to file the subject Forms 466s was due to inadvertent administrative errors; (c) it had a perfect record of compliance with the Commission's RHC rules and USAC filing deadlines for more than ten years; (d) USAC's refusal to accept the Forms 466 for filing resulted in a $633,170.49 shortfall for the subject HCPs; and (e) this scenario will force TCC to cut critical telecommunications services for its clinics and divert funds intended for health care for Alaska Natives to pay its service provider. This would cause severe hardship to the Alaska Natives affected by this situation. TCC requested that the Commission review USAC's decision to refuse acceptance of the subject Forms 466 or in the alternative waive the Filing Date Rule and direct USAC to accept the Forms 466 and obtain full funding for the subject HCPs.

7. TCC's Petition also requests review of USAC's decision to prorate RHC funding for Forms 466 received during the second Funding Window. That matter is beyond the scope of this Consent Decree. That proration matter is bifurcated from this proceeding and remains pending as a separate appeal.

8. In light of the compliance and funding issues raised by TCC's attempted filing of the subject Forms 466 and related matters stated in its Petition, the Parties have agreed to enter into this Consent Decree, by which both TCC and the Bureau intend to be legally bound.

## IV. Agreement

9. The Parties acknowledge that any proceeding that might result from TCC's Violation of the Filing Date Rule, the Bureau's possible denial of TCC's Petition and the resulting lack of as funding of the subject HCPs could be time-consuming and require substantial expenditure of private and public resources. In order to conserve such resources, resolve this matter, promote TCC's compliance with all pertinent Commission Rules, and ensure funding for the subject HCPs, the Parties are entering this Consent Decree in consideration of the mutual commitments made herein.

---

[1] TCC has thirty (30) Alaskan HCPs in its Consortium.

[2] USAC did not open the third filing window

10. The Parties agree to be legally bound by the terms and conditions of this Consent Decree. TCC and the Bureau each represent and warrant that its signatory is duly authorized to enter into this Consent Decree on its behalf. TCC agrees that Bureau has jurisdiction over the matters contained in this Consent Decree.

11. The Parties agree and acknowledge that this Consent Decree shall constitute a final settlement between TCC and the Bureau concerning TCC's failure to file the subject Forms 466 in accordance with the Filing Date Rule, as discussed herein.

12. In express reliance on the covenants and representations in the Consent Decree, the Bureau agrees to direct USAC to accept TCC's subject Forms 466 for filing *nunc pro tunc* and fully fund the subject HCPs in the total amount of $633,170.49 within ninety (90) days of the Effective Date, provided that TCC satisfies all its obligations under this Consent Decree. In the event TCC fails to satisfy any of its obligations under this Consent Decree, the Bureau may take any enforcement action available pursuant to the Act and the Rules with respect to each violation of this Consent Decree.

13. TCC acknowledges and hereby stipulates that by failing to file its subject Forms 466 within the FY16 Filing Windows, it violated the Filing Date Rule.

14. As part of the Order, the Bureau shall grant TCC's Petition only to the extent it pertains to the subject Forms 466.

15. In light of its Rule Violation, TCC agrees to pay a civil penalty to the United States Treasury in the amount of $2,000. Such contribution will be made, without further protest or recourse to a *trial de novo*, by check or similar instrument, wire transfer or money order payable to the order of the Federal Communications Commission. Payment by check or money order may be mailed to the Federal Communications Commission, at P.O. Box 979088, St. Louis, MO 63197-9000. Payment by overnight mail may be sent to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, Convention Plaza, St. Louis, MO 63101. Payment by wire transfer may be made to ABA Number 021030004, receiving bank: TREAS NYC, BNF: FCC/ACV – 27000001 and account number as expressed on the remittance instrument. If completing an FCC Form 159, enter the Account number in block number 23A, and enter the letters "FORF" in block number 24A (payment type code). TCC will also send electronic notification on the date said payment is made to radhika.karmarkar@fcc.gov. Payment in full shall be made no later than thirty (30) days after the Effective Date of this Consent Decree.

16. TCC represents that in addition to its existing policies and procedures it has adopted, it is currently in the process of implementing, and agrees to abide by, the Compliance Plan for the purpose of ensuring compliance with the Commission's Rules. TCC agrees, to the extent it has not already done so, to implement this Compliance Plan no later than thirty (30) days after the Effective Date and to keep such Compliance Plan in effect for two (2) years following the Effective Date.

17. TCC agrees that it is required to comply with each individual condition of this Consent Decree. Each specific condition is a separate condition of the Consent Decree as approved. To the extent TCC fails to satisfy any condition or Rule, it will be deemed noncompliant and may be subject to possible enforcement action, including, but not limited to, revocation of this Consent Decree, designation of this matter for hearing, letters of admonishment and/or forfeitures.

18. This Consent Decree will be binding on TCC's successors and assigns.

19. TCC waives any and all rights it may have to seek administrative or judicial reconsideration, review, appeal, or stay, or otherwise challenge the validity of this Consent Decree and the Order, provided the Order adopts this Consent Decree without change, addition or modification.

20. TCC agrees to waive any claims it may otherwise have under the Equal Access to Justice Act, 5 U.S.C. § 504 and 47 C.F.R. § 1.1501 *et. seq.*, relating to matters discussed in this Consent Decree.

21. TCC and the Bureau agree that the effectiveness of this Consent Decree is expressly contingent upon issue of the Order, provided the Order adopts the Consent Decree without change, addition or modification.

22. TCC and the Bureau agree that if TCC, the Commission or the United States on behalf of the Commission brings a judicial action to enforce the terms of the Order adopting this Consent Decree, neither TCC nor the Commission will contest the validity of the Consent Decree or Order, and TCC and the Commission will waive any statutory right to a trial *de novo* with respect to any matter upon which the Order is based (provided in each case that the Order is limited to adopting the Consent Decree without change, addition or modification), and will consent to a judgment incorporating the terms of this Consent Decree.

23. TCC and the Bureau agree that, in the event that this Consent Decree is rendered invalid by any court of competent jurisdiction, it will become null and void and may not be used in any manner in any legal proceeding.

24. This Consent Decree may be signed in counterparts and/or by telecopy and, when so executed, the counterparts, taken together, will constitute a legally binding and enforceable instrument whether executed by telecopy or original signatures.

**WIRELINE COMPETITION BUREAU
FEDERAL COMMUNICATIONS
COMMISSION**

By: _____

Date: _____

**TANANA CHIEFS CONFERENCE**

By: _____

Date: _____

# EXHIBIT E

**MARASHLIAN**
**& DONAHUE, LLC**
THE COMMLAW GROUP



May 2, 2019

<u>**Via Email and Courier**</u>

Ryan Palmer
Division Chief
Telecommunications Access Policy Division
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, D.C. 20554

> **Re:**   ***Tanana Chiefs Conference – Request for Expedited Action on***
> ***Waiver Request or Proposal to Resolve Rural Health Care Funding Matter***
> **WC Docket No. 02-60**
> <u>***Confidential***</u>

Dear Mr. Palmer,

Tanana Chiefs Conference ("TCC"), by its counsel, hereby requests that the Telecommunications Access Policy Division ("TAPD" or "Division") take expedited action regarding the above-captioned matter. Specifically, TCC requests that the Division act expeditiously to either: (a) grant TCC's Request for Review and Waiver ("Waiver Request") filed on April 28, 2017; or (b) accept its Proposal to resolve the issues regarding the outstanding Rural Health Care Program ("RHC") funding matters, filed October 18, 2017.[1] Both of the subject filings concern TCC's attempt to obtain RHC funding, which the Universal Service Administrative Company ("USAC") denied when it refused to let TCC file three of its FCC Forms 466 for FY16 funding in spite of the harm that the resulting lack of funding would cause Alaska Natives served by TCC's rural health care provider ("HCPs").

As detailed herein, an inordinate amount of time has passed since TCC filed its Waiver Request and Proposal. Meanwhile, TCC's severe financial shortfall continues. For those reasons, as well as those delineated below, expedited action is warranted in this instance.

The factual background of this proceeding is described in detail in the attached Waiver Request and Proposal. For ease of reference, however, a brief summary is provided here:

> ❖   USAC's new and hastily implemented filing windows for FY16 resulted in TCC missing both filing windows for three of its HCPs due to clerical issues (two were transitioning from satellite services during the windows, one involved an account that did not have a clinic listed for the Form 466 filing). TCC filed all of its remaining

---

[1] For the Division's convenience, copies of the Waiver Request and Proposal are attached hereto as <u>Exhibit One</u> and <u>Exhibit Two</u>, respectively.

Page 2

Forms 466 for FY16 during the second window, and had a prior perfect record of filing compliance. USAC did not provide fair notice of its new filing policies and deadlines.

- TCC, through its HCPs, provides health care services to more than 15,000 rural Alaskans who would otherwise be without it. RHC funding covers 98% of telemedicine costs in Alaska. USAC's actions cost TCC more than $1 million in health care funding for FY16: $633,171 by not allowing TCC file its FCC Forms 466 for three of its HCPs and $389,202.22 in prorated reduction in funding.

- On April 28, 2017, TCC filed its Waiver Request, wherein it explained in detail why strict enforcement of USAC's filing deadline and the resulting lack of funding to TCC's HCPs harms the public interest by adversely affecting the availability of health care to Interior Region Alaska Natives.

- On October 18, 2017, TCC filed its Proposal, which includes a draft Consent Decree and Compliance Plan. The Proposal was intended to provide the Division with an alternative and efficient means of resolving the instant matter.

Nearly two years have elapsed since TCC filed its Waiver Request, and more than 18 months have passed since TCC filed its Proposal. During the past two years, TCC has met with the Division[2] and has communicated several times with the Division. While the Division has been prompt in responding to TCC's communications, it has yet to act on TCC's Waiver Request or Proposal.

In its meeting with the Division, TCC stated that it wished to bifurcate this proceeding so the Division could separately rule on the late Form 466 filing and proration issues. The Consent Decree portion of TCC's Proposal further requests bifurcation of this proceeding by proposing that only the late Form 466 filing issue (and funding of $633,170.19) be effectuated in exchange for TCC agreeing to pay a civil penalty and implement a regulatory compliance plan.[3] As of this date, there has been no response concerning TCC's offer to bifurcate this proceeding.

TCC cited numerous precedents in its Waiver Request and Proposal wherein the Commission granted waivers or accepted consent decrees to applicants similarly situated to TCC, in which late filed applications were accepted and funding granted under various Universal Service programs. During the past year, the Commission has granted further waiver requests to applicants similarly situated to TCC.[4]

---

[2] TCC had an *ex parte* meeting with the Division on October 5, 2017.

[3] *See* Consent Decree at ¶¶ 12-16.

[4] *See Standing Rock Telecommunications, Inc., Order*, DA 18-1259 (Dec. 17, 2018) (Mobility Division grants waiver request of PCS licensee serving the Standing Rock Sioux Reservation, resulting in the Mobility Division accepting an extremely late filed license renewal application, when the delay was caused by "administrative oversite." The Mobility Division found that the waiver served the public interest by "facilitating the continued development and deployment of voice and data services to a remote and traditionally underserved community."); *see also Grants/Cibola County School District, Jemez Pueblo Tribal Consortium, Order*, DA 18-1060 (Oct. 17, 2018) (TAPD grants waivers of service implementation deadline to enable petitioners' more time to complete construction of their planned networks.).

Page 3

It is axiomatic that the Commission is required to treat similarly situated applicants in a similar manner. *See Melody Music, Inc. v. FCC,* 345 F.2d 730, 732-33 (D.C. Cir. 1965). With all the precedents cited by TCC and the precedents published by the Commission during the past year, TCC respectfully requests that the Division grant the relief requested by TCC.

Moreover, during the past two years, TCC has offered on numerous occasions, to provide the Division with any additional information it needs to expeditiously resolve this proceeding. Each time, the Division stated that no further information was required. Accordingly, it appears that the Division has a complete record in this proceeding.

For all the foregoing reasons, TCC respectfully requests that the Division promptly act to either grant TCC's Waiver Request or accept its Proposal. TCC is willing to work with the Division to expedite a resolution of this proceeding. But, if the Division does not act soon, TCC may be forced to file a request for a Writ of Mandamus with the U.S. Court of Appeals for the D.C. Circuit.

Thank you for your attention to this critical matter.

Sincerely,

Allison D. Rule
Ronald E. Quirk, Jr.
Counsel to Tanana Chiefs Conference

Attachments (2)

cc:    Chairman Ajit Pai
       Commissioner Michael O'Reilly
       Commissioner Brendon Carr
       Commissioner Jessica Rosenworcel
       Commissioner Geoffrey Starks
       Kris Monteith, Chief, Wireline Competition Bureau

# EXHIBIT F

 

**MARASHLIAN & DONAHUE, PLLC**
THE *COMMLAW* GROUP

July 12, 2019

**Ex Parte**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

**Re: Rural Health Care Support Mechanism, WC Docket No. 02-60**

Dear Ms. Dortch,

      Today, on behalf of my client Tanana Chiefs Conference ("TCC"), I met with Elizabeth Drogula, Philip Bonomo, Ryan Palmer, Trent Harkrader, and Regina Brown of the Wireline Competition Bureau ("WCB").

      The discussion concerned TCC's Request for Review and Waiver ("Waiver Request"), filed on April 28, 2017, by which, in pertinent part, TCC requested that the Commission review and reverse a decision by the Universal Service Company ("USAC") denying TCC's request to file three FCC Forms 466 outside of the USAC-imposed filing windows for the Rural Health Care ("RHC") Program for Funding Year 2016. USAC's decision prevented TCC from obtaining funding that TCC requires to provide telehealth services for three rural health care providers ("HCPs"), which are part of TCC's consortium.

      The crux of the discussion concerned TCC's request for expedited action on its Wavier Request. I also discussed the critical need for the telehealth services that TCC provides to the rural HCPs, as they are the only health care providers in the remote areas of Huslia, Hughes, and Chalkyitsik in Alaska. Citizens in those communities completely depend on the services provided by TCC. Those services are 98% funded by RHC. Accordingly, expedited action and a favorable decision on TCC's Waiver Request is critical to ensure that the healthcare services continue.

      Should you have any additional questions concerning this matter, please contact me directly.

                Sincerely,


                /s/Ronald E. Quirk
                Counsel to Tanana Chiefs Conference


cc:    Elizabeth Drogula
       Philip Bonomo
       Ryan Palmer
       Trent Harkrader
       Regina Brown

# EXHIBIT G





August 22, 2019

**Ex Parte**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

Re: **Rural Health Care Support Mechanism, WC Docket No. 02-60**

Dear Ms. Dortch,

On August 21st, 2019, on behalf of my client Tanana Chiefs Conference ("TCC"), I met with Preston Wise, Special Counsel to Chairman Ajit Pai, concerning the above-referenced proceeding.

The discussion concerned TCC's Request for Review and Waiver ("Waiver Request"), filed on April 28, 2017, by which, in pertinent part, TCC requested that the Commission review and reverse a decision by the Universal Service Company ("USAC") denying TCC's request to file three FCC Forms 466 outside of the USAC-imposed filing windows for the Rural Health Care ("RHC") Program for Funding Year 2016 ("FY16"). USAC's action resulted in TCC being denied desperately needed funding for telehealth services in rural Alaska.

The crux of the discussion concerned TCC's request for expedited action on its Wavier Request, which involves funding for critical telehealth services that TCC provides to the subject rural health care providers ("HCPs"), as they are the only health care providers in the remote areas of Huslia, Hughes, and Chalkyitsik in Alaska. Citizens in those communities completely depend on the services provided by TCC. USAC's decision resulted in a $633,171 shortfall for TCC. If the Waiver Request is not granted, the telehealth services provided by TCC to the subject HCPs will be put in jeopardy. Those services are 98% funded by RHC, and TCC cannot possibly pay for them without the RHC funding. Accordingly, expedited action and a favorable decision on TCC's Waiver Request are critical to ensure that the healthcare services for the three HCPs continue.

The conversation included the topic of a Public Notice issued by the Commission on August 26, 2019, wherein the Commission proposed three filing windows for FCC Forms 466 for FY16, the last of which would have been February 1, 2017 – April 30, 2017. These filing windows were intended to provide "a greater opportunity for HCPs filing within a filing window period to get some support, rather than none at all, even at the point where demand exceeds [the $400 million] cap." Instead of following the Commission's stated policy, USAC subsequently decided to cancel the third filing window, resulting USAC's refusing to accept TCC's Forms 466, which, due to inadvertent errors that delayed the filings (TCC had never previously missed an RHC filing deadline) TCC would have filed in March 2017. Had the third filing window listed in the aforementioned Public Notice been in effect, TCC could have timely filed its Forms 466 to obtain necessary funding for telehealth services for the three HCPs.

Mr. Wise and I further discussed USAC's reserve fund, which is intended to be used in situations such as this one, where USAC denies funding requests and those requests are or could be appealed. As

Page 2

shown by <u>USAC's records,</u> USAC had $35,280,855 in reserve funding for FY16, a fraction of which, $633,171, could have been released to TCC without disrupting the RHC funding process in the least. USAC has $31.35 million in unused funds from <u>FY17</u> RHC distributions. Hence, funding TCC's Waiver Request is not an issue.

The third topic discussed was the number of precedents wherein the Commission granted waiver requests similar to that of TCC's, in which funding applications were delayed due to ministerial and other inadvertent errors. The Commission has ordered USAC to accept late-filed funding applications, in order to effectuate the requirements of Section 254 of the Communications Act which states, in pertinent part, that consumers and health care providers in rural, insular, and high cost areas, should have access to telecommunications and information services.

Thank you for your attention to this matter. Should you have any questions or concerns, please contact me directly.

Sincerely,

/s/Ronald E. Quirk
Counsel to Tanana Chiefs Conference

cc: Preston Wise (via email)

# EXHIBIT H





October 29, 2019

**VIA HAND DELIVERY**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

OCT 29 2019

RECEIVED

Mark J. Langer, Clerk
Clerk's Office
United States Court of Appeals
District of Columbia Circuit
333 Constitution Avenue, N.W.
Room 5523
Washington, DC 20001

  **Re:** *In re Tanana Chiefs Conference, Petitioner*
    *PETITION FOR ISSUANCE OF WRIT OF MANDAMUS*

Dear Mr. Langer,

  On behalf of Tanana Chiefs Conference, please find enclosed for filing an original and four copies of the Petition for Issuance of Writ of Mandamus. Also enclosed is a check for $500, made payable to the Clerk, US Court of Appeals, for the filing fee. An additional copy of this cover letter has been submitted for stamp and return.

  Should there be any questions regarding this matter, kindly contact the undersigned.

       Respectfully submitted,

       Allison D. Rule

Enclosures.

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

In re Tanana Chiefs Conference,   :     **PETITION FOR ISSUANCE OF**
Petitioner                        :     **WRIT OF MANDAMUS**

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A.    Parties and Amici

The only party in this case before the Court is Tanana Chiefs Conference. This Petition has also been served on the Federal Communications Commission. This matter did not come before the district court. This Court has original jurisdiction over this Petition pursuant to the All Writs Act, 28 U.S.C. § 1651. *See also* Fed. R. App. P. 21.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner, Tanana Chiefs Conference, is a non-profit, intertribal consortium. As such, Petitioner has no parent company, and no publicly-held company has a 10% or greater ownership interest in Tanana Chiefs Conference.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

PETITION FOR WRIT OF MANDAMUS ............................................................... 1

I.   Relief Sought ..................................................................................................... 1

II.  Issues Presented ............................................................................................... 3

III.  Facts Necessary to Understand the Issues Presented by the Petition ........... 4

IV.  Why the Writ Should Issue .......................................................................... 9

   A.  The FCC Has a Duty To Provide Prompt Review of Appeals
   Concerning Universal Service Fund Administration ........................................ 9

   B.  The FCC's Delay in Acting on Petitioner's Application for Review
   is Unreasonable, and Therefore this Court Has a Duty to Compel the
   FCC to Act ...................................................................................................... 11

   C.  The FCC's Unreasonable Delay is so Egregious as to Warrant Mandamus
   Under the All Writs Act. .................................................................................. 12

CONCLUSION ....................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Amer. Broadcasting Co., Inc. v. FCC,* 191 F.2d 492, 500 (D.C. Cir. 1951) .......... 21

*Cutler v. Hayes,* 818 F.2d 879, 897, 898 (D.C. Cir. 1987) ...................................... 17

*FCC v. ITT World Commc'ns,* 466 U.S. 463 (1984)................................................... 2

*In re American Rivers & Idaho Rivers United,* 372 F.3d 413, 419 (D.C. Cir. 2004) ........................................................................................................................ 2, 12, 14

*In re California Power Exch. Corp.,* 245 F.3d 1110, 1124 (9th Cir. 2001) ............ 13

*In re Core Commc'ns, Inc.,* 531 F.3d 849, 857 (D.C. Cir. 2008) ............................ 14

*LaBonne v. Heckler,* 574 F.Supp. 1016 (D. Minn. 1983) ........................................ 14

*Liberty Fund, Inc. v. Chao,* 394 F. Supp. 2d 105, 115 (D.D.C. 2005).............. 16, 17

*Marinoff v. Dep't of Health, Ed. & Welfare,* 456 F. Supp. 1120, 1121 (S.D.N.Y. 1978)........................................................................................................................ 12

*Marinoff v. Dep't of Health, Educ. & Welfare,* 595 F.2d 1208 (2d Cir. 1979)....... 12

*MCI Telecomm. Corp. v. FCC,* 627 F.2d 332, 346 (D.C. Cir. 1980)............ 2, 11, 19

*Mountain States Legal Foundation v. Andrus,* 499 F. Supp. 383, 397 (D. Wyoming 1980)........................................................................................................................ 21

*Nader v. FCC,* 520 F.2d 182 (D.C. Cir. 1975)........................................................... 2

*Razaq v. Poulos,* 2007 WL 61884 (N.D. Cal. Jan. 8, 2007) .................................... 16

*Telecommc'ns Research & Action Ctr. v. FCC ("TRAC"),* 750 F.2d 70, 75, 76, 80; 372 F.3d 413, 419; 531 F. 3d 80, 855 (D.C. Cir. 1984)................. 2, 10, 13, 17, 22

**Statutes**

28 U.S.C. § 1651(a).......................................................................................... 1

28 U.S.C. § 2342(1)............................................................................................ 2

47 C.F.R. § 54.601............................................................................................. 6

47 C.F.R. § 54.602............................................................................................. 6

47 C.F.R. § 54.623......................................................................................... 6, 7

47 C.F.R. § 54.702....................................................................................... 5, 10

47 C.F.R. § 54.724(b)...................................................................................... 15

47 U.S.C. § 151 .............................................................................................. 18

47 U.S.C. § 254 ........................................................................... 3, 10, 18, 19

47 U.S.C. § 402(a).......................................................................................... 2

5 U.S.C. § 555(b)....................................................................................... 4, 11

5 U.S.C. § 706(1)............................................................................................. 2

**Other Authorities**

*Changes to the Board of Directors of the National Exchange Carrier Association,*
*Inc., Federal-State Joint Board on Universal Service,* Third Report and Order in
CC Docket No. 97-21, Fourth Order on Reconsideration in CC Docket No. 97-
21, and Eighth Order on Reconsideration in CC Docket No. 96-45, FCC 98-306,
13 FCC Rcd. 25058, 25091-96 (1998).................................................. 5, 10, 15, 17

*In the Matter of Promoting Telehealth in Rural America,* Report and Order in WC
Docket No. 17-310, FCC 18-82 (June 25, 2018)........................................... 20, 21

*Letter from FCC Chairman Ajit V. Pai to Senator Steve Daines* (Sept. 13, 2017)
..................................................................................................................................... 20

### PETITION FOR WRIT OF MANDAMUS

Tanana Chiefs Conference ("TCC" or "Petitioner") respectfully submits this Petition for Issuance of Writ of Mandamus ("Petition"), requesting that the Court compel the Federal Communications Commission (the "Commission," "FCC" or "Agency") to take action it is unreasonably withholding.

## I.    Relief Sought

After trying for nearly two and a half years to obtain a resolution to the underlying matter, Petitioner has been unable to effectuate any action by the Commission.  The FCC and its subordinate Wireline Competition Bureau ("WCB" or "Bureau") have responded to Petitioner's requests for expedited action of this matter with silence, leaving Petitioner without an avenue for relief. This agency inaction has created consequences for TCC tantamount to a denial of relief: a severe delay in funding for telemedicine services in rural clinics served by TCC. This has increased the risk that TCC may be forced to deny critical health care services for indigent Alaska Natives who are wholly dependent on clinics that are part of Petitioner's consortium.

With no other alternative available, Petitioner respectfully requests that this Court issue a writ of mandamus[1] compelling the FCC to act on Petitioner's pending

---

[1] This Court has authority to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions

request for relief within 90 days. In the alternative, TCC requests that this Court order the FCC to develop a schedule for resolution of the pending matter within a reasonable time,[2] including its rationale for allowing more than 90 days to elapse since Petitioner first requested relief, and that it keep the Court informed of its progress. In the meantime, Petitioner submits that the Court need not only protect its *prospective* jurisdiction over appeals of final FCC orders[3] by mandating that the agency issue a judicially reviewable decision,[4] but also that the Court *retain* jurisdiction over this matter until the FCC puts the matter now pending before it to rest.[5]

---

and agreeable to the usages and principles of law."). Congress has instructed courts to "compel agency action unlawfully or unreasonably delayed." 5 U.S.C. § 706(1).

[2] *See, e.g., MCI Telecomm. Corp. v. FCC*, 627 F.2d 332, 346 (D.C. Cir. 1980) (remanding to the FCC to recommend a feasible schedule for resolution of issues before it while retaining jurisdiction "'to ensure compliance'" with the Court's decision) (quoting *Nader v. FCC*, 520 F.2d 182 (D.C. Cir. 1975)).

[3] The Court of Appeals has exclusive jurisdiction to review final FCC orders. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *FCC v. ITT World Commc'ns*, 466 U.S. 463 (1984); *Telecommc'ns Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 75 (D.C. Cir. 1984) ("[T]he statutory commitment of review of FCC action to the Court of Appeals, read in conjunction with the All Writs Act, affords this court jurisdiction over claims of unreasonable Commission delay.") (internal citation omitted).

[4] *See TRAC*, 750 F.2d at 76; *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) ("[T]he primary purposes of the writ in circumstances like these is to ensure that an agency does not thwart [the court's] jurisdiction by withholding a reviewable decision.").

[5] *See MCI*, 627 F.2d at 346.

## II.     Issues Presented

The FCC's lassitude in acting on Petitioner's request for review of a decision by the Universal Service Fund ("USF" or "Fund") administrator, the Universal Service Administrative Company ("USAC") submitted on April 28, 2017 ("Request for Review"),[6] is an example of its disinclination to engage with the authority Congress assigned to it in Section 254 of the Telecommunications Act of 1996 (the "Act").[7] Congress statutorily mandated that the FCC direct the administration of the universal service mechanisms, and make policies to deploy and enhance access to telecommunications and information services, particularly to low-income consumers and those in rural, insular, and high cost areas.[8] Thus, two issues raised by this Petition are whether the FCC has abdicated its Congressionally mandated duty by: (a) failing to carry out the most basic oversight function – expeditious *de novo* review of actions of USAC; and (b) hampering the funding for the provision of vital telemedicine services to rural clinics served by TCC. The FCC should timely resolve these *particular* issues.

---

[6] *See In the Matter or Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Company*, Request for Review and Waiver, WC Docket 02-60 (April 28, 2017), a copy of which is attached hereto as **Exhibit A.**

[7] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended) at 47 U.S.C. § 254(a)(1), (b)(3).

[8] 47 U.S.C. § 254(a)(2).

Once established that the Agency has a *clear duty* under the Act to act on the matters Petitioner has brought before it, and to do so "within a reasonable time" under the Administrative Procedure Act ("APA"),[9] this Petition raises the issue of whether the FCC's delay in resolving the dispute in this case is *unreasonable*, a finding which sets in motion this Court's responsibility to take action to spur the Agency to respond.

Further, this Petition raises the issue whether, in light of the guiding considerations and principles employed by this Court, the Agency's delay is so *egregious* as to warrant mandamus.

## III. Facts Necessary to Understand the Issues Presented by the Petition

The factual background which led TCC to seek relief from the Commission is detailed in its Request for Review, which is incorporated herein by reference.[10] For ease of reference, TCC provides a brief summary of those facts. TCC also presents short summations of pertinent facts that have occurred in the nearly two and a half years since TCC's filed its Request for Review with the FCC.

TCC is a Fairbanks, Alaska-based non-profit intertribal consortium that provides health and social services to forty-two Alaskan communities, including

---

[9] 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.").

[10] *See* **EXHIBIT A** at 3-11 (*citations omitted*).

thirty-seven federally recognized tribes in Alaska's vast interior region. TCC, through its health care providers ("HCPs") provides health care services to approximately 15,000 Alaskan Natives.[11]

The urgent underlying matter concerns rural health care funding for three clinics served by TCC, located in the remote villages of Huslia, Hughes, and Chalkyisik ("HHC Clinics"). These are the sole health care facilities in the respective villages.[12] Because these villages are accessible only by air or water, the HHC Clinics are dependent on telemedicine services that TCC provides. These services include electronic health record access, videoconferencing, computerized physician order entry, and dispensing medicines over long distances.[13]

TCC cannot provide these services without funding from the Rural Health Care ("RHC") program, part of the Universal Service program, administered by USAC.[14] The RHC program provides support for rural HCPs and consortia like TCC

---

[11] *Id.* at 5-7.

[12] *Id.* at 5.

[13] *Id.* at 6-7.

[14] USAC is responsible for the day-to-day management of the Universal Service Fund but has no authority to interpret FCC rules or make policy. *See* 47 C.F.R. § 54.702(a), (c) (2010); *see also Changes to the Board of Directors of the National Exchange Carrier Association, Inc., Federal-State Joint Board on Universal Service*, Third Report and Order in CC Docket No. 97-21, Fourth Order on Reconsideration in CC Docket No. 97-21, and Eighth Order on Reconsideration in CC Docket No. 96-45, FCC 98-306, 13 FCC Rcd. 25058, 25091-96 (1998) (adopting specific rules for appeal of USAC decisions and delimiting USAC's authority to purely administrative activities) ("*USAC Third Report and Order*").

by enabling telecommunications carriers to provide services to the HCPs at greatly reduced rates.[15] USAC requires that eligible health care entities, such as, TCC file a Form 466 annually for each HCP it serves so that the RHC funds may be distributed to the designated telecommunications carrier, which in turn provides discounts to the subject HCPs.[16] In TCC's case, RHC subsidies cover nearly 98% of the overall monthly cost of providing telemedicine services.[17]

Every year since the inception of the RHC program, USAC's deadline for filing Forms 466 in order to receive funding has been June 30.[18] For several years, TCC timely submitted its Forms 466. In 2017, however, due to inadvertent ministerial errors, TCC missed the newly-imposed deadline for filing its Forms 466 for the HHC Clinics, and USAC refused to accept TCC's Forms 466 for the HHC Clinics, which resulted in a financial shortage of $633,170.19 for funding year 2016 ("FY16").[19]

---

[15] See 47 C.F.R. §§ 54.601, 54.602.

[16] *See* 47 C.F.R. §§ 54.623 (a), 54.675 (c)-(d).

[17] *See* **Exhibit A** at 8.

[18] *Id* at 9, *citing* 47 C.F.R. § 54.675(c)(4), Form 466 Instructions and USAC's website; copies of which are attached to the Request for Review as *Exhibits Four and Five.*

[19] *Id.* at 3,10-11 (*citations omitted*). The newly-imposed deadline was due to USAC's anticipation of an RHC funding shortfall. But, as delineated in the Request for Review at 9 and *Exhibit Six* thereto, USAC had more than enough funding in reserve - $35,280,855 - to cover the RHC funding shortfall.

One month after USAC's decision, on April 28, 2017, TCC filed the Request for Review, appealing USAC's refusal to accept the subject Forms 466, or in the alternative, seeking waiver of two FCC rules that would then require USAC to accept TCC's Forms 466 and provide the necessary funding for the HHC Clinics.[20]

The Request for Review clearly explained, *inter alia* : (a) the urgency of the situation, *i.e.*, the hardship on the patients of the HCC Clinics if USAC's decision is allowed to stand;[21] (b) the FCC has granted nearly identical requests for relief to similarly-situated applicants;[22] (c) fair notice of the new filing deadline was not provided;[23] (d) USAC has more than sufficient funds to cover funding for the HHC Clinics;[24] and (e) due to an evergreen contract that TCC has with its telecommunications supplier, USAC has funds earmarked for service to those clinics, and consequently there would be no disruption in the RHC program if TCC's Request for Review is granted. [25]

---

[20] *Id.* at 1, *citing* 47 C.F.R. §§ 54.623, 54.675(c)(2). The Request for Review also includes an appeal of the decision to prorate the RHC funds for FY16, but as discussed below, TCC requested bifurcation of this proceeding; the issues presented here are solely related to USAC's refusal to accept TCC's Forms 466 for the HHC Clinics.

[21] *Id.* at 17-19.

[22] *Id.* at 12-13 (*citations omitted*).

[23] *Id.* at 13-14 (*citations omitted*).

[24] *Id.* at 15-17.

[25] *Id.* at 15-16.

On October 5, 2017, several months after TCC submitted its Request for Review, it arranged for an *ex parte* meeting with FCC officials. During that meeting, TCC: (a) reiterated the urgency of the need for funding the HHC Clinics; (b) provided further examples of legal, regulatory, and policy precedents for granting the Request for Review; and (c) presented a compliance plan implemented by TCC to ensure that all future filing deadlines would be met.[26] The FCC took no action regarding that meeting. On October 17, 2017, TCC followed up with a proposal to resolve the instant matter.[27] The FCC did not respond to that proposal

After a number of telephone communications with FCC officials during 2018 wherein TCC inquired as to the status of the proceeding and requesting expedited action, but receiving no concrete response, on May 2, 2019, TCC filed a Request for Expedited Action ("Expedited Action Request").[28] The FCC did not respond to TCC's Expedited Action Request.

This lack of response led TCC to meet again with the FCC on July 12, 2019 to reiterate the urgency of issuing a favorable decision on its Request for Review.[29]

---

[26] *See* letter dated October 6, 2017 from Ronald E. Quirk to Marlene H. Dortch, summarizing the meeting (*citations omitted*). A copy of that letter is attached hereto as **Exhibit B.**

[27] *See* letter dated October 18, 2017 from Ronald E. Quirk to Radhika Karmarker, a copy of which is attached hereto as **Exhibit C.**

[28] *See* letter dated May 2, 2019 from Ronald E. Quirk to Ryan Palmer, a copy of which is attached hereto as **Exhibit D.**

[29] *See* letter dated July 12, 2019 from Ronald E. Quirk to Marlene H. Dortch, a copy of which is attached hereto as **Exhibit E.**

TCC made one further attempt to get the FCC to take action on the instant matter when it again met with the FCC, specifically the Special Counsel to Chairman Pai, on August 21, 2019.[30] The FCC has continued its pattern of non-responsiveness.

TCC owes its telecommunications provider $633,116.81 for services provided during FY16 to the HHC Clinics. While that provider has not, as yet, called on TCC to pay, it could, at any time, require TCC to pay in full, with late payment penalties. Without the subject funding, TCC will likely have to divert funding needed to provide for provisions of health care services away from its patients and to its telecommunications provider.

In sum, the Agency's delay in acting on Petitioner's Request for Review leaves Petitioner in a state of uncertainty as to whether it will ever receive its FY16 RHC funding and hence whether TCC will be able to make the necessary payments to its telecommunications provider. The delay in deciding this matter in unacceptable.

## IV. Why the Writ Should Issue

### A. The FCC Has a Duty To Provide Prompt Review of Appeals Concerning Universal Service Fund Administration

---

[30] *See* letter dated August 22, 2019 from Ronald E. Quirk to Marlene H. Dortch, a copy of which is attached hereto as **Exhibit F**.

With Section 254 of the Act, Congress assigned to the FCC overarching responsibility to establish mechanisms to preserve and advance universal service.[31] The FCC delegated day-to-day ministerial functions to USAC, but strictly prohibited USAC from engaging in policy-making.[32] To maintain strict oversight over USAC, the FCC established procedures for review of USAC decisions. The FCC acknowledged that adequate oversight of the Fund administrator would require an *expedited* review process. It emphasized that FCC "oversight would be strengthened by an appeals process that ensures that matters are brought promptly to the Commission."[33]

And yet, this Petitioner has been deprived of a reviewable final FCC action on its Request for Review. This Court must not allow the FCC to maintain a practice of tacit acceptance of a challenged USAC action when doing so tramples on the due process rights of the rightful recipients of RHC funding.[34]

There can be no doubt that, in adopting Section 254, Congress assigned the FCC the paramount obligation to oversee universal service, and that the FCC understands its "clear duty" to act promptly when presented with questions

---

[31] *See* 47 U.S.C. § 254(a).
[32] *See* 47 C.F.R. § 54.702(c).
[33] *See* USAC *Third Report and Order* at ¶ 66.
[34] *See* TRAC, 750 F.2d at 76 ("Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction.").

concerning USF administration.  In examining the degree of discretion given to the Agency by Section 254's mandate, this Court must also consider the APA's directive that agencies act within a reasonable time.[35]  As shown below, the FCC should be prepared to handle appeals of USAC decisions, and its failure to address even this one Request for Review violates the statutory "reasonable time" requirements.

## B. The FCC's Delay in Acting on Petitioner's Application for Review is Unreasonable, and Therefore this Court Has a Duty to Compel the FCC to Act

As discussed in a subsequent section, the delay in this instance is egregious enough to warrant a writ of mandamus to the FCC ordering it to act on the Request for Review within 90 days.  However, even if the Court finds that mandamus is not warranted, but does find that the delay is unreasonable, the Court has the authority, even the statutory mandate, to take other actions to "catalyze the FCC's proceedings."[36]  The APA instructs that courts "shall compel agency action" where action has been "unlawfully withheld or unreasonably delayed."[37]  This Court may

---

[35] *See* 5 U.S.C. § 555(b), cited in *American Rivers*, 372 F.3d at 418.

[36] *MCI*, 627 F.2d at 343.

[37] 5 U.S.C. §§ 555(b), 706(1); *MCI Telecommc'ns Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980). Section 706(1) provides that "the reviewing court *shall* . . . compel action unlawfully withheld or unreasonably delayed." (emphasis added).

11

act to preserve its own jurisdiction over appeals of final FCC orders where the FCC's delay makes appellate review impossible.[38]

Although the merits of this dispute are not before this Court in this Petition, the subject of the dispute is relevant insofar as it demonstrates the straightforward nature of the questions presented to the FCC. The fact that Petitioner's Request for Review is not complex, not to mention the numerous instances wherein the FCC granted relief to similarly situated applicants,[39] makes the FCC's inaction all the more unreasonable. Delay in this case has had the effect of a denial of Petitioner's Request for Review. With the passage of time, it is all the more exigent that the FCC apply its own rules and conduct prompt review of USAC appeals – including Petitioner's Request for Review.

### C. The FCC's Unreasonable Delay is so Egregious as to Warrant Mandamus Under the All Writs Act.

This Court has "jurisdiction to issue a writ of mandamus compelling an agency of the United States 'to perform a duty owed to the plaintiff.'"[40] Mandamus relief is "warranted where agency action has been delayed to such an extent as to

---

[38] *See American Rivers*, 372 F.3d at 417 (Court has jurisdiction to entertain petition for writ of mandamus to safeguard protective jurisdiction under statute to review agency decisions).

[39] *See e.g.*, **Exhibit A** at 12-14 (*citations omitted*), **Exhibit B** at 1-3 (*citations omitted*).

[40] *Marinoff v. Dep't of Health, Ed. & Welfare*, 456 F. Supp. 1120, 1121 (S.D.N.Y. 1978) aff'd sub nom. *Marinoff v. Dep't of Health, Educ. & Welfare*, 595 F.2d 1208 (2d Cir. 1979) (citing 28 U.S.C. § 1361 (1970)).

frustrate the court's role of providing a forum for review."[41]  This Court has provided six principles for determining whether unreasonable agency recalcitrance to act is so egregious as to warrant mandamus:

(1) the time agencies take to make decisions must be governed by a "rule of reason;"

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"[42]

---

[41] *In re California Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001).
[42] *TRAC*, 750 F.2d at 80 (outlining the "hexagonal contours" of the analytical framework applicable to claims of agency delay).

While these factors are not "ironclad," they are intended to provide "useful guidance in assessing claims of agency delay."[43]

First, the time agencies take to make decisions "must be governed by a 'rule of reason.'"[44] As a first line of inquiry, courts consider the time agencies generally take to make decisions.[45] This Court has explained that what constitutes a "reasonable time" is counted in "weeks or months, not years."[46] "There is no per se rule as to how long is too long to wait for agency action."[47]

FCC rules provide a baseline expectation for how long it should take the Agency to issue a written decision – 90 days.[48] Rule 54.724(b) ("Time periods for Commission approval of Administrator decisions") provides, in pertinent part:

---

[43] *Id.*

[44] *Id.*

[45] While "[t]here 'is no *per se* rule as to how long is too long' to wait for agency action ... a reasonable time for agency action is typically counted in weeks or months, not years." *American Rivers,* 372 F.3d at 419 (internal citations omitted). In *American Rivers,* this Court put an end to a similar "marathon round of administrative keep-away" by ordering an agency to issue a judicially reviewable response within a certain time period. *Id.* In this case, it has been nearly a year since Petitioner filed its Application for Review, but these questions have been unresolved since early 2009 when Petitioner first received the inexplicable invoice.

[46] *American Rivers,* 372 F.3d at 419 (finding that an agency had engaged in a "marathon round of administrative keep-away" by failing to issue a judicially reviewable order).

[47] *Id.*; *see also In re Core Commc'ns, Inc.,* 531 F.3d 849, 857 (D.C. Cir. 2008) (citing range of lengths of delay found unreasonable in cases where private parties requested action).

[48] In *LaBonne v. Heckler,* 574 F.Supp. 1016 (D. Minn. 1983), the District Court found that where applicants were "caught in the administration's appeal process for as long as one to two years," the APA's reasonable time requirements mandated that

The Commission shall issue a written decision in response to a request for review of an Administrator decision that involves novel questions of fact, law, or policy within ninety (90) days. The Commission may extend the time period for taking action on the request for review of an Administrator decision.[49]

This provision indicates not only that the Agency has determined for itself a reasonable time period for resolving USAC administration issues submitted to it, but also that the FCC must take some affirmative action to "extend" the time period, and that this extension must not occur simply due to the passage of time. This is reflected in the FCC's order adopting the specific rules for appealing USAC decisions:

> For appeals that are properly before the Commission, a written decision will be issued within 90 days unless the Commission *takes action* to extend the period for review; under no circumstances will an appeal before the full Commission be deemed approved as a result of inaction on the part of the Commission. We expect that the Bureau and the Commission will act promptly to resolve appeals of USAC decisions.[50]

In this case, Petitioner's Request for Review, which relates to RHC Funding for FY16, is properly before the FCC, and has been pending for nearly two and a half years. As this goes on, Petitioner is more and more vulnerable to the possibility that its telecommunications supplier may demand payment in full and cut off service if such payment is not made.

---

agency answer complaints seeking review of denial of benefits "within the normal 60 days allotted to it").
[49] 47 C.F.R. § 54.724(b).
[50] *USAC Third Report and Order*, ¶ 38.

Moreover, whether the delay encountered should be deemed unreasonable "will depend in large part...upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."[51] In this case, the facts and law are not complex. Petitioner challenges the decision by USAC not to accept TCC's Forms 466 for RHC funding for the HHC Clinics. While the significance of the outcome relative to this Petitioner is great, from the point of view of the FCC's management and oversight of the RHC program, review of Petitioner's Request for Review should be the type of task the Agency takes on in the ordinary course, and 90 days should be ample time to issue a judicially reviewable decision.

Further, the fact that the FCC has given no indication whatsoever as to when it will act further supports this Court compelling the Commission to act. "[U]nder the 'rule of reason,'" if an agency has some projected timeline for acting and balancing its competing priorities "that provides relief in the foreseeable future" this

---

[51] *Liberty Fund, Inc. v. Chao,* 394 F. Supp. 2d 105, 115 (D.D.C. 2005) (internal citations omitted); *see also Razaq v. Poulos,* 2007 WL 61884 (N.D. Cal. Jan. 8, 2007) ("[I]n each case the court must determine what kind of decision the applicant was asking the government to make, what kind of information the government would reasonably need to acquire in order make that decision responsibly, how much time it might take to gather that information, whether the applicant could have provided needed information faster or more reliably, what competing demands were being made on the agency during the relevant period, and whether there were forces at work or barriers involved that were beyond the agency's control that disabled it from getting a sufficient information base to make the kind of decision it was being asked to make.").

fact might "weigh[] against issuance of mandamus."[52] Here, the FCC has not proposed a timeline to rule on Petitioner's Request for Review, nor has it taken action to extend the 90 days ordinarily allotted for it to review an appeal. On the contrary, Petitioner's efforts to expedite this proceeding by meeting with the Commission's representatives have produced only silence.

**Second**, courts will evaluate whether the statutory scheme provides further content for applying the above "rule of reason."[53] While Congress has not adopted a specific timeframe within which the Agency must act on petitions, such as the Request for Review, in keeping with Congressional intent, the FCC has established clear limits on USAC's authority.[54] One important way the FCC keeps USAC within the bounds of its ministerial role is an expedited review process. In adopting the process for review of USAC decisions, the FCC explained that "Commission oversight will be strengthened by an appeals process that ensures that matters are brought *promptly* to the Commission."[55]

---

[52] *Liberty Fund*, 394 F. Supp. 2d at 116 (citing *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987).

[53] *See TRAC*, 531 F.3d at 855.

[54] The FCC has determined from the legislative history of Section 254 that Congress intended that USAC would not be permitted to "administer the programs in any manner that requires that entity to interpret the intent of Congress in establishing the programs or interpret any rule promulgated by the Commission in carrying out the programs, without appropriate consultation and guidance from the Commission." *USAC Third Report and Order*, 13 FCC Rcd. at 25066, ¶ 15 and n.41.

[55] *USAC Third Report and Order* at ¶ 66 (emphasis added).

17

Part of this clear statutory mandate is that the FCC ensure that contributions into the Fund are "specific" and "predictable."[56] Thus, the statutory scheme and the Congressional intent gives the FCC the clear duty to hold the reins of RHC fund administration, and a critical component of adequate oversight is the FCC's review process, which seems to have come to a halt in this case.[57]

**Third,** courts will consider whether, within the regulatory scheme, the delay could have an impact that extends beyond economic issues into the realm of human welfare.[58] In the Act, Congress set forth broad directives and guiding principles for the "preservation and advancement" of universal service,[59] a concept that existed in the Communications Act of 1934, calling for "wire and radio communication service with adequate facilities at reasonable charges" to "all people of the United States."[60] Congress gave the FCC responsibility to follow principles that address human welfare issues, including that "consumers in all regions of the Nation, including low-

---

[56] 47 U.S.C. § 254(c)(1).
[57] *See generally Misadventures of USF, supra,* note 29.
[58] In any event, "[e]conomic harm is clearly an important consideration and will, in some cases, justify court intervention." *Cutler v. Hayes,* 818 F.2d at 898 (D.C. Cir. 1987)
[59] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended at 47 U.S.C. § 254(a)(1)).
[60] Communications Act of 1934, ch. 652 §1, 48 Stat. 1064 (codified as amended at 47 U.S.C. § 151).

income consumers and those in rural, insular, and high cost areas, have access to telecommunications and information services."[61]

The Agency's failure to act on Petitioner's Application is particularly egregious because it harms not only Petitioner but Alaska Natives who are dependent upon telemedicine services at the HHC Clinics. Hence, it is axiomatic that in this instance the FCC's delay has had a profound impact that extends beyond economic issues into the realm of human welfare.

This Court has recognized that "delay in the resolution of administrative proceedings can also deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."[62] The public interest supports issuance of a writ of mandamus in this case.

**Fourth**, this Court may consider how spurring the FCC to resolve the issues raised in Petitioner's Request for Review might have a countervailing impact on FCC activities of a higher or competing priority.

The RHC program is one of – if not the – top program administered by the Commission. FCC Chairman Pai has, on numerous occasions, publicly announced his support for the RHC Program and the critical function it serves by ensuring

---

[61] 47 U.S.C. § 254(b)(3).
[62] *MCI*, 627 F.2d at 341.

critical telemedicine services to underserved, rural areas. One example is contained in a letter Chairman Pai wrote to Montana Senator Daines on this topic:

> As the son of two doctors in rural Kansas, I understand how connectivity can play a transformative role in the provision of medical care. I recall my father driving many miles at times to see patients. Having seen today how telemedicine is being used to improve the well-being of rural Americans, I support the RHC program. As Chairman, I will work to ensure it efficiently provides needed connectivity to rural health care providers.[63]

More recently, the Commission has acknowledged the critical importance of fully funding the RHC program so that "health care providers participating in [the RHC] can continue providing [remote x-ray reading, videoconferencing between rural health care professionals] and other essential telemedicine services to their communities."[64] In spite of the FCC's concern for ensuring that rural health care providers have the necessary funding, it has not acted on TCC's Request for Review, a favorable decision on which will actually further the Commission's priority of universal telemedicine services in rural areas.

Granting mandamus is essential to the true public interest that must be served by the RHC program. At the same time, there is nothing to suggest that acting on the Request for Review would deny the FCC the opportunity to give its immediate attention to other competing obligations. In addition, the fact that the FCC

---

[63] *See* Letter from FCC Chairman Ajit V. Pai to Senator Steve Daines (Sept. 13, 2017). Text may be found on the FCC's website.
[64] *In the Matter of Promoting Telehealth in Rural America*, Report and Order in WC Docket No. 17-310, FCC 18-82 (June 25, 2018) at ¶ 1.

subsequently adopted policies that have provided more funding for the RHC program beginning in FY17[65] should not act as a barrier to its current and ongoing duty to oversee USAC through the appeals process. The FCC might argue since it has added funding going forward, HCPs that were not provided full funding in FY16 RHC do not merit priority. Courts have rejected such arguments in the past.[66] As this Court has previously noted, "Agency inaction can be as harmful as wrong action."[67]

Fifth, this Court may take into account the nature and extent of interests prejudiced by the delay. Even though allegations of a "procedural injury" alone can be sufficient to show that an agency has unreasonably withheld action,[68] the FCC's unreasonable and egregious delay exposes Petitioner to irreparable injury. By failing to act on the Request for Review, the FCC not only puts Petitioner at risk of being unable to pay its supplier, but also endangers the very lives of the HHC Clinic patients by putting their telemedicine services in jeopardy.

For this reason, the FCC's inertia is tantamount to a denial of Petitioner's Request for Review and tacit approval of USAC's decision.

---

[65] *Id., passim.*

[66] *See Amer. Broadcasting Co., Inc.("ABC") v. FCC,* 191 F.2d 492, 500 (D.C. Cir. 1951).

[67] *ABC,* 191 F.2d at 500.

[68] *Mountain States Legal Foundation v. Andrus,* 499 F. Supp. 383, 397 (D. Wyoming 1980).

When administrative inaction has precisely the same effect on the rights of the parties as denial of the requested agency action, an agency many not prevent judicial review by masking agency policy in the form of inaction rather than an order denying the action requested.[69]

**Finally,** this Court need not find anything nefarious in the FCC's failure to act on the Application. Delays can be egregious regardless of the FCC's intentions, and therefore the Court need not reach the question of whether there is any "impropriety lurking"[70] behind the FCC's apathy. Regardless of whether the Agency has acted improperly in declining to address the Request for Review, Petitioner is entitled to a writ of mandamus for the above reasons.

## CONCLUSION

Petitioner has reached the point of having nowhere else to turn. The FCC, despite meeting with TCC, has not taken action for nearly two and a half years. Petitioner respectfully seeks mandamus from this Court because the FCC has failed to act to resolve issues pending before it, and its inaction is tantamount to a denial of relief. As long as the FCC delays resolving Petitioner's pending Request for Review, Petitioner and the patients of the HHC Clinics are suffering ongoing financial harm and uncertainty as to whether those clinics can continue providing critical telemedicine services.

---

[69] *Mountain States Legal Foundation*, 499 F. Supp. at 396.
[70] *TRAC*, 531 F.3d at 80.

Respectfully submitted,

Tanana Chiefs Conference

By

Allison D. Rule
Marashlian & Donahue, PLLC
1420 Spring Hill Road
Suite 401
Tysons, Virginia 22102
(703) 714-1300
adr@commlawgroup.com

Its Attorney

# EXHIBIT I

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**No. 19-1232**                                      **September Term, 2019**

**Filed On: January 08, 2020**

In re: Tanana Chiefs Conference,

     Petitioner

     **BEFORE:**   Srinivasan, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the petition for a writ of mandamus, it is

**ORDERED**, on the court's own motion, that the Federal Communications Commission file a response to the petition for writ of mandamus, not to exceed 7,800 words, within 30 days of the date of this order. <u>See</u> Fed. R. App. P. 21(d); D.C. Cir. Rule 21(a). Tanana Chiefs Conference may file a reply, not to exceed 3,900 words, within 14 days of the filing of the response.

**Per Curiam**

# EXHIBIT B

Federal Communications Commission                                                                                      DA 20-64

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Request for Review and Waiver of a Decision | ) | |
| by the Universal Service Administrator by | ) | |
| | ) | |
| Tanana Chiefs Conference | ) | |
| Fairbanks, AK | ) | |
| | ) | |
| Interior Alaska Regional Health Consortium | ) | HCP Nos. 10720, *et al.* |
| | ) | |
| Rural Health Care Universal Service | ) | WC Docket No. 02-60 |
| Support Mechanism | ) | |

**ORDER**

**Adopted:  January 15, 2020**                                   **Released:  January 15, 2020**

By the Chief, Telecommunications Access Policy Division, Wireline Competition Bureau:

I.    **INTRODUCTION**

        1.        In this Order, we deny a request for review and waiver by the Tanana Chiefs Conference (TCC)[1] seeking review of the Universal Service Administrative Company (USAC)'s decision denying TCC's request to file FCC Forms 466 (Funding Request and Certification Form) for three clinics after the Rural Health Care (RHC) Program application filing deadline had passed for funding year 2016.[2]  We

---

[1] *See* Tanana Chiefs Conference, Interior Alaska Regional Health Consortium, Request for Review and Waiver, WC Docket No. 02-60 (filed Apr. 28, 2017) (TCC Request for Review and Waiver).  *See also* Supplemental Letter to Radhika Karmarkar, Deputy Division Chief, Telecommunications Access Policy Division, WCB, from Nick Gasca, Deputy General Counsel to Tanana Chiefs Conference, WC Docket No. 02-60 (dated Sept. 6, 2017); Letter to Marlene H. Dortch, Secretary, FCC, from Ronald E. Quirk, Jr., Counsel to TCC, WC Docket No. 02-60 (dated Oct. 6, 2017); Letter to Ryan Palmer, Division Chief, Telecommunications Access Policy Division, WCB, from Allison D. Rule and Ronald E. Quirk, Jr., Counsel to Tanana Chiefs Conference, WC Docket No. 02-60 (dated May 2, 2019) (requesting expedited action on TCC's Request for Review and Waiver); Letter to Marlene H. Dortch, Secretary, FCC, from Ronald E. Quirk, Jr., Counsel to TCC, WC Docket No. 02-60 (dated July 12, 2019).

[2] *See* TCC Request for Review and Waiver at 1, 9-14 (regarding Health Care Provider (HCP) Nos. 10720, 10721, and 11022).  A funding year runs from July 1 through June 30 of the subsequent year. 47 CFR § 54.675(b) (2018).  FY2016 started on July 1, 2016 and ended on June 30, 2017.  The application filing deadline for FY2016 was November 30, 2016. *See* Wireline Competition Bureau Provides a Filing Window Period Schedule for Funding Requests Under the Telecommunications Program and the Healthcare Connect Fund, WC Docket No. 02-60, Public Notice, 31 FCC Rcd 9588, at 3-4 (WCB 2016) (August 2016 Filing Window PN) (establishing the filing window periods for funding year 2016); USAC, Rural Health Care Program, Telecommunications Program, Filing Windows for FY2016, https://www.usac.org/rural-health-care/commitment-info/fy2016-funding-information/ (last visited Jan. 10, 2020) (Funding Year 2016 Filing Windows and Pro-rata Information).  In October 2017, counsel, on behalf of TCC, filed a proposed Consent Decree and Compliance Plan seeking to effectuate a resolution of TCC's three FCC Forms 466 for FY2016 which TCC attempted to file outside of the funding year 2016 filing window period.  Letter to Radhika Karmarkar, Deputy Division Chief, Telecommunications Access Policy Division, WCB, TCC – Proposed Consent Decree & Compliance Plan (*Confidential Filing*), from Ronald E. Quirk, Jr., Counsel to TCC (dated Oct. 18, 2017) (Proposed Consent Decree & Compliance Plan); Letter to Radhika Karmarkar, Deputy

(continued....)

Federal Communications Commission                    DA 20-64

also deny TCC's request to waive the Commission's proration rules to enable TCC to receive full RHC Program support for all 30 of the clinics in its consortium for funding year 2016.[3] We find that TCC has not presented special circumstances warranting a waiver of the FCC Form 466 application filing window deadline for funding year 2016 or the Commission's proration rules.[4]

## II. BACKGROUND

### A. RHC Program Rules and Procedures

2.    Pursuant to section 254 of the Telecommunications Act of 1996,[5] eligible health care providers may apply for reduced rates on eligible telecommunications, advanced telecommunications and information services.[6] With an exception not applicable in this matter, the Commission's rules require health care providers to file new funding requests for each funding year in order to receive RHC Program support.[7] Some contracts may qualify for evergreen status which exempts health care providers only from the competitive bidding process for the life of the contract or until the contract is modified.[8] Thus, after an applicant has selected a service provider and entered into a service contract, the applicant must submit its request for discounts to USAC, even where a health care provider has a contract designated as "evergreen" with USAC.[9]

(Continued from previous page) ——————————

Division Chief, Telecommunications Access Policy Division, WCB, TCC's USAC Compliance Program Update (*Confidential Filing*), from Michael Humphrey, Acting Executive Director of IT, TCC (dated Jan. 10, 2018).

[3] *See* TCC Request for Review and Waiver at 2, 14-17 (regarding HCP Nos. 10720, 10721, 11022, 10715, 10716, 10717, 10718, 10722, 10723, 10724, 10726, 10727, 10729, 10730, 10731, 10732, 10733, 10735, 10736, 10737, 10738, 10739, 11011, 12804, 15464, 15465, 16362, 10736, 176991, and 10719); 47 CFR § 54.675(f) (2018). TCC's Consent Decree did not address its waiver of the proration rules. *See* Proposed Consent Decree & Compliance Plan.

[4] Section 54.719(c) of the Commission's rules provides that any person aggrieved by an action taken by a division of USAC may seek review from the Commission. 47 CFR. § 54.719(c). Generally, the Commission's rules may be waived if good cause is shown. 47 CFR § 1.3. The Commission may exercise its discretion to waive a rule where the particular facts make strict compliance inconsistent with the public interest. *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (*Northeast Cellular*). In addition, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis. *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969); *Northeast Cellular*, 897 F.2d at 1166. Waiver of the Commission's rules is appropriate only if both (i) special circumstances warrant a deviation from the general rule, and (ii) such deviation will serve the public interest. *Northeast Cellular*, 897 F.2d at 1166.

[5] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (1996 Act). The 1996 Act amended the Communications Act of 1934 (Communications Act or Act). *See* S. Conf. Rep. No. 104-230 at 133 (1996); 47 U.S.C. § 254.

[6] 47 CFR §§ 54.602(a) and (b), 54.634 (2018).

[7] Health care providers that have received a multi-year funding commitment in the Healthcare Connect Fund Program are not required to file funding requests after the first year. 47 CFR § 54.675(d) (2018).

[8] *See* USAC, Rural Health Care, Additional Program Guidance, Evergreen Contracts, https://www.usac.org/rural-health-care/additional-program-guidance/evergreen-contracts/ (last visited Jan. 10, 2020) (Rural Health Care Program Evergreen Contracts) (indicating that health care providers with evergreen contracts must also submit the FCC Form 466 and the FCC Form 467 annually for every funding year in which funding is requested under the terms of the contract).

[9] *See* USAC, Rural Health Care, Telecommunications Program, Step 4: Submit Funding Requests, https://www.usac.org/rural-health-care/telecommunications-program/step-4-submit-funding-requests/ (last visited Jan. 10, 2020); USAC, Rural Health Care, Healthcare Connect Fund Program, Individual Health Care Providers, Submit Funding Requests, https://www.usac.org/rural-health-care/healthcare-connect-fund-program/step-4-submit-funding-requests/ (last visited Jan. 10, 2020); USAC, Rural Health Care, Resources, Forms, FCC Form 466, https://www.usac.org/rural-health-care/resources/forms/ (last visited Jan. 10, 2020); USAC, Rural Health Care,

(continued….)

3.      The Commission's rules allow USAC to open a filing window for RHC applications and to treat all eligible health care providers filing within the window period as if their applications were simultaneously received.[10] Applicants must submit their requests prior to the close of the application filing window in order to be considered for funding under the RHC Program. If requests submitted during a filing window period exceed the RHC Program's cap, per the Commission's rules, USAC must apply a pro rata reduction in support to all those requests received during the filing window period.[11] Funding requests submitted after the close of the filing window will not be accepted.

4.      In March 2016, USAC opened a filing window period for funding year 2016 that ended on June 1, 2016.[12] After the end of that initial filing window period, USAC continued to accept funding requests on a rolling basis and, following its review of the requests, made funding commitments to eligible participants for eligible services on a "first-come, first-served" basis, per the Commission's rules.[13] In August 2016, recognizing the growing interest in the RHC Program and the potential that requests in funding year 2016 could exceed the $400 million cap prior to the end of the funding year, the Bureau released a public notice providing a schedule for additional filing windows in funding year 2016.[14] USAC implemented a second filing window from September 1, 2016 to November 30, 2016.[15] USAC conducted outreach in the form of an email blast to all account holders, webinar, newsletter, and notices on its website regarding the dates of the second filing window period.[16] Under the Commission's rules, if requests submitted during an established filing window period exceed the RHC Program's cap, USAC must apply a pro rata reduction in support to all those requests received during the filing window period.[17] In adopting the pro rata rule, the Commission found that this approach ensured fairness and equity to each health care provider applying for universal service support and did not impose an undue administrative burden upon either the applicants or USAC.[18] Because demand for RHC Program support during the second filing window period of funding year 2016 exceeded the total amount available for the RHC Program, all qualifying funding requests submitted during the second filing window period for funding year 2016 received a pro-rated amount of 92.5%.[19]

(Continued from previous page) ————————————————————————
Resources, Forms, FCC Form 462, https://www.usac.org/rural-health-care/resources/forms/ (last visited Jan. 10, 2020).

[10] 47 CFR § 54.675(c)(2) (2018).

[11] See 47 CFR § 54.675(f) (2018).

[12] See Funding Year 2016 Filing Windows and Pro-rata Information.

[13] See 47 CFR § 54.675(c)(1) (2018); Funding Year 2016 Filing Windows and Pro-rata Information.

[14] See August 2016 Filing Window PN.

[15] Id.; Funding Year 2016 Filing Windows and Pro-rata Information.

[16] See August 2016 Filing Window PN (establishing a filing window period schedule for applications for RHC Program support based on the Commission's current rules for the RHC Program, and indicating that the opening of any filing window periods is dependent upon whether the demand for RHC Program funds exceeds the funding cap); FY2016 Filing Windows and Pro-rata Information; Email to RHC Program distribution list, from USAC RHC Program, New Filing Window Periods: File Your Funding Request ASAP (dated Aug. 26, 2016) (August 2016 Email) (strongly encouraging applicants to submit funding requests by November 30 and indicating that there would only be a third filing window period if funding remained).

[17] See 47 CFR § 54.675(f) (2018).

[18] See Federal-State Joint Board on Universal Service, CC Docket No. 96-45, Fifth Order on Reconsideration and Fourth Report and Order, 13 FCC Rcd 14915, 14940-41, para. 40 (1998) (RHC Fifth Order on Reconsideration and Fourth Report and Order).

[19] See id. at 14941, para. 41; 47 CFR § 54.675(f) (2018); August 2016 Filing Window PN at 5; Funding Year 2016 Filing Windows and Pro-rata Information.

**B.    TCC's Funding Year 2016 Funding Requests and Appeal**

5.    TCC is a Fairbanks, Alaska-based, nonprofit intertribal consortium providing a wide range of health services to Alaska Native communities in interior Alaska.[20]  For FY2016, TCC timely filed its FCC Form 466 applications for 27 of the clinics in its consortium within the second filing window period for funding year 2016.[21]  Pursuant to the Commission's rules, those funding requests were prorated and reduced by 7.5%.[22]  TCC, however, failed to file FCC Form 466 applications for the three other clinics in its consortium — Hughes Village Health Clinic, Huslia Village Health Clinic, and Chalkyitsik Village Clinic (collectively, HHC Clinics).[23]  TCC asserts that the applications for the HHC Clinics were not filed because those locations were transitioning from satellite connections to terrestrial microwave, and the TCC official responsible for filing the applications put off filing the applications until after the transitions in order to avoid confusion when filing.[24]  TCC contends that the official was unaware of the filing windows and therefore missed the November 30, 2016 deadline.[25]  TCC also claims that the application for Chalkyitsik Village Clinic was missed because of an oversight of the primary account holder who did not have this location listed on the list of health care providers for which an FCC Form 466 should be filed.[26]  TCC discovered its omissions for the HHC Clinics in late March 2017, approximately four months after the close of the second application filing window and, when it attempted to submit applications for the HHC Clinics, was told by USAC that the filing window for funding year 2016 was closed and that it was not possible for USAC to waive the filing deadline rules.[27]

6.    On April 28, 2017, TCC filed the instant Request for Review and Waiver seeking review of USAC's decision not to allow TCC to file FCC Forms 466 for the HHC Clinics that are part of the TCC health care delivery system.[28]  In the alternative, TCC requests that the Commission waive the filing window period deadline for the HHC Clinics and permit TCC to file its FCC Forms 466 for funding year 2016.[29]  TCC argues that the Commission should not allow TCC's inadvertent errors to prevent it from receiving the discounts necessary for vital telecommunications services.[30]  According to TCC, failure to grant the request or waiver will force TCC to cut critical telecommunications services for its clinics and divert funds intended for health care for Alaska Natives to pay its service provider.[31]  TCC maintains that the Commission has previously permitted parties to cure clerical and ministerial errors in the context of receiving universal service administrative support and that there was no fair notice that the applications would not be accepted.[32]  TCC also points out that it has never missed an FCC Form 466 deadline.[33]  In addition, TCC states that, due to this situation, it has implemented a quality control program to prevent

---

[20] *See* TCC Request for Review and Waiver at 4, 12.

[21] *Id.* at 9-11.

[22] *See* 47 CFR § 54.675(f) (2018).

[23] *See* TCC Request for Review and Waiver at 9-11.

[24] *Id.* at 10.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 11, 20.

[28] *See* TCC Request for Review and Waiver.

[29] *Id.* at 1; 47 CFR §§ 54.623, 54.675(c)(2) (2018).

[30] TCC Request for Review and Waiver at 12.

[31] *Id.*

[32] *Id.* at 13-14, 20.

[33] *Id.* at 10, 19.

missing any further filing deadlines and to ensure compliance with all USAC and Commission requirements going forward.[34]

7.    TCC also requests a waiver of the proration rule for FY2016 to enable all 30 of its members, including the timely filed applications for the other 27 member clinics, to receive the full amount of their commitments.[35] First, TCC states that USAC approved TCC's contract as evergreen and, according to TCC, all health care providers in TCC's consortium were deemed eligible and full funding was earmarked for them.[36] TCC claims that the funding reduction adversely affected all of TCC's rural health care clinics and that the unusual circumstances in funding year 2016 warrant a waiver of the Commission's rules.[37] Next, TCC again asserts that it did not receive fair notice that USAC planned to pro-rate funding for every health care provider, even evergreen contracts, who filed during the second filing window period.[38] Lastly, TCC maintains that USAC has the money to fully fund telecommunications service for TCC's health care providers.[39] TCC states that a denial of its request for RHC Program support would cause hardship on TCC and have an adverse impact on the Alaska Native populations served by TCC.[40]

## III.    DISCUSSION

8.    *Filing Window Deadline.* We deny TCC's request for review of USAC's decision or in the alternative waiver of the application filing deadline for funding year 2016.[41] We reject TCC's first argument that it should be permitted to file the FCC Forms 466 after the filing window deadline for funding year 2016.[42] TCC indicates that, for two of the clinics, the responsible official was unaware of the filing window periods and, for one clinic, the deadline was missed because of an oversight of the primary account holder.[43] Filing the FCC Forms 466 on a timely basis was therefore within TCC's control but for the mistake on the part of a TCC staff member. In certain instances, the Commission has granted a waiver of an application filing deadline where the FCC Form was filed shortly after the deadline, the deadline was missed due to circumstances beyond the applicant's control, or the application was filed within a reasonable period of time following the death or serious illness of the person responsible for filing the application or the death of a family member of the staff person.[44] However, none of these special circumstances are present here. Rather, in this instance, FCC Forms 466 were *never* filed for the HHC Clinics and the omissions were discovered over three months later.[45] We also do not

---

[34] *Id.* at 20-21; Proposed Consent Decree & Compliance Plan.

[35] TCC Request for Review and Waiver at 2, 14-17; 47 CFR § 54.675(f) (2018).

[36] TCC Request for Review and Waiver at 14-16.

[37] *Id.* at 15.

[38] *Id.* at 16.

[39] *Id.* at 16-17.

[40] *Id.* at 17-19.

[41] *See id.* at 1, 9-14 (regarding Health Care Provider (HCP) Nos. 10720, 10721, and 11022).

[42] *See* TCC Request for Review and Waiver at 9-11.

[43] *Id.* at 10.

[44] *See, e.g., Requests for Waiver and Review of Decisions of the Universal Service Administrator by Acorn Public Library District, et al., Schools and Libraries Universal Service Support Mechanism,* CC Docket No. 02-6, Order, 23 FCC Rcd 15474 (WCB 2008).

[45] *See* TCC Request for Review and Waiver at 10-11. *Cf., Request for Review by Bradford Regional Medical Center, Rural Health Care Universal Service Support Mechanism,* WC Docket No. 02-60, Order, 25 FCC Rcd 7221, 7222-23, paras. 4-5 (WCB 2010) (waiving the filing deadline to allow the petitioner to file an FCC Form 466-A where the petitioner timely filed an FCC Form 466, timely responded to USAC's request for additional information, made several attempts to follow-up with USAC, and USAC delayed in responding to the petitioner).

consider these omissions ministerial or clerical errors, as suggested by TCC.[46]  Ministerial or clerical errors include the kinds of errors that a typist might make when entering data from one list to another, such as mistyping a number, using the wrong name or phone number, failing to enter an item from the source list onto the application, or making an arithmetic error.[47]  These types of errors are not present in this instance.

   9.      We also reject TCC's argument that USAC did not provide fair notice of the application filing window deadlines for funding year 2016.[48]  First, the Bureau announced the filing window period schedule for funding year 2016 in August 2016 after it became apparent that program demand could exceed the $400 million cap.[49]  In addition, USAC conducted substantial outreach about the funding year 2016 filing window.  USAC advised program participants of the filing window deadlines through an email blast to all holders of accounts in USAC's RHC Program filing system, in a newsletter, during a webinar it conducted, and by including notices on its website.[50]  All of the outreach encouraged applicants to file applications by the November 30 deadline in order to ensure that qualifying funding requests would receive funding since a third filing window would only open if RHC Program funding remained available.[51]

   10.     RHC Program participants are ultimately responsible for knowing about and complying with all program rules, including deadlines established pursuant to our program rules.[52]  That is true whether or not USAC conducts outreach to program participants regarding a program deadline,[53] as it did here.  TCC had one account holder for all the health care providers in its consortium.  At a minimum, that account holder received USAC's email blast concerning the funding year 2016 application filing window period and participated in USAC's webinar regarding the filing window period deadlines.[54]  Therefore, there should have been no confusion about the filing deadlines for funding year 2016.  In fact, TCC timely filed applications for 27 of the 30 health care providers in its consortium.  While we recognize that TCC has taken steps, as part of its subsequent efforts to rectify its filing procedures going forward,[55] we

---

[46] See TCC Request for Review and Waiver at 13.

[47] See Requests for Waiver and Review of Decisions of the Universal Service Administrator by Ann Arbor Public Schools, et al.; Schools and Libraries Universal Service Support Mechanism, CC Docket No. 02-6, Order, 25 FCC Rcd 17319, 17320, paras. 1-2, note 5 (WCB 2010).

[48] See TCC Request for Review and Waiver at 10, 14.

[49] See August 2016 Filing Window PN at 4.

[50] See supra para. 4, note 16.

[51] Id.

[52] See Request for Review by Portland Area Indian Health Service, Rural Health Care Universal Service Support Mechanism, WC Docket No. 02-60, Order, 25 FCC Rcd 13050, 13053, para. 7 (WCB 2010) ("All applicants must comply with our rules and procedures and continue to submit complete and accurate information to USAC as part of the application review process."); Jemez Pueblo Tribal Consortium Jemez and Zio Pueblos, Schools and Libraries Universal Service Support Mechanism, CC Docket No. 02-6, Order, 32 FCC Rcd 10238, 10243, para. 10 (WCB 2017).

[53] See Universal Service Contribution Methodology, WC Docket No. 06-122, Order, 25 FCC Rcd 7399, 7401, para. 6 (WCB 2010) (noting that emails sent by USAC to regulatory contacts for contributors about changes to contribution base revenues are "just that, a courtesy notification . . . It is the contributor's responsibility to identify and correct any errors in its filing within the 45-day revision window").

[54] See August 2016 Email; September 2016 Webinar.

[55] See Proposed Consent Decree & Compliance Plan.

find, consistent with Commission precedent, that TCC has not presented special circumstances justifying a waiver of the filing window period deadline for funding year 2016.[56]

11.    *Funding Year 2016 Proration.* We also deny TCC's request to waive the Commission's pro-rata rules so that TCC will receive full RHC Program support for all 30 of the clinics in its consortium.[57] Specifically, we reject TCC's argument that because USAC approved TCC's contract as evergreen, all of TCC's health care providers were deemed eligible for full funding for the life of the contract.[58] TCC misunderstands the effect of having a contract deemed evergreen by USAC. Evergreen status provides an important shortcut by allowing health care providers an exemption from the competitive bidding requirement for future funding years.[59] Health care providers are not required to participate in competitive bidding for the life of the contract (or until the contract is modified), but evergreen status does not guarantee health care providers full funding for the length of the evergreen contract nor does it allow them to avoid submitting a request for discounts by filing a funding application each year.[60]

12.    We also reject TCC's argument that it did not receive fair notice that USAC planned to pro-rate funding for all health care providers that filed in the second filing window for funding year 2016.[61] USAC's email to all RHC account holders and newsletter in August 2016 specifically encouraged applicants to submit their funding requests by November 30 indicating that there would only be a third filing window period if funding remained and the potential for proration if demand exceeded the cap during the filing window.[62] Moreover, applicants were able to file as early as March 1, 2016 for funding year 2016 RHC Program support and, beginning as early as August 2016, had adequate notice of the funding year 2016 filing window deadlines for the remainder of the application filing period.[63] TCC thus had six months to file its FCC Forms 466 in order to receive funding for its clinics but waited until the second filing window, where demand exceeded available RHC Program funding. As a result of this

---

[56] *See, e.g., Requests for Waiver and Review of Decisions of the Universal Service Administrator by Academy of Math and Science et al.; Schools and Libraries Universal Service Support Mechanism*, CC Docket No. 02-6, Order, 25 FCC Rcd 9256, 9259, para. 8 (2010) (denying waivers of the Schools and Libraries Program's application (FCC Form 471) filing window deadline where petitioners failed to present special circumstances justifying waivers of the Commission's rules). *See also* Streamlined Resolution of Requests Related to Actions by the Universal Service Administrative Company, CC Docket Nos. 96-45, 97-21, 02-6 and WC Docket Nos. 02-60, 06-122, Public Notice, 30 FCC Rcd 11692 (WCB 2015) (denying in part appeals related to the FCC Form 466 deadline where the appellants late-filed or never-filed the FCC Form 466 by the deadline). Because we deny TCC's request for waiver of the application filing deadline finding that TCC has not presented special circumstances justifying a waiver of the Commission's rules for funding year 2016, we therefore also decline to consider and dismiss with prejudice TCC's proposed Consent Decree and Compliance Plan. In the alternative, were we to construe the Consent Decree and Compliance Plan as submitted in support of the request for waiver, the proposals contained in the Consent Decree and Compliance Plan, while addressing compliance measures on a going forward basis, do not address the flaws identified in the waiver request for funding year 2016. *See* Proposed Consent Decree & Compliance Plan.

[57] *See* TCC Request at 2, 14-17 (regarding HCP Nos. 10720, 10721, 11022, 10715, 10716, 10717, 10718, 10722, 10723, 10724, 10726, 10727, 10729, 10730, 10731, 10732, 10733, 10735, 10736, 10737, 10738, 10739, 11011, 12804, 15464, 15465, 16362, 10736, 176991, and 10719); 47 CFR § 54.675(f).

[58] *See* TCC Request for Review and Waiver at 14-15.

[59] *See supra* para. 2; Rural Health Care Program Evergreen Contracts.

[60] *See supra* para. 2; 47 CFR § 54.675(d) (2018) (requiring health care providers to file new funding requests for each funding year, except for health care providers who have received multi-year funding commitments); Rural Health Care Program Evergreen Contracts.

[61] *See* TCC Request for Review and Waiver at 16.

[62] *See* August 2016 Email; 3rd Quarter 2016 Newsletter.

[63] *See supra* para. 4, note 16; August 2016 Filing Window PN; August 2016 Email.

delay, USAC was required, per Commission's rules, to pro-rate TCC's commitments.[64]  Although USAC did not have to implement the Commission's proration rules in previous funding years, these rules have been in effect since the early years of the RHC Program.[65]  TCC has also been a regular participant in the RHC program for the past few years[66] and over that time demand for RHC Program support has steadily grown towards the program cap.  TCC therefore should have been aware of the proration rules and the potential for these rules to take effect if demand ever exceeded the cap.

13.      We next reject TCC's argument that it should receive full funding for all of its consortium members because USAC has the money to fully fund telecommunications services for TCC's health care providers.[67]  The annual funding cap for funding year 2016 was $400 million with a total amount of qualifying funding requests for that year of $407,770,232.[68]  After subtracting $12,700,000 for USAC's administrative expenses, the total amount of available RHC Program funding was $387,242,870.[69]  At the time of TCC's request, $241,466,119 in funding requests were pending and $131,023,258 in commitments had been made.[70]  TCC argues that this means $14,753,493 in available RHC Program funding remained for funding year 2016.[71]  TCC also contends that USAC had $35,280,855 held in "reserve" for funding year 2016.[72]  TCC argues that USAC could use a portion of these funds to fully fund TCC's funding year 2016 requests.[73]

14.      As an initial matter, TCC misunderstands USAC's funding calculations for funding year 2016.[74]  The total amount of qualifying funding requests for funding year 2016 was $407,770,232 which represented the sum of $241,466,119 in pending commitments, $131,023,258 in commitments made, as well as the $35,280,855 held in "reserve."[75]  The funds held in "reserve" were fully allocated for appeals of funding requests that were denied or reduced and funding requests that remained pending for further review.[76]  Accordingly, no funding year 2016 funds remain to provide additional support for funding year 2016 requests, as TCC suggests.[77]  In fact, the total dollar value of all qualifying funding requests received by the close of the second filing window period for funding year 2016 was $274,725,249, which

---

[64] *See* 47 CFR § 54.675(f) (2018).

[65] *See RHC Fifth Order on Reconsideration and Fourth Report and Order*, 13 FCC Rcd at 14941, para. 41.

[66] TCC Request for Review and Waiver at 19 (noting that for more than ten years, TCC has been a part of the RHC Program).

[67] *See* TCC Request for Review and Waiver at 16-17.

[68] *See* USAC, Rural Health Care Program, Funding Commitments, FY2016 Funding Information, https://www.usac.org/rural-health-care/commitment-info/funding-commitments-archive/ (last visited Jan. 10, 2020) (Funding Year 2016 Funding Information).

[69] Funding Year 2016 Funding Information.

[70] *Id.*

[71] TCC Request for Review and Waiver at 16-17.

[72] *Id.*

[73] *Id.* at 17.

[74] *See* Funding Year 2016 Funding Information.

[75] *Id.*

[76] *Id.*  When USAC denies or reduces a funding request, it holds the amount denied or reduced in the event of a successful appeal.

[77] *See* TCC Request for Review and Waiver at 16-17.

**Federal Communications Commission**                                     **DA 20-64**

exceeded the funding available ($254,255,017) by approximately $20 million.[78] For this reason, USAC was required to prorate all funding requests received in the second filing window for funding year 2016.[79]

15.     TCC's consortium of rural health clinics was among many other health care providers that received prorated funding for funding year 2016. As indicated above, in adopting the pro rata rule, the Commission found that this approach ensured fairness and equity to each health care provider applying for universal service support and did not impose an undue administrative burden upon either the applicants or USAC.[80] Therefore, it would be inconsistent with the Commission's intent in establishing this rule to prioritize full funding to the rural health care clinics as part of TCC's consortium over other eligible health care providers that also submitted funding requests during the final filing window for funding year 2016 and received prorated funding. Further, program rules and deadlines are necessary for the effective administration of the RHC Program, ensuring program integrity, and providing certainty to all RHC Program participants. While we appreciate that the proration of funding requests may place a strain on health care providers working to deliver health care services in their rural communities, a general claim that a reduction of funding will have a detrimental impact does not constitute special circumstances for waiving the Commission's rules, particularly where an applicant has missed a filing deadline.[81] Indeed, if the detrimental impact a reduction of funding has on rural communities and health care providers alone were grounds for a waiver, waiver could be warranted for almost every conceivable violation of the Commission's rules.

16.     That said, in the *Alaska Waiver Order*, released in June 2017, the Commission recognized that the impact of proration on health care providers in Alaska was more severe and those health care providers could be required to absorb a substantially larger portion of the cost of the services they receive, potentially having public health consequences.[82] It, therefore, gave Alaskan health care providers the opportunity to seek to mitigate the impact of funding year 2016 proration by working with its service provider to obtain a reduced price for its services.[83] TCC, as an Alaskan consortium of health care providers, had the ability to take advantage of this opportunity by working with its service provider to minimize any significant costs borne by TCC due to proration. Thus, while we are sympathetic to the need for health services to Alaska Native residents served by the rural health clinics as part of TCC's consortium, we find that TCC has not provided special circumstances justifying a waiver of the Commission's pro rata rules.

## IV.     ORDERING CLAUSES

17.     ACCORDINGLY, IT IS ORDERED that, pursuant to the authority contained in sections 1-4 and 254 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154 and 254, and sections 0.91, 0.291, and 54.722(a) of the Commission's rules, 47 CFR §§ 0.91, 0.291, and 54.722(a) that

---

[78] Funding Year 2016 Funding Information; Funding Year 2016 Filing Windows and Pro-rata Information.

[79] *See* 47 CFR § 54.675(f) (2018); FY2016 Filing Windows and Pro-rata Information. All qualifying requests submitted before the September 1 – November 30, 2016 filing window period received 100% of the requested funding. FY2016 Filing Windows and Pro-rata Information.

[80] *See supra* para 4; *RHC Fifth Order on Reconsideration and Fourth Report and Order*, 13 FCC Rcd at 14940-41, para. 40.

[81] *See Application for Review of a Decision of the Wireline Competition Bureau by Yakutat School District*, CC Docket No. 02-6, 29 FCC Rcd 10746, 10749, para. 8 (2014); *supra* para 10, note 52. In this instance, TCC seeks full RHC Program support for all 30 of the clinics in its consortium for funding year 2016, including the three clinics where TCC never filed applications for support. *See* TCC Request for Review and Waiver at 2, 14-17.

[82] *Rural Health Care Support Mechanism*, WC Docket No. 02-60, Order, 32 FCC Rcd 5463, 5464, para. 5 (2017) (*Alaska Waiver Order*) (waiving, *sua sponte*, the Commission's rules to assist remote Alaskan health care providers impacted by the RHC Program proration in funding year 2016).

[83] *See id.* at 5464-67, paras. 6-12.

the Request for Review and Waiver filed by the Tanana Chiefs Conference on April 28, 2017 IS DENIED.

18.    IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1-4 and 254 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154 and 254, and sections 0.91, 0.291, and 1.93 of the Commission's rules, 47 CFR §§ 0.91, 0.291, and 1.93 that the Proposed Consent Decree submitted by Tanana Chiefs Conference IS DISMISSED with prejudice.

19.    IT IS FURTHER ORDERED, pursuant to section 1.103(a) of the Commission's rules, 47 CFR. § 1.103(a), that this Order SHALL BE EFFECTIVE upon release.

FEDERAL COMMUNICATIONS COMMISSION

Ryan B. Palmer
Chief
Telecommunications Access Policy Division
Wireline Competition Bureau

# EXHIBIT C

# PUBLIC NOTICE

**Federal Communications Commission**
**445 12th St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: https://www.fcc.gov
TTY: 1-888-835-5322

**DA 20-224**
**Released:  March 4, 2020**

## WIRELINE COMPETITION BUREAU SEEKS COMMENT ON TANANA CHIEFS CONFERENCE APPLICATION FOR REVIEW

### WC Docket No. 02-60

**Comment Date: April 3, 2020**
**Reply Comment Date: April 20, 2020**

By this Public Notice, the Wireline Competition Bureau (Bureau) seeks comment on the Application for Review filed by Tanana Chiefs Conference (TCC).[1]  GCI seeks review of a Bureau decision that dismissed a request filed by TCC that sought review of a prior Bureau decision upholding a denial by the Universal Service Administrative Company to allow TCC to file three funding requests after the filing deadline for Funding Year 2016 had passed in the Telecom Program of the Rural Health Care Universal Service Mechanism.[2]

Interested parties may file comments and reply comments on or before the respective dates indicated above.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS), or by filing paper copies.

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  https://www.fcc.gov/ecfs/filings.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.  Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

  - All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of <u>before</u> entering the building.

  - Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

  - U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington, DC 20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at (202) 418-0530 (voice), (202) 418-0432 (TTY).

---

[1] Tanana Chiefs Conference, Application for Review, WC Docket 02-60 (filed Feb. 14, 2020).

[2] *Id.* at 2.

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[3]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

For further information, please contact Bryan P. Boyle, Telecommunications Access Policy Division, Wireline Competition Bureau at (202) 418-7924 or via email at Bryan.Boyle@fcc.gov.

**– FCC –**

---

[3] 47 CFR §§ 1.1200 *et seq.*

# EXHIBIT D

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Request for Review and Waiver of a | ) | |
| Decision by the Universal Service | ) | |
| Administrator by | ) | |
| | ) | HCPs Nos. 10720, et al. |
| Tanana Chiefs Conference | ) | WC Docket No. 02-60 |
| Fairbanks, AK | ) | |
| | ) | |
| Interior Alaska Regional Health Consortium | ) | |
| | ) | |
| Rural Health Care Universal Service | ) | |
| Support Mechanism | ) | |
| | ) | |

To: The Wireline Competition Bureau

## REPLY COMMENTS

Pursuant to the Wireline Competition Bureau's ("WCB") Public Notice dated March 4, 2020,[1] Tanana Chiefs Conference ("TCC") files these Reply Comments in the above-captioned proceeding. WCB seeks comment on TCC's Application for Review ("Application")[2] of WCB's January 15, 2020 Order ("Order"),[3] denying the Request for Review or Waiver ("Waiver

---

[1] *Wireline Competition Bureau Seeks Comment on Tanana Chiefs Conference Application for Review*, Public Notice, DA 20-224 (March 4, 2020).

[2] *In the Matter of Request for Review and Waiver of a Decision by the Universal Service Administrator by Tanana Chiefs Conference, Fairbanks, AK,* Tanana Chiefs Conference, Application for Review, WC Docket No. 02-60 (filed Feb. 14, 2020).

[3] *In the Matter of Request for Review and Waiver of a Decision by the Universal Service Administrator by Tanana Chiefs Conference, Fairbanks, AK, Order*, DA 20-64, HCPs Nos. 10720, *et. al.*, WC Docket No. 02-60 (rel. January 15, 2020).

Request") TCC filed on April 28, 2017.[4]  For the reasons stated herein, TCC concurs with all of comments filed in this proceeding, as they uniformly support grant of TCC's Application.

## I. **Summary of Submitted Comments**

Twenty-four comments were filed in support of TCC's Application,[5] and one set of reply comments in support has been filed.[6]  No opposition comments were filed.[7]

### A. Rural Communities that Depend on TCC's Telehealth Services

Many of the comments were submitted by officials of communities located in TCC's region, wherein the citizens depend on health care provided by TCC's clinics ("Rural Community Officials' Comments").  In stating their support for TCC's Application and funding for the three TCC rural health care clinics that were denied funding by USAC in FY16 ("HHC Clinics")[8] these officials delineated the following:

---

[4] *See Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Administrative Corporation*, WC Docket No. 02-60 (filed Apr. 28, 2017) ("Waiver Request").

[5] *See* Comments of Bristol Bay Area Health Corporation (filed Mar. 30, 2020), Mt. Sanford Tribal Consortium (filed Mar. 31, 2020), Copper River Native Consortium (filed Mar. 31, 2020), Maniilaq Association (filed Mar. 31, 2020), Alaska Native Tribal Health Consortium (filed Mar. 31, 2020), Alaska Legal Services Corporation (filed Mar. 31, 2020), Hughes Village Council (filed Apr. 1, 2020), Alaska Native Health Board (filed Apr. 1, 2020), Healy Lake Village Council (filed Apr. 1, 2020), Nulato Tribal Council (filed Apr. 1, 2020), Native Village of Stevens (filed Apr. 1, 2020), Manley Hot Springs Village (filed Apr. 1, 2020), Circle Tribal Council (filed Apr. 1, 2020), Eagle Village Council (filed Apr. 1, 2020), Huslia Tribal Council (filed Apr. 1, 2020), Native Village of Tetlin (filed Apr. 1, 2020), Kaltag Tribal Council (filed Apr. 1, 2020), Koyukuk Village Council (filed Apr. 1, 2020), Tanacross Village Council (filed Apr. 1, 2020), Chalkyitsik Village Council (filed Apr. 1, 2020), Louden Tribal Council (filed Apr. 1, 2020), Rampart Village Council (filed Apr. 1, 2020), Native Village of Minto (filed Apr. 2, 2020), and  Evansville Tribal Council (filed Apr. 2, 2020).

[6] *See* Reply Comments of ADS Advanced Data Services, Inc. (filed Apr. 10, 2020).

[7] Based on a review of the FCC's ECFS database for WC Docket 02-60. Last checked on April 16, 2020: https://www.fcc.gov/ecfs/search/filings?proceedings_name=02-60&sort=date_disseminated,DESC

[8] *See* TCC's Application at 1-5 (citations omitted).

-2-

- Access to telehealth in their communities is essential, due to extreme weather conditions and lack of reliable air transportation to a health clinic in Fairbanks, which is the only, and often unviable, alternative to telehealth services for citizens in the TCC region served by the HHC Clinics.

- The necessity for telehealth in the HHC Clinics is more acute now, with the COVID-19 pandemic. Telehealth makes it possible for patients to obtain healthcare without patients having to travel to Fairbanks, or health care providers traveling to the local communities. Such travel could spread COVID-19, which if it infected citizens in the TCC Region could severely endanger the health of hundreds of people in the communities, especially the elderly. Accordingly, fully funded telehealth at the HHC clinics is now more important than ever.

- If the Commission grants TCC's Application and directs USAC to release the funding for the HHC Clinics, the FCC would be helping to prevent the spread of COVID-19 in the TCC Region. The Commission recently did this for other communities by waiving the gift rules applicable to the Rural Health Care ("RHC") Program.

- The communities served by TCC would suffer serious hardships if funding for the HHC Clinics is denied, as TCC would be forced to cut telehealth services as a result. Moreover, WCB's Order did not address key arguments TCC presented in its Waiver Request, including the hardship which the denial of funding for the HHC Clinics would have on patients dependent on telehealth provided at those clinics; nor did it mention how the public interest would be served by denying TCC's underlying Waiver Request. Especially now, considering the COVID-19 epidemic, TCC's Application must be granted and the funding TCC requested should be expeditiously provided.[9]

B. Officials of Rural Health Care Organizations

Officials of Alaskan rural heath care organizations also submitted comments in support of TCC's Application ("Rural Health Care Officials' Comments"). The critical points raised by these officials are as follows:

- Many of the rural communities their organizations serve are "off the road," meaning that residents cannot drive to clinics or hospitals when they require

---

[9] *See e.g.,* Comments of Evansville Tribal Council at 1-2 (citations omitted); Comments of Huslia Tribal Council at 1-2 (citations omitted); Comments of Circle Tribe Council at 1-2 (citations omitted); Comments of Chalkyitsik Village Council at 1-2 (citations omitted); Comments of Eagle Village Council at 1-2 (citations omitted); Healy Lake Village Council at 1-2 (citations omitted); and Tanacross Village Counsel at 1-2 (citations omitted).

health care services. Accordingly, telehealth, such as that provided by TCC, is essential for patients in rural areas of Alaska.

- Funding provided by the Indian Health Service ("IHS") is insufficient to meet the demands of Alaska tribal health organizations such as TCC. Hence, full RHC funding is crucial to delivering telehealth services to rural communities.

- The FCC is very cognizant of the COVID-19 pandemic; it waived the gift rule as it applies to the RHC program, noting that health care providers need additional broadband capacity to combat the COVID-19 pandemic. If the Commission denies TCC's requested funding, it is essentially asking TCC to repay funds it critically needs during this public health emergency. Denying TCC's Application could exacerbate the COVID-19 emergency in the areas served by TCC.

- WCB's Order did not address important precedents and statutes cited by TCC in its underlying waiver request, nor did it address TCC's public interest and hardship arguments, as it is required to do by law.

- WCB took an inordinate amount of time - nearly three years - to issue a decision on TCC's waiver request, which concerns public health matters. The Order did not explain why it took so long for WCB to release a decision on a straightforward pleading; no complex or novel issues were presented by TCC.

- For the above-stated reasons, WCB's Order, if allowed to stand, might discourage other organizations from filing appeals, regardless of the merits of their cases. The Order runs counter to the administrative appeals process. The Commission has the opportunity to do right by TCC and the communities it serves by granting TCC's Application and providing the RHC funding requested by TCC.[10]

C. Provider of Legal Services to Low-Income Alaskans

- The Alaska Legal Service Corporation ("ALSC"), an agency providing legal services to low-income Alaskans facing civil legal issues, such as family law, housing, health care, and issues specific to the elderly; also filed comments in support of TCC. ALSC explains that that life-threatening legal issues are both the cause and result of inadequate health care.

- Because rural communities have less access to health care than their urban counterparts, telehealth is essential to reducing the likelihood that rural Alaskans will face life-threatening legal issues. Demand for ALSC's services already

---

[10] *See e.g.,* Comments of Bristol Bay Area Health Corporation at 1-2 (citations omitted); Comments of Alaska Native Health Board at 1-2 (citations omitted); Alaska Native Tribal Health Consortium at 1-2 (citations omitted); Comments of Maniilaq Association at 1-2 (citations omitted); and Comments of Mt. Sanford Tribal Consortium at 1-2 (citations omitted).

exceeds its resources, forcing it to reject nearly half of the people who seek its legal assistance each year. If the FCC does not grant TCC's Application and distribute funding for the HHC Clinics, ALSC may have to deny more services to rural Alaskans whose legal issues could have been prevented. Consequently, denial of TCC's Application would result in TCC's patients suffering hardships beyond their health care needs.[11]

D.    Small Business that Assists RHC Applicants

- Advanced Data Services, Inc. ("ADS") a company that assists RHC applicants with administrative matters, filed reply comments in support of TCC. ADS explains that, based on its experience, RHC applicants often make inadvertent mistakes and filing errors. The imposition of multiple RHC filing windows for the first time in FY16 which resulted in untimely filing of TCC's Forms 466 constitutes a "radical change in program rules," which are special circumstances that, based on precedent cited by TCC in its Waiver Request, warrant a waiver of the filing deadline rules for TCC.

- Regarding RHC funding, unused funds from FY16 or later years to provide relief to TCC.

- In these times of uncertainty and unprecedented circumstances (presumably referring to the COVID-19 pandemic), decisions by the FCC to help members of rural Alaskan communities "are of far greater concern and importance."

- The Commission may waive its rules for good cause shown and the FCC may waive a rule when strict compliance with same disserves the public interest. The Commission may also take into consideration hardship, equity, and more effective implementation of a policy. TCC has shown that it has met the requirements necessary for its Waiver Request to be granted.[12]

## II. Commenters Concur with TCC's Critical Health and Public Interest Arguments

As illustrated by the summaries above, commenters are unanimous in their statements concerning the need for full funding for telehealth services for rural clinics, including the HHC Clinics, and the hardships that patients would suffer if TCC were forced to curtail services. The

---

[11] *See* Comments of Alaska Legal Services Corporation at 1.

[12] *See* Reply Comments of ADS Advanced Data Services, Inc. at 1-2 (citation omitted).

comments comport with the Commission's established rural health care policy – the crux of which is to ensure that rural health care clinics are fully funded for critical telehealth service - which TCC delineated in its Application and underlying Waiver Request.[13]

The comments are important because they illustrate the importance of WCB upholding the Commission's rural health care policy. As TCC illustrated in its Application, WCB inexplicably deviated from that policy by denying crucial RHC funding for the HHC Clinics, and did not address TCC's public interest arguments.[14] WCB's departure from the policy and its failure to discuss TCC's public interest arguments, constitute an abuse of discretion that warrants reversal of the Order.[15]

The commenters also raise critical points concerning the Commission's need to abide by its rural health care policy by providing assistance to rural clinics to ensure robust continuity of telehealth services during the COVID-19 pandemic, including providing full funding for the HHC Clinics as requested by TCC. Indeed, WCB recently undertook significant actions intended to enable rural health care providers contain transmission of COVID-19 by enhancing telehealth services in rural areas.

First, WCB waived the RHC and E-Rate Gift Rule to ensure that health care providers have the resources they need to provide adequate telehealth services to respond effectively to COVID-19.[16]

---

[13] *See* Application at 8-10 (citations omitted) and Waiver Request at 5-7.

[14] Application at 10 (citations omitted).

[15] *Id.* (citations omitted).

[16] *See Rural Health Care Universal Service Support Mechanism, Schools and Libraries Universal Service Support Mechanism, Order*, DA 20-290, ¶¶ 8-9 (rel. Mar. 18, 2020) (citations omitted).

Second, WCB waived the FY20 RHC application filing window, directing USAC to extend the filing deadlines for Forms 462 and 466 in order to "minimize the disruptions caused by the COVID-19 pandemic that are facing health care providers around the country . . . ."[17] WCB decided to waive its rules because strict adherence to them would be contrary to the public interest, considering hardship, equity, and more effective implementation of its rural health care policy.[18]  Said WCB: "We find that the scale of the current public health emergency, the extensive disruption to health care providers throughout the county, and the enhanced need for telehealth and telemedicine services caused by COVID-19 present a compelling and unique circumstances that merit waiver of the rules and the additional relief discussed below. We conclude that any potential costs to the RHC Program that could result from this order will be clearly outweighed by the benefits of our actions."[19]

This is yet another instance of WCB granting a waiver based on public interest and hardship concerns, whereas it utterly failed to consider any of the similar arguments presented by TCC in its Waiver Request.[20] This case also upholds the Commission's rural health care policy,[21] but WCB deviated from it, without explanation, in TCC's case.[22]

The precedent created by this recent order is more evidence that TCC is entitled to full funding for its HHC Clinics.  As TCC stated in its Application, "TCC will ultimately have to pay the full amount owed to its communications provider, and if RHC funding is denied, funding for other critical health care [services] (*i.e.*, telehealth) would be diverted, causing hardship to

---

[17]*See Rural Health Care Support Mechanism, Order*, DA 20-345, ¶ 6 (rel. Mar. 26, 2020) ("RHC Order").

[18] *Id.* at ¶ 4.

[19] *Id.* at ¶ 5.

[20] *See* Application at 8-10, 18-22 (citations omitted).

[21] *See* RHC Order at ¶¶ 1, 3-6.

[22] *See* Application at 8-10 (citations omitted).

TCC's entire service area."[23] TCC remains in the same position today, doing the best it can to provide telehealth services during the COVID-19 pandemic. As diversion from telehealth resources is exactly the reason why WCB waived its RHC filing deadline rules in this instance,[24] WCB should waive the FY16 filing deadlines, as requested by TCC.  As stated in the Rural Health Care Officials' Comments: "If the Commission denies TCC's requested funding, it is essentially asking TCC to repay funds it critically needs during this public health emergency. Denying TCC's Application could exacerbate the COVID-19 emergency in the areas served by TCC."

WCB's conclusion that "any potential costs to the RHC Program that could result from this order will be clearly outweighed by the benefits of our actions"[25] should also apply to TCC's situation. TCC explained at length how WCB's statement that "no funding year 2016 funds remain to provide additional support for funding year 2016, as TCC suggests" was a misstatement of fact, and that financial sources exist to provide the funding TCC requests.[26]

ADS' Comments make the salient point that funding the HCC Clinics as requested by TCC should not be an issue: "Regarding RHC funding, unused funds from FY16 or later years to provide relief to TCC," which corresponds to one of the funding arguments TCC made in its Application.[27] As discussed above, TCC's situation is applicable here, and accordingly it should be fully funding, in spite of "any potential costs to the RHC Program."

---

[23] *Id.* at 5.
[24] See RHC Order at ¶¶ 4-6.
[25] *Id.* at ¶ 5.
[26] *See* Application at 22-24 (citations omitted).
[27] *Id.* at 23-24.

### III.    Commenters Support TCC's Administrative Procedure Arguments

The Rural Health Care Officials' Comments state that the Order did not address important precedents and statutes cited in TCC's Waiver Request, nor did it explain why WCB took so long to issue a decision, which could discourage other organizations from filing appeals, regardless of the merits of their cases.   Hence, the Order runs counter to the administrative appeals process.

TCC concurs completely with those comments.  As delineated in its Application, TCC asserted that WCB flouted binding legal precedents by declining to grant TCC's Waiver Request, when it had granted waivers to similarly situated applicants.[28]  Additional precedents for granting TCC's Waiver Request have been issued by WCB since the filing of the Application.  One such precedent is, as discussed above, the RHC Order.

Another precedent was established by an order released on February 19, 2020, wherein WCB granted waiver to an Alaskan health care provider that violated a procedural rule which resulted in USAC denying the provider's FY17 funding requests.[29] The Commission granted the petitioner's waiver request because strict enforcement of the procedural rule was: (a) not necessary to achieve policy objectives; and (b) inconsistent with the public interest.[30] Also, WCB found no evidence of waste, fraud or abuse.[31]

While the facts of that case are somewhat different to those of TCC, the precedent holds because, as TCC explained in its Application, WCB denied TCC's request for waiver of a procedural rule where no evidence of waste, fraud or abuse was found, while also failing to

---

[28] *Id.* at 11-17 (citations omitted).
[29] See Request for Waiver or Review by Maniilaq Association of Decision of Universal Service Administrator, Order, DA 20-173 (rel. Feb. 19, 2020) at ¶ 4.
[30] *Id.* at ¶ 9.
[31] Id. at ¶ 10.

consider TCC's policy and public interest arguments.[32] This is yet another instance wherein WCB failed to treat TCC in the same manner as a similarly situated entity, in violation of binding precedent.[33]

**IV.   Conclusion**

For all the foregoing reasons, TCC concurs with all the aforementioned comments. Those comments support grant of TCC's Application and full funding for the HHC Clinics as requested in TCC's Waiver Request.  Accordingly, TCC reiterates its request that the Commission reverse WCB's Order and grant the relief requested in its Waiver Petition.

Respectfully submitted,

Tanana Chiefs Conference

By      /s/Ronald E. Quirk
        Allison D. Rule
        Ronald E. Quirk
        Its Counsel
        Marashlian & Donahue, PLLC
        1420 Spring Hill Road, Suite 401
        Tysons, VA 22102
        (703) 714-1305
        www.commlawgroup.com

April 17, 2020

---

[32] *See* Application at 8-10, 11-17, 18-22 (citations omitted).
[33] *Id.* at 11 (citations omitted).

-10-

# EXHIBIT E

EVANSVILLE TRIBAL COUNCIL
PO BOX 26087
BETTLES FIELD, ALASKA 99726
PHONE: (907)692-5005 FAX: (907)692-5006
EMAIL:  evansvillealaska@gmail.com

March 27, 2020

Marlene H. Dortch, Secretary
Federal Communications Commission
Office of the Secretary
445 12th Street, SW
Washington, DC 20554

### *WC Docket No. 02-60, HCP Nos. 10720, et al.*

Dear Ms. Dortch,

My name is Frank Thompson, First Chief of Evansville Tribal Council. Our community is located in the Tanana Chiefs Conference (TCC) region.[1] TCC is the main health care provider for a majority of the communities in our region. I write in support of TCC's Application for Review (Application) and for the funding of the three rural health care clinics (HHCs) that were denied in Funding Year 2016.

Access to telehealth in our community is essential to living in remote rural Alaska. Extreme weather conditions not experienced in the "Lower 48" and lack of reliable air transportation, which in many communities is the only reasonable form of transportation to the Chief Andrew Isaac Health Clinic in Fairbanks, AK, make telehealth a necessity in the TCC region.

In other words, telehealth is a tool that bridges the gap for communities like mine and allows access to medical providers that are not available in my community. Without the telehealth services provided at the HHCs, there is no viable option for providing high quality health services in our communities.

The necessity for telehealth in rural interior Alaska is even more evident now with the COVID-19 pandemic. Travel between my community and Fairbanks is mainly done by air. Telehealth makes it so that community members needing medical care do not have to travel to Fairbanks and providers from Fairbanks do not have to come to my community. Both measures reduce the spreading of COVID-19, which if introduced in rural Alaska would wipe out our communities of 50-500 people, including a high percentage of elders.

The Commission can do its part to help prevent this from happening in the TCC region, as it recently did for other communities in when it waived the gift rules applicable to the Rural Health

---

[1] TCC's region covers an area of 235,000 square miles in interior Alaska, which is equal to 37% of the entire state and is just slightly smaller than the size of the state of Texas.

Care (RHC) and E-Rate programs in response to the COVID-19 pandemic,[2] by granting TCC's Application and releasing the funding as requested by TCC.

Rural communities served by TCC's health care system would suffer hardships if funding was denied and services were decreased in any way as a result of this matter. The FCC's January 15, 2020 order did not address TCC's hardship argument, nor did it mention how or why the public interest would be served by denying TCC's waiver request. Now that the COVID-19 pandemic is here and not simply a hypothetical, TCC's Application must be granted.

Sincerely,

Frank Thompson, First Chief

---

[2] *See In the Matter of Rural Health Care Universal Service Support Mechanism, Order,* DA 20-290 (March 18, 2020) at para. 1.

# EXHIBIT F



MARASHLIAN
& DONAHUE, PLLC
THE *COMMLAW* GROUP

February 2, 2021

**Via ECFS & Email**

*Ex Parte*
Ms. Marlene H Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re:    **Tanana Chiefs Conference:  Urgent Request for Expedited Action**
       **Rural Health Care Support Mechanism, WC Docket No. 02-60**

Dear Ms. Dortch,

On behalf of my client, Tanana Chiefs Conference ("TCC"), this is an *ex parte* filing in the above-referenced proceeding. The purpose of this filing is to urge the Commission to take expedited action on TCC's pending Application for Review,[1] which seeks a favorable decision on its Request for Review and Waiver ("Waiver Request").[2] The Waiver Request, filed on April 28, 2017, was pending for *nearly three years* before the Wireless Competition Bureau ("Bureau") issued an Order, which, as described below, was apparently forced by the D.C. Circuit Court of Appeals. The associated Application for Review has been pending for nearly a year. A copy of the Waiver Request is here. A copy of the Application for Review is here.

By way of background TCC, in its Waiver Request, asked that that the Bureau review and reverse a decision by the Universal Service Company ("USAC") denying TCC's request to file three FCC Forms 466 outside of the USAC-imposed filing windows for the Rural Health Care ("RHC") Program for Funding Year 2016 ("FY16"). USAC's action resulted in TCC being denied needed funding for telehealth services in rural Alaska. A full history of this proceeding can be found in TCC's Application for Review and TCC's Reply Comments, filed on April 17, 2020,[3] a copy of which is here.

The FCC's rules provide an expectation for how long it should take the Commission and Bureau to issue a written decision on USAC rulings that are challenged – 90 days.[4] Commission Rule 54.724(b) provides, in pertinent part: "The Commission shall issue a written decision in response to a request for review of an Administrator decision that involves novel questions of fact, law, or policy within ninety (90) days . . . . The Wireline Competition Bureau also may extend action on a request for review of an Administrator decision for a period of up to ninety days."[5] As stated above, TCC's Waiver Request was pending for almost

---

[1] *See In the Matter or Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Company, Application for Review*, WC Docket No. 02-60 (Feb. 14, 2020).

[2] *See In the Matter or Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Company, Request for Review and Waiver*, WC Docket 02-60 (April 28, 2017).

[3] *See In the Matter or Request for Review and Waiver by Tanana Chiefs Conference of Decision by the Universal Service Company, Reply Comments*, WC Docket No. 02-60 (April 17, 2020).

[4] In *LaBonne v. Heckler*, 574 F.Supp. 1016 (D. Minn. 1983), the District Court found that where applicants were "caught in the administration's appeal process for as long as one to two years," the APA's reasonable time requirements mandated that agency answer complaints seeking review of denial of benefits "within the normal 60 days allotted to it").

[5] 47 C.F.R. § 54.724(b).

---

Page 2

three years, and there has been no decision issued by the Commission since TCC filed its Application for Review a year ago. This is much longer than the 90 day period mandated by the Commission's rules.

Since the Waiver Request was filed, TCC filed many letters with the Bureau and made several visits to same, attempting to obtain a decision, all to no avail.[6]  With no other choice, on October 29, 2019, TCC was forced to file a Petition for Writ of Mandamus with the D.C. Circuit.[7] On January 8, 2020, the D.C. Circuit issued an Order, directing the Commission to provide a written response to TCC's Mandamus Petition.[8]  On January 15, presumably in response to the D.C. Circuit's Order, the Bureau released an Order, denying TCC's Waiver Request,[9] to which TCC filed its Petition for Review.

This proceeding has been extremely drawn out. The Bureau's actions have forced TCC to expend an inordinate amount of resources, financial and otherwise, in order to obtain its requested relief; relief that the Commission has granted to many similarly-situated entities.[10]  The resources expended by TCC could have used to provide direct and telehealth services to the patients served by these clinics.

TCC respectfully requests expedited action on its Application for Review, which if granted would provide funding for critical telehealth services that TCC provides its three rural health care providers ("HCPs"), as they are the only such providers in the remote areas of Huslia, Hughes, and Chalkyitsik in Alaska.  Residents in those communities completely depend on the services provided by TCC for its health care services.  USAC's decision resulted in a $633,171 shortfall for TCC.  Accordingly, expedited action and a favorable decision on TCC's Application for Review are critical to ensure that funds for healthcare services are used for health care services for the three HCPs ; services that are even more crucial now, during the COVID-19 pandemic.

Summaries of the comments that were filed in this proceeding are instructive. The Commission solicited comments on TCC's Application for Review. A total of 25 comments were filed, all of which supported TCC's position.[11] Some of the comments are summarized as follows:

- Access to telehealth in their communities is essential, due to extreme weather conditions and lack of reliable air transportation to TCC's health clinic in Fairbanks.

- The necessity for telehealth in the HHC Clinics is more acute now, with the COVID-19 pandemic. Telehealth makes it possible for patients to obtain healthcare without patients having to travel to Fairbanks, or health care providers traveling to the local communities. Such travel could spread COVID-19, which if it infected residents in the TCC Region could severely endanger the health of hundreds of people in the communities, especially the elderly. Accordingly, fully funded telehealth at the HHC clinics is now more important than ever.

- If the Commission grants TCC's Application and directs USAC to release the

---

[6] *See Application for Review* at Exhibits E-G.

[7] *Id.* at Exhibit H (citation omitted).

[8] *Id.* at Exhibit I (citation omitted).

[9] *In the Matter of Request for Review and Waiver of a Decision by the Universal Service Administrator by Tanana Chiefs Conference, Fairbanks, AK, Order*, DA 20-64, HCPs Nos. 10720, *et. al.*, WC Docket No. 02-60 (rel. January 15, 2020).

[10] *See Application for Review* at 11-17 (citations omitted).

[11] *See Reply Comments* at 2.

Page 3

funding for the HHC Clinics, the FCC would be helping to prevent the spread of COVID-19 in the TCC Region. The Commission recently did this for other communities by waiving the gift rules applicable to the Rural Health Care ("RHC") Program.

• WCB's Order did not address key arguments TCC presented in its Waiver Request, including the hardship which the denial of funding for the HHC Clinics would have on patients dependent on telehealth provided at those clinics; nor did it mention how the public interest would be served by denying TCC's underlying Waiver Request. Especially now, considering the COVID-19 epidemic, TCC's Application must be granted and the funding TCC requested should be expeditiously provided.

• Many of the rural communities their organizations serve are "off the road," meaning that residents cannot drive to clinics or hospitals when they require health care services. Accordingly, telehealth, such as that provided by TCC, is essential for patients in rural areas of Alaska.

• Funding provided by the Indian Health Service ("IHS") is insufficient to meet the demands of Alaska tribal health organizations such as TCC. Hence, full RHC funding is crucial to delivering telehealth services to rural communities.

• The FCC is very cognizant of the COVID-19 pandemic; it waived the gift rule as it applies to the RHC program, noting that health care providers need additional broadband capacity to combat the COVID-19 pandemic. If the Commission denies TCC's requested funding, it is essentially asking TCC to repay funds it critically needs during this public health emergency. Denying TCC's Application could exacerbate the COVID-19 emergency in the areas served by TCC.[12]

For all the forgoing reasons, TCC respectfully requests that the Commission take expedited action to grant TCC's Application for Review and provide the relief requested in TCC's Waiver Request.

Sincerely,

Allison D. Rule
Ronald E. Quirk
Counsel to Tanana Chiefs Conference

cc (via email):
Jessica Rosenworcel, Chairwoman
Kris Anne Monteith, Chief, WCB
Bryan Boyle, Deputy Division Chief, TAPD

---

[12] *Id.* at 3-4 (citations omitted).

COMMLAWGROUP.COM

# EXHIBIT G

**From:** Ronald Quirk <req@commlawgroup.com>
**Sent:** Tuesday, February 02, 2021 4:50 PM
**To:** Kris Monteith <Kris.Monteith@fcc.gov>
**Subject:** Critical Rural Telehealth Matter - Request for Expedited Action

Dear Ms. Monteith,

I am writing on behalf of my client, Tanana Chiefs Conference ("TCC"), an intertribal consortium that provides telehealth services to clinics in rural Alaska serving Native Alaskans, many of whom have no other means of obtaining medical care. Today TCC filed the attached Request for Expedited Action regarding a funding matter that has been outstanding at the Commission since April 2017. I know that your time is extremely limited, but if your office could work with the full Commission to effectuate an expedited decision on the pending Application for Review, TCC and its clinics would be most grateful. The attached letter describes the history of the proceeding and need for funding.

Thank you very much for your attention to this matter.

Respectfully,

Ronald E. Quirk, Esq.
Head of IoT Practice
Marashlian & Donahue, PLLC
1430 Spring Hill Road
Tysons, VA 22102
Office Tel: (703) 714-1305
Office Fax: (703) 563-6222
Cell: (202) 299-7732
Email: req@commlawgroup.com
Website: www.commlawgroup.com

**From:** Kris Monteith <Kris.Monteith@fcc.gov>
**Sent:** Tuesday, February 2, 2021 5:30 PM
**To:** Ronald Quirk <req@commlawgroup.com>
**Cc:** Adam Copeland <Adam.Copeland@fcc.gov>
**Subject:** RE: Critical Rural Telehealth Matter - Request for Expedited Action

Thank you for the courtesy copy of your filing, Mr. Quirk.  I am also copying Adam Copeland, Associate Bureau Chief in WCB, on this email and will send him your letter separately.

Best, Kris

*Kris Anne Monteith*
Chief
Wireline Competition Bureau
Federal Communications Commission
(202) 418-1098

# EXHIBIT H

## Ronald Quirk

| | |
|---|---|
| **From:** | Ronald Quirk |
| **Sent:** | Friday, March 10, 2023 4:04 PM |
| **To:** | alejandro.roark@fcc.gov |
| **Cc:** | adam.copeland@fcc.gov; Bryan.Boyle@fcc.gov |
| **Subject:** | Critical Rural Telehealth Matter, WC Docket No. 02-60 - Request for Expedited Action |
| **Attachments:** | TCC Ex Parte Letter (2-2-2021) Final.pdf |

Dear Mr. Roark,

On behalf of my client, Tanana Chiefs Conference ("TCC"), I am writing to request that the Bureau take expedited action to issue a decision on TCC's Application for Review, which has been pending since February 14, 2020. The attached letter provides detailed background on this proceeding and links to important filings.

As shown by the email string below, the last time TCC has heard from the Commission regarding this matter was on February 2, 2021, more than three years ago. A review of the record in this proceeding, as summarized in the attached letter, illustrates the importance of the subject funding to rural clinics that TCC serves. Accordingly, my client requests a prompt response to this email and a rapid decision on the Application for Review. Four years is an inordinately long time for the Commission to rule on such an important matter. My client has authorized me to file another petition for writ of mandamus with the D.C. Circuit Court of Appeals if a decision is not expeditiously released. A previous petition (as shown by an attachment to the Application for Review) was decided in TCC's favor by the D.C. Circuit.

As shown by the history of this proceeding, TCC has patently and respectfully worked with the Commission since April 2017 to achieve the funding to which it is entitled. TCC is happy to discuss this matter further with the Commission and provide any additional information the Commission may need to effectuate an equitable decision. But, TCC simply cannot wait much longer for its funding.

Thank you very much for your attention to this matter. TCC looks forward to your response. Please address all correspondence regarding his matter to the undersigned.

Respectfully Submitted,

Ronald E. Quirk
Head of IoT Practice
MARASHLIAN & DONAHUE, PLLC
The CommLaw Group
1430 Spring Hill Road, Suite 310
Tysons, Virginia 22102
 Office Tel: 703-714-1305
Cell: 202-299-7732
Office Fax: 703-563-6222
E-Mail: req@commlawgroup.com
Website: www.CommLawGroup.com

---

**From:** Kris Monteith <Kris.Monteith@fcc.gov>
**Sent:** Tuesday, February 2, 2021 5:30 PM
**To:** Ronald Quirk <req@commlawgroup.com>

**Cc:** Adam Copeland <Adam.Copeland@fcc.gov>
**Subject:** RE: Critical Rural Telehealth Matter - Request for Expedited Action

Thank you for the courtesy copy of your filing, Mr. Quirk. I am also copying Adam Copeland, Associate Bureau Chief in WCB, on this email and will send him your letter separately.

Best, Kris

*Kris Anne Monteith*
Chief
Wireline Competition Bureau
Federal Communications Commission
(202) 418-1098

---

**From:** Ronald Quirk <req@commlawgroup.com>
**Sent:** Tuesday, February 2, 2021 4:50 PM
**To:** kris.monteith@fcc.gov
**Subject:** Critical Rural Telehealth Matter - Request for Expedited Action

Dear Ms. Monteith,

I am writing on behalf of my client, Tanana Chiefs Conference ("TCC"), an intertribal consortium that provides telehealth services to clinics in rural Alaska serving Native Alaskans, many of whom have no other means of obtaining medical care. Today TCC filed the attached Request for Expedited Action regarding a funding matter that has been outstanding at the Commission since April 2017. I know that your time is extremely limited, but if your office could work with the full Commission to effectuate an expedited decision on the pending Application for Review, TCC and its clinics would be most grateful. The attached letter describes the history of the proceeding and need for funding.

Thank you very much for your attention to this matter.

Respectfully,

Ronald E. Quirk, Esq.
Head of IoT Practice
Marashlian & Donahue, PLLC
1430 Spring Hill Road
Tysons, VA 22102
Office Tel: (703) 714-1305
Office Fax: (703) 563-6222
Cell:  (202) 299-7732
Email: req@commlawgroup.com
Website: www.commlawgroup.com

# EXHIBIT I

**From:** Adam Copeland <Adam.Copeland@fcc.gov>
**Sent:** Wednesday, March 15, 2023 2:26 PM
**To:** Ronald Quirk <req@commlawgroup.com>; Alejandro Roark <Alejandro.Roark@fcc.gov>; Trent Harkrader <Trent.Harkrader@fcc.gov>
**Cc:** Bryan Boyle <Bryan.Boyle@fcc.gov>
**Subject:** RE: [EXTERNAL]: Critical Rural Telehealth Matter, WC Docket No. 02-60 - Request for Expedited Action

(adding Trent Harkrader, Wireline Bureau Chief)

Ronald –

Thank you for your email.  We are looking into this matter further and will be in touch if we have additional questions or require additional information.

Thank you.

Adam Copeland

Adam Copeland
Associate Bureau Chief
Wireline Competition Bureau
Federal Communications Commission
(202) 418-1037
Adam.Copeland@fcc.gov